07 Civ. 8813 (RWS)


DECLARATION OF
JOHN A. ORZEL IN OPPOSITION TO DEFENDANT'S M OTION TO
VACATE
MARITIME ATTACHMENT


*Exhibit Q*

DeOrchis Wiener & Partners, LLP
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

*Attorneys for Defendant*
ASPEN INFRASTRUCTURES LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
PROSHIPLINE, INC.,

        Plaintiff,     07 Civ. 10969 (RWS)

- against -          DECLARATION OF SANJEEV
               BANGAD IN SUPPORT OF
               DEFENDANT'S APPLICATION
ASPEN INFRASTRUCTURES LTD., F/K/A
SUZLON INFRASTRUCTURE LTD.,

        Defendant.
-------------------------------------------------------X

I, SANJEEV BANGAD DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOLLOWING IS TRUE AND CORRECT:

*1.* I serve in the capacity of General Manager of Aspen Infrastructures, Ltd. ("AIL"), formally known as Suzlon Infrastructure Ltd. ("SIL") and am, and at all material times have been, a duly authorized agent for AIL/SIL in the above-entitled and numbered cause. I am employed by Suzlon Energy Ltd. AIL/SIL is an associated company of Suzlon Energy Ltd. AIL/SIL is not a subsidiary of Suzlon Energy Ltd (although the two companies do have related directorship and ownership). AIL/SIL is a corporation organized under the laws of India with its main office located in Pune, India. Suzlon Energy Ltd., is engaged in the manufacture and sale of alternative energy producing devices, in particular wind turbines. AIL/SIL is mainly concerned with the sale and distribution of Suzlon Energy's products to the worldwide market. To facilitate that distribution, AIL/SIL has entered into the transportation/logistics business, mainly through the charter of ocean going vessels. While the vessels will normally leave India



with cargoes associated with Suzlon Energy, the vessels were not guaranteed sufficient return cargoes from places like the US, back to Asia. For that reason AIL/SIL undertook to arrange a US agency to secure cargoes for the vessels that AIL/SIL control.

2. On or about April 9, 2006, SIL and EP-Team, Inc. ("EP-Team") entered into a "Sales and Logistics Service Agreement" ("the Agreement"). While the Agreement contains an assignment clause, I do not believe that there was any assignment of the agreement by EP-Team whilst it was effective and at no time did AIL ever receive oral or written notice of any assignment of the contract from EP-Team to ProShipLine. On 14th December 2007 notice of an assignment on the previous day of "all rights...... to sue for and recover damages from Aspen and/or for breach of any other obligations owed by" AIL to EP-Team was given by EP-Team's Texas lawyers to the lawyers representing AIL in Houston. EP-Team has claimed in the litigations that a notice of assignment of the Agreement was sent to me by letter dated April 26, 2006. I do not believe that I received this letter and cannot trace that it was ever received by AIL. I have only seen a crumpled copy provided as an e-mail attachment by EP-Team's lawyers on 19th November 2007. I note that unlike regular communication between the parties it was apparently not sent by either fax or e-mail. Furthermore, I have since learnt that according to a company search ProShipLine, Inc., Nevada was only incorporated on 3rd May 2006 and I note that the letter itself does not actually give notice of an assignment.

3. While AIL had dealings with ProShipLine, such dealings were always on the basis that ProShipLine acted on EP-Team's behalf because EP-Team is the party with whom we negotiated, reached and maintained the contract at issue. At no time did AIL enter a direct contractual relationship with ProShipLine. (Annexed hereto as **Exhibit A** is a true and correct copy of the Agreement).

4. Throughout the dealings between SIL/AIL and EP-Team, the individuals ultimately responsible for managing the relationship were myself for AIL and David Pulk for EP-Team. When AIL/SIL entered into the Agreement, EP-Team was a Nevada corporation. I have subsequently learnt that in about April and May 2007, during the term of the Agreement, EP-Team created a new company in Delaware and merged the Nevada company with it before, apparently, dissolving the Nevada entity. I note that the Certificate of Incorporation of EP-Team, Inc. Delaware was filed on April 25 2007 and signed by Richard A Lowe of Shannon Gracey Ratliff & Miller LLP, Fort Worth (ShannonGracey) as "incorporator" and the Articles

of Merger were filed on May 8 2007 and signed by Richard A Lowe of ShannonGracey as "Asst. Secretary". This was never communicated by EP-Team to AIL/SIL. (Annexed hereto as **Exhibit B** is a copy the Certificate of Incorporation and Articles of Merger)

5. During the operation of the Agreement AIL became increasingly dissatisfied with EP-Team/ProShipLine's administration of the collection of AIL's freight payments, payment of disbursements (port, stevedoring, agency costs, etc.) and the failure to provide adequate accounting of these monies, despite repeated requests for such accounting. In addition, problems arose over communication with EP-Team and ProShipLine. I personally communicated AIL/SIL's concerns to EP-Team, either by telephone or e-mail to David Pulk. By June 2007, matters had deteriorated dramatically and AIL had decided to set up its own office in Houston. I tried to discuss this with EP-Team but was not able to get a response to any of the messages sent to David Pulk.

6. On 13th June 2007 I sent an email to David Pulk of EP-Team. It was addressed to David Pulk but also copied to Neil Johnson, also a director of EP-Team. I explained that AIL had decided to set up its own office in Houston and that therefore "the present arrangements", by which I meant the use of the services provided by EP-Team and ProShipLine under the agreement with EP-Team, would continue only until then. Again, I received no response to this communication. (Annexed hereto as **Exhibit C** is a copy of my e-mail message).

7. Between 13th June and 5th July 2007 AIL further considered what to do about the situation and how to handle the business partly covered by the Agreement with EP-Team. It was decided that it would be preferable that the time chartering of the ships should be dealt with by SE Shipping Lines PTE Ltd, a wholly owned subsidiary of AIL incorporated in Singapore, and that new arrangements would be made by SE Shipping Lines PTE., for the handling of the business in the USA. Accordingly, since I had still not had any response to my attempts to communicate with EP-Team, on 5th July 2007 I sent a further email (this time addressed to "Dear Sirs") to EP-Team, again to David Pulk and Neil Johnson (who was a director of SE Shipping Lines PTE Ltd as well as of EP-Team) informing them that as from 1st August 2007 the owners (by which I meant the time charterers as disponent owners of the ships) would have alternative arrangements in place and "thus ProShipLine will seize [sic] to be our agents." I did not intend this as a notice under the Agreement. To my mind, there was no need to send notice under the Agreement since it was not anticipated that the relevant services provided by EP-

Team/ProShipLine would be required for the time being. (Annexed hereto as **Exhibit D** is a copy of the July 5, 2007 e-mail message).

8. I did not receive any response to my email of 5th July 2007 from EP-Team. However, the following day, 6th July 2007, I received a response on behalf of EP-Team from ShannonGracey. This suggested that my email was a "purported termination" of the Agreement and was "in violation of the Services Agreement". It said that "EP-Team may seek appropriate claims against Suzlon ["AIL"] and you under the Services Agreement and applicable law." (Annexed hereto as **Exhibit E** is a copy of the ShannonGracey letter). AIL instructed English solicitors, Chauncy & Co, and that firm replied to ShannonGracey on 13th July 2007. In that reply, Chauncy & Co made it clear that the notice did not apply to the Agreement. (Annexed hereto as **Exhibit F** is a copy of the Chauncy & Co. reply).

9. By a letter dated 30th July 2007 ShannonGracey gave notice "that EP-Team/ProShipLine will as of midnight July 31, 2007, not be in a position to act in any capacity on behalf of Suzlon and/or its assigned agents for any matters, including, but not limited to, executing/signing bills of lading, arranging cargo deliveries or providing other customary agency activities." (Annexed hereto as **Exhibit G** is a copy of that letter). Subsequently EP-Team and ProShipLine failed to perform any service or undertake any activity in connection with the Agreement save that EP-Team and/or ProShipLine continued to collect freight due to AIL in respect of cargo shipped on board the "BELUGA FASCINATION". Freight thus collected from 30th July onwards was at least US$ 819,099.74 according to bank statements for the "impress account" for this period that were only eventually supplied by EP-Team's London counsel, as an e-mail attachment, on 14th December 2007.

10. More troubling to AIL/SIL and perhaps more indicative of EP-Team/ProShipLine's bad faith is the fact that EP-Team/ProShipLine disregarded my express instructions with regard to the collection of a large freight payment from one of AIL/SIL's major customers, Panalpina, in July, 2007. On July 11, 2007 ProShipLine enquired about who would take care of a Panalpina shipment moving from Bilbao, Spain to Sikka, India. As this movement was not within the geographic limits of the Agreement, I told EP-Team/ProShipLine that AIL/SIL would handle the collection of the freight for that shipment. Contrary to my instructions, EP-Team/ProShipLine invoiced and collected US$ 214,221.63 in ocean freight for that shipment. That amount is still

4

being held by EP-Team/ProShipLine. (Annexed hereto as **Exhibit H** are e-mail exchanges pertaining to this issue).

11. On 3rd August 2007 AIL requested that EP-Team and ProShipLine pay the balance of the freights thus received to AIL. The email was sent by me to David Pulk of EP-Team and Roger Clark and Jessie Baiza of ProShipLine. (Jessie Baiza is David Pulk's brother-in-law and dealt with the accounts at ProShipLine). To date, no payment has been made. (Annexed hereto as **Exhibit I** is a copy of my e-mail message). EP-Team/ProShipLine failed to provide full particulars of the Impress Account, despite several demands. Only on 14th December did they provide statements for July through October, in connection with the Singapore arbitration between SIL/AIL and EP-Team The bank statement for October 30, 2007 shows a balance of US$684,328.07. (Annexed hereto as **Exhibit J** is a copy of that bank statement). They have still not provided statements for the period thereafter.

12. After July 31, 2007, EP-Team and/or ProShipLine received freight payments due and owing to AIL, which they have also withheld. In fact, AIL has calculated that EP-Team and/or ProShipLine withheld freight payments amounting to at least US$952,806.00. Although they have paid some disbursements that I believe may have been properly payable to third parties and have deducted commission for themselves, they have effectively converted the majority of such monies without lawful authority. Those monies are still being withheld from AIL. It has not been possible to determine the exact amount owed to AIL because of the deficiencies in the information provided by EP-Team / ProShipLine. I believe that in order to determine the full amount owed to AIL further information is required from EP-Team and ProShipLine and a further investigation will be necessary. However, it seems clear that there is a substantial amount owed in addition to the balance of about "US$ 699,000" said to be in the account by Jessie Baiza in his statement to the Houston Court of 15th November 2007 and that the true balance owed is in excess of US$ 900,000, although, as I have said I do not believe that it is possible to determine an exact figure without further information and investigation.

13. Attached to this declaration as **Exhibit K** are true and correct copies of invoices received from ProShipLine for agency fees attendant to each vessel voyage. The invoices were sent by ProShipLine. There was no consistency in the timing of the invoices and some were sent a very long time after the relevant voyage. In each case ProShipLine has already deducted the amount invoiced from freight collected on AIL's behalf. Neither EP-Team nor ProShipLine sought the

approval of AIL before making the individual deductions. All amounts owed by AIL to EP-Team under the contract were dealt with in this way. Thus to the best of my knowledge there can be no amount outstanding from AIL to EP-Team in respect of the voyages covered by the invoices. Specifically, AIL was charged and has fully paid the following commissions/fees:

| Vessel | Invoice Date | Amount |
|---|---|---|
| BELUGA REVOLUTION | Nov 2, 2006 | USD 40,857.50 |
| BELUGA SPIRIT | Nov 2, 2006 | USD 71,765.78 |
| MARGARETHA GREEN | Nov 2, 2006 | USD 65,052.26 |
| INSPIRATION | Dec 7, 2006 | USD 2,500.00 |
| ENVEAVOR | Dec 7, 2006 | USD 2,500.00 |
| CENTURY | Dec 10, 2006 | USD 2,500.00 |
| BELUGA REVOLUTION | Jan 11, 2007 | USD 109,932.49 |
| MARGARETHA GREEN | Mar 31, 2007 | USD 68,849.06 |
| BELUGA ETERNITY | May 30, 2007 | USD 83,157.37* |
| BELUGA REVOLUTION | Jun 7, 2007 | USD 60,513.89 |
| BELUGA FUSION | Jul 9, 2007 | USD 59,629.73 |
| BELUGA FUSION | Jul 27, 2007 | USD 27,592.02* |
| BELUGA FASCINATION | Jul 27, 2007 | USD 50,096.41* |
| BELUGA SPIRIT | Jul 31, 2007 | USD 2,500.00* |
| JANA | Jul 31, 2007 | USD 2,500.00* |

Total fees paid: USD 649,946.51

14. I have reviewed each of the foregoing invoices. I certify that each of these invoices was made by EP-Team/ProShipLine and sent to AIL, including the "Paid" stamps. Five of the invoices (each marked with an asterix in the list above and amounting in total to USD 165,845.80) were not marked "Paid", but I now know from the bank statements that these should have also been paid out of freight collected by ProShipLine. In fact a payment out of the impress account was made in respect of the largest of these (US$ 83,157.37) on the same day that the invoice was dated. The foregoing invoices for agency fees are the only ones that AIL has ever received from EP-Team/ProShipLine. They cover all voyages except for the very last. It appears that all commissions have been deducted from the impress account by EP-Team / ProShipLine. I believe that it is most unlikely that anything remains outstanding from AIL under the Agreement.

6

15. EP-Team and ProShipLine have initiated at least three attachment proceedings, in which the amount of claimed damages exceeds USD 5.7 million. During the approximately 15 months that the contract was in place, the total agency fee revenue earned by EP-Team/ProShipLine, not profit, amounted to only USD 678,866.66. Consequently, AIL completely fails to understand how Plaintiffs can demand USD 5.7 million in damages, plus attorney's fees and arbitration costs. EP-Team/ProShipLine was responsible for all of the expenses of the agency activities under the Agreement. AIL/SIL has never been privy to an accounting of EP-Team/ProShipLine's profit and loss statement.

16. AIL/SIL demanded arbitration against EP-Team in Singapore as provided in the Agreement. EP-Team initially failed to participate in that arbitration. Instead it had filed suit against AIL/SIL in the United States District Court for the Southern District of Texas and continued with that action. EP-Team/ProShipLine's law suit sought declaratory relief and an order from the court directing that EP-Team/ProShipLine pay all monies belonging to AIL/SIL into the court. This action has been administratively closed pending the parties' arbitration in Singapore. EP-Team/ProShipLine is still holding the AIL/SIL funds.

17. Aside from the Texas lawsuit, EP-Team/ProShipLine have also filed suit in the United States District Court for the Western District of Washington seeking maritime attachment of any property belonging to AIL/SIL on board any vessel calling at the ports of that district. To date AIL/SIL has had to post a bond in the amount of US$ 532,539.00 to cover fuel that belonged to AIL/SIL on the vessel MARGAETHA GREEN. In addition, EP-Team/ProShipLine removed fuel belonging to AIL/SIL worth more than US$ 93,000 from the vessel BELUGA FUSION, which also called within the district and AIL posted a bond in the amount of US$ 51,455.24.

18. EP-Team/ProShipLine filed a second law suit against AIL/SIL in the Southern District of Texas seeking a maritime attachment of any property belonging to AIL/SIL on board vessels calling within that district. AIL/SIL was successful in having that attachment vacated because AIL/SIL maintains a general agent and conducts business within the Southern District of Texas, a fact that EP-Team/ProShipLine should have known given that EP-Team/ProShipLine dealt with our agent on a regular basis.

19. With regard to the Singapore arbitration, ProShipLine, as opposed to EP-Team, has stated, through its legal counsel, that it will not demand arbitration and that it will instead seek damages against AIL/SIL in the Southern District of Texas. (Annexed hereto as **Exhibit L** is an

exchange between counsel and the arbitral tribunal in Singapore). It is my understanding from reviewing the papers filed by ProShipLine in New York that the purpose of the New York attachment action was stated to the Court to be to obtain security for any eventual arbitration award of ProShipLine against AIL/SIL in Singapore and for security for its attorney fees and arbitration expenses in Singapore. How can ProShipLine maintain this action if it has communicated its intent not to arbitrate?

20. There is no provision in the Agreement which guarantees EP-Team/ProShipLine that AIL/SIL will maintain its transportation service to the United States or that AIL/SIL will not sub-charter its controlled tonnage to a third party. In other words, there is no guarantee in the Agreement that EP-Team/ProShipLine will receive business from the Agreement. This was AIL/SIL's intention with the Agreement because transportation is only an adjunct to our larger business involving alternative energy sources. If the transportation business did not show a profit, AIL/SIL did not want to be in a position where it would have to guarantee to offer space on board ships and payment to EP-Team/ProShipLine.

**I DECLARE UNDER PENALTY OF PERJURY OF UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed:    January 9, 2008

_____
SANJEEV BANGAD

8