07 Civ. 8813 (RWS)


DECLARATION OF
K. MURALITHERAPANY IN OPPOSITION TO DEFENDANT'S MOTION TO
VACATE
MARITIME ATTACHMENT


*Exhibit 8*



Claimant; Sanjeev Bangad ; 1ˢᵗ ; .03.2008

## IN THE MATTER OF AN ARBITRATION

Between

## ASPEN INFRASTRUCTURES, LTD.
## (FORMERLY KNOWN AS SUZLON INFRASTRUCTURE, LTD.)

... Claimant

And

## EP-TEAM, INC.

... Respondent

## AFFIDAVIT

I, Sanjeev Bangad, care of 5ᵗʰ Floor, Godrej Millennium, 9 Koregaon Park Road, Pune, 411-001, Maharashtra, India, do hereby swear/affirm and say as follows:-

1.   I am the General Manager of Suzlon Infrastructure, Limited, (hereinafter "the Claimant"). Suzlon Infrastructure, Ltd. changed its name to Aspen Infrastructures, Ltd. in March 2007, but changed its name back to Suzlon Infrastructure, Limited, on 19ᵗʰ September 2007. I am duly authorised to make this Affidavit on behalf of the Claimant.



2

2.    Insofar as the matters deposed to herein are within my personal knowledge, they are true. Insofar as the matters deposed to herein are not within my personal knowledge, they are based on the Claimant's file, records and papers available to me as General Manager and are to the best of my knowledge and belief.

3.    I annex hereto collectively marked "SB-1" copies of documents referred to in this Affidavit. References to page numbers are references to the page numbers of "SB-1".

4.    By a written agreement dated 9 April 2006, the Claimant and the Respondent entered into a "Sales and Logistics Service Agreement" (hereinafter "the Agreement") wherein the Claimant appointed the Respondent as its general sales and port services agent in the USA. This is not in dispute and a copy of the Agreement is annexed at pages 12 to 19.

5.    The Respondent subsequently drew up an Addendum No. 1 dated 20 April 2006 wherein it was suggested that the effective date of the Agreement be taken as 19 April 2006. Further, certain clarifications and changes to the Agreement were proposed.



3

6.    Clause 17 of the Agreement provided that no modifications to the Agreement shall be valid unless made in writing and signed by the duly authorized representatives of the parties. The said Addendum No. 1 was not signed or expressly agreed to in writing by the Claimant and/or its duly authorized representative.

7.    Thereafter, the Respondent set up a company called ProShipLine, Inc. (hereinafter "PSL") specifically to handle part of the business of the Respondent under the Agreement. It was understood by the Claimant that PSL was a wholly owned subsidiary of the Respondent. PSL was the agent and/or subcontractor of the Respondent for the purpose of the Agreement.

8.    The Claimant believes that PSL was and is wholly under the control of the Respondent or its directors or some of them, including Mr. David Pulk, the Respondent's President and Chief Executive Officer, and Mr. Neil Johnson, the Respondents' Vice President and Director. Although in proceedings in the Southern District of New York, Mr. Neil Johnson has described himself as a "principal" of PSL, I do not know whether or not this is the case. A copy of the Declaration of Neil Johnson dated Singapore, January 16, 2008, filed in Index No.: 07-CV-10969 (RWS) in the United States District Court, Southern District of New York, is annexed at pages 25 to 27.



4

9. The Respondent subsequently drew up an Addendum No. 2 dated 10 November 2006. This Addendum No 2 made changes to Clause 7 of the Agreement (relating to termination) and the "Compensation" provision in Attachment A to the Agreement. This Addendum No.2 was drafted by the Respondent and submitted to the Claimant. It was signed and dated by the Claimant and returned to the Respondent, but a copy signed by the Respondent was not received in return before 5 December 2006 when the Claimant sent notice to the Respondent that it considered the Addendum No. 2 "null and void". Copies of the said Addendums are annexed at pages 20 to 24.

## Impress Account

10. PSL set up a bank account in its name, called the "SIL Account" and bearing No. 4880 0043 9659, with the Bank of America (hereinafter "the Impress Account"). The purpose of the Impress Account was to receive cargo freight and other associated revenue earned from the shipment of cargo on board the Claimant's vessels and make required and authorized payments to third party service providers on behalf of the Claimant. This is not in dispute.

11. It is not in dispute that payments were made into and from the Impress Account and that the monies remaining in the Impress Account belong to the Claimants. In court proceedings filed by the Respondent and/or PSL in the



5

USA, they have admitted that the monies were managed on behalf of the Claimants and that the balance monies currently held in the Impress Account was approximately USD699,000.00.  See; paragraphs 9 and 21 of the Plaintiffs' Original Complaint and Request for Declaratory Relief, and paragraph 10 of the affidavit of Jesus R. Baiza executed on November 15, 2007, all filed in Civil Action No. H-07-2549 in the United States District Court, Southern District of Texas, Houston Division.  Copies of these documents are annexed at pages 28 to 36.



12.    By way of an email dated 3 August 2007 from Sanjeev Bangad to David Rulk, the Claimant gave a clear instruction to the Respondent to transfer the balance of funds available as on 31 July 2007 in the Impress Account to the Claimant.  This instruction was ignored and to date, no funds have been remitted to the Claimant.  A copy of the said email is annexed at page 39.

13.    The Respondent is therefore wrongfully withholding these monies.  The Claimant is entitled to be paid these monies regardless of any issue between the parties relating to breaches of the Agreement and any such payment would not impact upon the said issue.

14.    Further, there is a concern whether the monies are being dissipated.  On 14 December 2007, the Respondent provided the Claimant with bank statements relating to the Impress Account up to the period end October

6

2007. Upon the Claimant's solicitor's request, on 31 January 2008, the Claimant was provided with bank statements relating to the Impress Account for the months of November 2007 and December 2007.

15. As can be seen from the statements, as of 31 December 2007, the Impress Account contained a balance of the sum of USD676,326.76 which is noticeably less than the figure of USD699,000.00 previously admitted. See; Bank of America Full Analysis Business Checking for Account Number 4880 0043 9659 for the Statement Period 12/01/07 through 12/31/07, a copy of which is annexed at pages 40 to 42.

**Absolute and Unqualified Right to an Audit**

16. Under the Agreement, the Claimant is entitled to a full accounting from the Respondent;

Under Clause 8 – Price and Payment:

"See Attachment A.

...



7

*EP-Team agrees to keep and maintain books and records reflecting the revenues and calculations of gross revenue, vessel operating costs, net revenue and sales commissions, as further described in Attachment A, in accordance with sound accounting principles consistently applied. SIL shall have the right, upon at least ten (10) days advance written notice to EP-Team ("Audit Notice") and at SIL's sole expense, to audit EP-Team's books and records in order to verify such revenues, costs and calculations of fees. Any such audit shall be performed during EP-Team's normal business hours. EP-Team shall have the right to dispute the result of any such audit by SIL. EP-Team shall maintain such books ad records for a period of at least three years from the date of the relevant transaction."*

Under ATTACHMENT A:

**"Accounting**

***Booking of Cargo for Voyages from India and United States***

*EP-Team shall be responsible for invoicing all amounts to companies which booked cargo on the vessels. EP-Team shall give credit and terms of credit to such companies per industry standards using industry accepted credit checking practices with prior written consent of SIL.*



8

EP-Team shall account for all revenue billed and received on a per vessel voyage basis. EP-Team shall provide weekly reports to SIL of all accounts payable and receivable issues. Amounts due from customers but not yet received as of the time of vessel net revenue accounting and payment, shall be accounted for, commissions determined and net amounts paid to SIL on a monthly basis.

**Port Handling and other Charges for Origin/Destination Services on Cargo Loaded on Vessels**

EP-Team shall be responsible for securing all services required by SIL for efficient and effective offloading/loading of cargo as well as storage and beyond transportation EP-Team shall further manage the pricing, invoicing, processing and payment for such services and in turn invoice SIL for such services. Prior to commencement of any such service, EP-Team shall provide to SIL all rate sheets, terms and conditions, tariffs and other relevant sources upon which its invoices are to be based and the same shall be approved by SIL before invoicing takes place. The intent of this process is to ensure that EP-Team is paid by SIL within the credit terms extended to EP-Team by the actual service providers."

17.    Clause 8 of the Agreement also provides the Claimant with an absolute and unqualified right to audit such books and records relating to the Agreement,



9

including but not limited to the books and records reflecting revenues, costs and fees.

18.   On 4 February 2008, the Claimant gave notice to the Respondent that it wishes to exercise its absolute right under the Agreement to audit the books and records relating to the Agreement whether in the hands of the Respondent or PSL and informed the Respondent to make the books and records available for audit by 15 February 2008.



      The Respondent's position is that it has no books or records relating to the business and that the books and records are the books and records of PSL; and that PSL is not prepared to agree to an audit inspection of its books. See, copies of 2 e-mail chains between the Claimant's lawyers, M/s Joseph Tan Jude Benny, and the Respondent's lawyers, BLP, annexed at pages 43 to 50.

20.   I am advised and verily believe that discovery and an audit of all the books and records relating to the Agreement is necessary in order for the Claimant to fully formulate its claim and/or quantify the damages suffered.  The relief sought by the Claimant in this regard is mirrored in the Claimant's Points of Claim.

10

21.    In light of the foregoing, I humbly pray for an order in terms of the application

filed herein.

Sworn/Affirmed by the abovenamed )

Sanjeev Bangad on this ( 3ᵗʰ day of )

March 2008 in                              )



At Pune
Maharashtra
India

Before me

Identity

Seen driving licence

bearing

No: MH 12/503132-04

A NOTARY PUBLIC

affiant

BEFORE ME

B G DORGE
ADVOCATE & NOTARY
GOVT. OF INDIA
REGD. No.
639/2008

13 MAR 2008

11

THIS IS THE ANNEXURE

"SB-1"

REFERRED TO IN

THE AFFIDAVIT OF

**SANJEEV BANGAD**

## SALES AND LOGISTICS SERVICES AGREEMENT

THIS SALES AND LOGISTICS SERVICES AGREEMENT (THE "AGREEMENT") MADE as of this ___ TH day of April, 2006 by Suzlon Infrastructure Ltd., a company incorporated under the Companies Act 1956, India, having corporate offices at 9, Koregaon Park Road, Pune, 411 001, Maharashtra, India, (hereinafter referred to as "SIL", which expression shall unless it be repugnant to the context or meaning thereof be deemed to mean and include its successors and assigns), and EP-Team, Inc. a corporation formed under the laws of the State of Nevada, USA, having an office at 320 Lake Trail Court, Double Oak, Texas 75077-8491, USA (hereinafter referred to as "EP-Team"), which expressions shall unless it be repugnant to the context or meaning thereof be deemed to mean and include its successors and assigns),

WHEREAS, SIL is in the business of undertaking contracts for supply chain management and has chartered vessels which would be trading worldwide.

WHEREAS, EP-Team is a logistics management organization that, inter alia, provides business development and management services to various logistics organizations;

WHEREAS, SIL seeks to utilize the services of EP-Team in support of its efforts to book space on its vessels .

NOW THEREFORE, in consideration of the premises, the parties agree as follows:

### 1.  PRELIMINARY STATEMENT

Time Chartering of Vessels

SIL presently has the following ocean-going vessels for a specific period of time:

* Beluga Spirit, chartered
* Beluga Margaretha Green,

SIL anticipates to have more vessels under its control and such vessels would be covered under the present agreement as and when they would be added to the present list. In the event such additional vessels are chartered, such additional vessels will be subject to this agreement and this agreement will be supplemented with a list of such vessels, according to the provisions set forth hereinafter regarding supplements or changes to this Agreement.

Planned Scope of Use of Charter Vessels

SIL anticipates loading these vessels at various ports in India and worldwide. SIL will control the load planning of all vessels loading cargoes for destination in United States. These voyages shall be considered "inbound voyages".

SIL also requires port terminal facilitation, stevedoring, storage and other logistics management services at Houston upon arrival and discharge of its cargo.

### 2.  APPOINTMENT OF EP-TEAM AS  GENERAL SALES AND PORT SERVICES AGENT IN USA

SIL is appointing EP-Team as its sales agent to establish a sales and management operation to secure freight and associated revenue.



13

The parties acknowledge that EP-Team additionally has the ability to bring to SIL opportunities to add cargo to specific outbound voyages from India ports as a revenue enhancement to SIL. SIL agrees that EP-Team will be the sales agent for appropriate co-ordination for additional freight and revenue for voyages from United States. However, SIL has full discretion to accept or reject any incremental cargo opportunities brought to it by EP-Team for outbound voyages.

The parties further acknowledge that EP-Team has the ability to manage on SIL's behalf all of the various port and terminal handling operations at Houston and other ports of arrival for the outbound voyages. Therefore SIL is appointing EP-Team to be its agent for the appropriate selection, assignment and management of the terminal facilitation, stevedoring, and heavy lift operations as related to the discharge and further loading of SIL's vessels at USA ports and loading/discharge at intermediate or other destination ports, as may be specified and per service requirements as agreed by the various parties necessary to the sale of cargo space and disposition of such cargo on those vessels.

### 3.  SERVICES

The EP-Team shall perform the work described or referred to in and required by the Statement of Work contained in Attachment A (the "Services/Fees") attached hereto and incorporated by reference as part of this Agreement.

### 4.  PERIOD OF PERFORMANCE

The term of this agreement is for a period coextensive with the time chartering of vessels by SIL, subject to earlier termination as provided in this Agreement. Any extension of the term will require execution of a written agreement signed by both parties.

### 5.  SUBCONTRACTS/ASSIGNMENTS

The EP-Team and SIL may assign this agreement, in whole or in part.

### 6.  NOTICE OF DEFAULT

In the event that either party commits a breach of this agreement or otherwise is in breach of any of the obligations of this Agreement, the other party may notify the breaching party that it is in default of its obligations and request the party to remedy such breach. Such notification shall be in writing and to the individual listed below as notify party for that party. The breaching party shall have 90 days from date of notice in which to remedy such breach. Failure of a party not to notify a party in breach shall not operate as a waiver or estoppel of such breach.

### 7.  TERMINATION

The parties shall have the right to terminate this arrangement by giving the other party 30 days notice of the same without stating any cause at any time during the currency of this agreement. On such termination both the parties shall continue to perform their duties for the shipment already underway and shall be bound by the terms of this agreement till such time the activity undertaken or initiated prior to termination is not competed in totality. The parties on such termination shall continue to co-operate with each other to ensure proper closure of accounts and completing all activities for the termination of the arrangement.

Upon completion of the procedure relating to Notice of Default, either party, may, for cause, terminate this Agreement and performance hereunder, in whole or, from time to time, in part by written notice of termination, which notice shall state the extent to which performance shall be terminated and the date upon which termination shall become effective.

2                              As agreed:    *David R. Pulk*

Dated: April 9, 2006



Upon receipt of such notice, the party receiving such notice shall:

* Stop work on the date and to the extent set forth in such notice, and
* Take such further action regarding termination of the Services or the Agreement as the party seeking termination may reasonably direct.

### 8. PRICE AND PAYMENT

See Attachment A.

All taxes of every nature and kind, other than applicable sales taxes (if any) on EP-Team's services, that are applicable to amounts received by EP-Team from SIL, under the Agreement, shall be the responsibility of EP-Team and SIL shall have no obligation to EP-Team or to any taxing authority with respect to such taxes. EP-Team will indemnify and hold SIL harmless from any liability, costs, suits, attorney fees, or other costs of any kind resulting from claims by taxing authorities against SIL with respect to taxes which are the responsibility of EP-Team hereunder.

EP-Team agrees to keep and maintain books and records reflecting the revenues and calculations of gross revenue, vessel operating costs, net revenue and sales commissions, as further described in Attachment A, in accordance with sound accounting principles consistently applied. SIL shall have the right, upon at least ten (10) days advance written notice to EP-Team ("Audit Notice") and at SIL's sole expense, to audit EP-Team's books and records in order to verify such revenues, costs and calculations of fees. Any such audit shall be performed during EP-Team's normal business hours. EP-Team shall have the right to dispute the result of any such audit by SIL.   EP-Team shall maintain such books and records for a period of at least three years from the date of the relevant transaction.

### 9. REPRESENTATIONS

The EP-Team represents, warrants and covenants to SIL that the EP-Team is not restricted in any way, by agreement or otherwise, from entering into this Agreement or performing the Services.

SIL represents, warrants and covenants to the EP-Team that SIL is not restricted in any way, by agreement or otherwise, from entering into this Agreement.

Notwithstanding the foregoing, the parties acknowledge that certain legal reviews are required to ensure legal and lawful operation of the intended service according to US Federal Maritime Commission regulations.

### 10. CONFIDENTIALITY

SIL and the EP-Team agree that the terms and conditions of this Agreement are confidential and the parties hereto agree not to disclose the terms of this Agreement to any third party (other than to their respective attorneys, accountants, advisors and affiliates) except (i) as may be required by law or by the order of a court of competent jurisdiction, (ii) where such information is or becomes publicly available through lawful means without breach of this Agreement, or (iii) with the prior written consent of the other party. However, the parties agree that disclosures by either party to entities who propose to purchase from such party (or its affiliates) or enter into a financing transaction with such party (or its affiliates) concerning property of SIL (or its affiliates), or who propose to become investors in such party (or its affiliates) will not violate the terms of this confidentiality provision.

### 11. COMPLIANCE WITH LAWS

Except as noted with respect to start-up costs relating to legal status of the vessel operations, the EP-

3                    As agreed:    *David R. Pulk*

Dated: April 9, 2006



Team shall, at its own expense, comply with all laws, rules and regulations, and assume all liabilities or obligations imposed by such laws, rules and regulations, with respect to the EP-Team's performance hereunder.

SIL shall, at its own expense, comply with all laws, rules and regulations, and assume all liabilities or obligations imposed by such laws, rules and regulations, with respect to its status as charter party of the vessels and also as owner of the cargo on the outbound voyages.

## 12. INDEMNITY

Each party shall indemnify the other and its affiliates, partners, principals, representatives and employees from and against any and all liability, damages, losses, claims, demands, judgments, costs and expenses of every nature and kind, by reason of injury to or death of any person or damage to or destruction of property, to the extent arising out of the negligent acts or omissions or willful misconduct, of it and its employees, subcontractors or agents, if any, in performance under the Agreement. The provisions of this Section survive termination of the Agreement.

Neither party shall be responsible for any such losses, liabilities, claims, judgments, costs, demands, and expenses caused by the negligence and willful misconduct of the other party, its partners, principals, agents, representatives or employees. The provisions of this Section survive termination of the Agreement.

In the event litigation is filed against either party for which the other party may be responsible under this provision, notice shall be promptly given of such claim pursuant to the notice provisions of this Agreement.

## 13. APPLICABLE LAW

This agreement shall be construed and enforced in accordance with English Law .

## 14. ENTIRE AGREEMENT; SUPPLEMENTS AND MODIFICATIONS

This Agreement constitutes the entire understanding between the parties hereto with respect to the subject matter hereof and shall supersede all previous negotiations, commitments, understandings, and agreements. The parties may make changes or supplements to this agreement; such changes or supplements shall be reduced to writing, executed by authorized individuals of the parties and copies of such writings attached to this Agreement.

## 15. ARBITRATION

If any dispute arises between the parties out of or in connection with the agreement whether in the nature of interpretation or meaning of any term hereof or as to any claim by one against the other, or otherwise, the same shall be referred to arbitration of a common arbitrator if agreed upon or to arbitrators one to be appointed by each party to the dispute and the arbitration shall be governed by the Arbitration Act for the time being in force. Unless the parties to the dispute mutually agree to the location of the arbitration, the arbitration shall be held in Singapore.

## 16. ATTORNEYS' FEES

In the event of any litigation occurring out of this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees in connection with such litigation.

4

As agreed:   *David R. Pulk*
Dated: April 9, 2006

## 17. MODIFICATIONS

Except as expressly provided herein, no modifications to this Agreement shall be valid unless made in writing and signed by the duly authorized representative of SIL and the EP-Team, and neither the acquiescence in any performance at variance to the provision of this Agreement nor the failure to exercise any right or enforce any obligation hereunder shall be deemed a modification of this agreement.

## 18. NOTICES

All notices or requests to be given under this Agreement and all other communications related to the Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, sent by overnight courier or mailed, first class, by registered or certified mail return receipt requested, addressed as follows, and shall be effective when received:

For SIL:

Mr. Sanjeev Bangad
General Manager – Logistic
5th Floor - Godrej Millenium
9, Koregaon Park Road
Pune, 411-001
Maharashtra
India

For EP-Team

Mr. David Pulk
President
320 Lake Trail Court
Double Oak, Texas 75077-8491
USA

Either party may change such address, designation, or title of the individuals by written notice issued and delivered as above.

SIGNED by the parties to be effective as of the date first written above.

SUZLON INFRASTRUCTURE LTD.

By: _____

    Name: _____
    Title: _____

EP-TEAM, INC.



By:   *David R. Pulk*

Name: David R. Pulk

greed:  *David R. Pulk*
Dated: April 9, 2006

ATTACHMENT A                                                                          17

Legal Character of Service

It is the intent of the parties to represent in its sales that the actual services to be provided by the vessels is to be a non-liner service and further that there will be no specific tariff filings requisite to US Federal Maritime Commission requirements for vessel operating common carriers (VOCCs) or non-vessel operating common carriers (NVOCCs). The parties shall secure appropriate legal advice on how to structure its sales efforts and the charter operations to ensure such intended status.

Start-up Costs for the Vessels

Costs associated with such legal advice on the structure of the vessel service and other costs relating to the vessels legal and regulatory status (such as laws and regulations of other countries) shall be borne by EP-Team

Structure of Sales and Support Services

EP-Team will represent SIL in its efforts to develop freight for its voyages from United States.

The parties shall mutually develop standard operating and accounting procedures to manage the sales, operations and accounting processes prior to the sailing of the first voyage from United States. These shall include appropriate consideration for insurance coverage, requirements for bonds and certificates of financial responsibility.

EP-Team will provide dedicated sales and support staff in offices to be managed from a base of operations in Houston, Texas, based upon the capacity of the vessels and the anticipated trade lanes to be solicited for freight. Costs associated with this staff and any legal and regulatory obligations relating to such staff will be borne by EP-Team.

EP-Team anticipates additional support offices in Dallas, Texas (USA); Dubai, UAE; and Mumbai and Ahmedabad, India; as well as utilizing existing structures and sales organizational support in various global markets, (i.e., Seoul, Korea; Singapore; Paris, France; Hong Kong, S.A.R.; Amsterdam, Netherlands, etc.), and may open additional offices as required to maximize revenue to SIL for voyages from United States.

EP-Team shall target opportunities for the voyages from United States that will maintain SIL's 90 day round trip voyage sales order fulfillment planning schedule, unless otherwise waived by SIL due to significant revenue enhancement opportunities or otherwise.

EP-Team shall further coordinate with SIL on all opportunities for additional cargo for voyages from India.

EP-Team's focus for sales shall be in the following lanes:

Voyages from India:

* Space/cube as available on India-to-Houston trade lane

                                                7        As agreed:  *David R. Pulk*
                                                                    Dated: April 9, 2006



- By inducement to/from those points wherein outbound voyages will be routed from India ports to other points, including, but not limited to, China, Republic of Korea, etc.

18

Voyages from United States

- Houston to all ports in India
- Inducement calls USA-ports Gulf/East Coast to ports of call within acceptable deviation (time and cost) from otherwise empty return voyage to Kandla/Mumbai
- Inducement calls to Ports in the Mediterranean Sea
- Inducement calls to Ports in the Red Sea, Arabian Sea and Arabian Gulf Via Suez Canal
- Provide for authorized P2-level B/L per U.S.A.-government "USA-flag vessel" using legal transit (not cabotage vessel - primarily lighter/barge to Kuwait, Oman, Qatar, and Iraq ports via Dubai, UAE)
- "Cargo of opportunity" to ASPAC-ports (China, Korea, etc.) Via Panama Canal based on inducement

### Accounting

Booking of Cargo for Voyages from India and United States

EP-Team shall be responsible for invoicing all amounts to companies which booked cargo on the vessels. EP-Team shall give credit and terms of credit to such companies per industry standards using industry accepted credit checking practices with prior written consent of SIL.

EP-Team shall account for all revenue billed and received on a per vessel voyage basis. EP-Team shall provide weekly reports to SIL of all accounts payable and receivable issues. Amounts due from customers but not yet received as of the time of vessel net revenue accounting and payment, shall be accounted for, commissions determined and net amounts paid to SIL on a monthly basis.

### Compensation

Various types of costs (fixed and variable) associated with the operation of the various vessels shall be established and agreed upon by the parties based upon the contract in effect between SIL and the vessel owner, or otherwise established at time of vessel voyage.

For actual costs assessed by third parties for such delay, diversion or otherwise due to the additional freight on the voyage, the parties shall agree upon who shall be responsible for payment of such costs. If SIL is the responsible party, it shall provide relevant cost information to EP-Team for further revenue accounting of the vessel voyage. This agreement shall be incorporated within the mutual standard procedures to be developed by the parties.

30 days after completion of each vessel voyage, EP-Team shall account for all revenue billed and received from customers (gross revenue) and compute net revenue based upon all costs associated with delay, diversion or carriage of non-SIL freight on the voyage. Net Vessel Voyage Revenue shall be Gross Revenue achieved per vessel less Vessel Operating Costs (those costs associated with inducement/delay, diversion and additional freight) including but not limited to, port fees, terminal/stevedoring, transit fees (Suez Canal), additional days of charter ("day rate" and bunker assessments). Details relating to these processes shall be incorporated in the standard procedures to be developed by the parties.

8

As agreed:  *David R. Pulk*
Dated: April 9, 2006



19

Net Vessel Voyage Revenue shall then be apportioned between SIL and EP-Team according to the following formula which shall be reviewed every six months and mutually agreed upon by the parties to be in line with the market trends. EP-Team shall remit the net revenue split due to SIL at that time.

EP-Team agrees that the cargoes that shall be booked by SIL for voyages from United States through their own contacts and in which EP-Team has no role to play, for such shipments the revenue will not be shared by SIL with EP-Team as would be agreed below, however they shall be paid 2% of net revenue earned as services charges for the services provided by EP-Team to SIL or its clients.

The details of the compensation, (commission on sales) schedule is listed below by example. The commissions are based on cumulative revenues attained, (i.e.; first dollar sales accrued from net revenue per vessel at the level noted).

| NET REVENUE per VESSEL (from and up to) | Incremental Commission to EP-TEAM for sales | | |
|---|---|---|---|
| $   700,000 | 8.0% | | |
| $  1,000,000 | 10.0% | | |
| $  1,250,000 | 12.5% | | |
| $  1,500,000 | 15.0% | | |
| $  2,000,000 | 17.5% | | |
| $  2,500,000 | 20.0% | | |

COMMISSIONS are based on NET REVENUE per VESSEL as defined in the AGREEMENT. Sales commissions are to be paid to EP-TEAM based on total cumulative revenues from US$1-base sales as calculated from NET REVENUE per VESSEL.

Port Handling and other Charges for Origin/Destination Services on Cargo Loaded on Vessels

EP-Team shall be responsible for securing all services required by SIL for efficient and effective offloading/loading of cargo as well as storage and beyond transportation. EP-Team shall further manage the pricing, invoicing, processing and payment for such services and in turn invoice SIL for such services.Prior to commencement of any such service, EP-Team shall provide to SIL all rate sheets, terms and conditions, tariffs and other relevent sources upon which its invoices are to be based and the same shall be approved by SIL before invoicing takes place. The intent of this process is to ensure that EP-Team is paid by SIL within the credit terms extended to EP-Team by the actual service providers.



9

As agreed:    *David R. Pulk*
Dated: April 9, 2006

April 20, 2006

ADDENDUM No. 1 to Sales and Logistics Services Agreement

Attn: Mr. Sanjeev Bangad
Suzlon Energy Ltd.
On behalf
Suzlon Infrastructure Ltd.LTD

Thank you. We are in receipt of the copy of the contract executed by you on behalf of SIL, and forwarded to us by S. Raam Kummar. We are in general agreement with you on all points, with the following comments due to a need for clarification or correction.

Please refer with your agreement to the below points.

1.  The version that we received contains no page 6. It appears that the main body of the contract ends at page 5 and continues on page 7 with Attachment "A". This clarification is to note that there is no page 6 which forms a part of the Agreement.

2.  We need to put in a specific date at the beginning of the contract as the effective date of the Sales and Logistics Services Agreement - April 19, 2006 should be considered the effective date of the Agreement.

3.  Section 1 – Preliminary Statement, Planned Scope of Use of Charter Vessels. The first paragraph, third line mentions "inbound voyages". We believe that this was changed in error by Suzlon in a recent draft. It should be "outbound voyages". This will serve to be a modification to that phrase.

4.  Section 2, 2nd paragraph, second sentence. This sentence refers to "voyages from United States". Again, this section was changed in a recent draft by Suzlon and the original scope of the provision has been unintentionally altered. The paragraph is referring to voyages from India and the ability of EP-Team to supplement outbound voyages with additional non Suzlon cargo. This paragraph was not meant to apply to voyages from the United States. Therefore, this shall serve as a correction of the quoted phrase from "voyages from United States" to "voyages from India".

5.  Attachment "A" – Start Up Costs. As discussed and acknowledged by you today, we will revert to the original intent and language of this provision whereby EP-Team shall advance such costs, which shall be accounted for as a cost of operation against the first revenue generating charter vessel or vessels, in order to insure establishment of a lawful and legal vessel service for booking of non-Suzlon cargo on these vessels.

6.  Prior versions of the contract failed to account for the situation whereby the US regulatory authorities would object to our stated goal of operating a non-VOCC or

21

NVOCC service (or this objective otherwise fails to receive affirmative legal advice). In that event, we may need to establish a VOCC service. We anticipate that for that service the US regulatory authorities will at a minimum require for SIL to execute an assignment of your charter party to EP-Team for nominal consideration (eg. "One US Dollar per day") to legitimize the VOCC service by EP-Team.

This will simply acknowledge our understanding and agreement that a form of such assignment may be required. In that event, this will require immediate attention, cooperation, and execution of such assignment, taking such reasonable steps in order to insure compliance with relevant laws and uninterrupted vessel services.

7. The final issue is related to contractual port services upon arrival Houston for vessel no. 1 – "M/V Beluga Spirit", inclusive of terminal handling, stevedoring, and onward inland transportation wherein our Agreement indicates a potential overlapping of responsibilities with what we assume to be existing contracts for such services. In order to facilitate such services to SIL, please clarify this point, as we will work toward the optimization of SIL's interests.

This shall constitute Supplement No.1 to Sales and Logistics Services Agreement between Suzlon Infrastructure Ltd. and EP-Team, Inc., pursuant to Section 14 of said Agreement...

For: SUZLON INFRASTRUCTURE LTD.

Sanjeev Bangad

_____

Dated: _____

For: EP-TEAM, Inc.

David R. Pulk

_____

Dated: __20 April 2006_____

22

November 10, 2006

**Attn: Mr Sanjivv Bangad**
**Suzlon Energy Ltd**
**On behalf of**
**Suzlon Infrastructure Ltd**

Dear Sanjivv,

Re: Addendum No 2. to Sales and Logistics Services Agreement between EP-Team and
Suzlon Infrastructure

In accordance with our discussions over the past weeks we are presenting our suggested
modifications to the wording of the Sales and Logistics Services Agreement executed between
Suzlon Infrastructure Limited and EP-Team Inc on April 9, 2006 and as modified by Addendum
No.1 dated and accepted April 20, 2006.

Please sign to confirm your agreement to the following points:

**A. Replacement of Termination clause with the following wording:**

7.    *Termination*

*A party shall have the right to terminate this arrangement by giving the other party 30 days notice of the
same at any time during the currency of this agreement only in the following cases:*

- *Where a serious breach of contract by a party has been notified to the party by the other party
  and where within 30 days of such notification no action plan has been set forth by the party to the
  other party to mitigate the breach then the other party may choose to terminate the contract.*

- *Where a party has committed an act of willful negligence causing material loss to the other party
  in performing its obligations under this agreement and where within 30 days of such act no action
  plan has been set forth by the party to the other party to mitigate the loss then the other party
  may choose to terminate the contract.*

- *Where a notice of default has been served and the procedure dealing with such notice has been
  followed and the party in breach has failed to remedy the breach then the other party may
  terminate the contract.*

*On such termination both the parties shall continue to perform their duties for the shipments already
underway and shall be bound by the terms of this agreement till such time the activity undertaken or
initiated prior to termination is not completed in totality.*

*The parties on such termination shall continue to cooperate with each other to ensure proper closure of
accounts and completing all activities for the termination of the arrangement.*

*Upon receipt of such notice, the party receiving such notice shall:*

- *Stop work on the date and to the extent set forth in such notice, and*
- *Take such further action regarding termination of the services or the Agreement as the party
  seeking termination may reasonably direct.*

### B. Replacement of Compensation clause in ATTACHMENT A with the following wording:

#### Compensation

*Except where otherwise agreed in advance in writing between the parties the costs of operation of the vessels shall be borne by SIL.*

*EP-Team shall be compensated in the following manner for its services:*

1.   *In relation to SIL vessels on voyages to India:*

*EP-Team will be remunerated by way of a composite fee to cover management of the following activities:*

- *Sales and marketing to customers of cargo space for voyages to India*
- *Invoicing and collection of payments from customer for cargo sold on SIL vessels by EP-Team*
- *Regular reporting of all activities related to SIL vessels for which EP-Team is responsible for including but not limited to regular outlook on cargo prospects, rates and market conditions, invoicing activity, port handling, and agency activity.*
- *Administration of payments of port and agent dues and charges related to return voyages to India*
- *Administration and oversight of port handling in Houston and other ports West of Suez for which PSL is responsible for sales and marketing return voyages to India*

*The management fee to be paid to EP-Team for this activity shall be as follows:*

- *Where the net revenue accumulated on a voyage is USD1,400,000.00 or below, EP-Team shall be due an amount of 5% of the net revenue.*

- *Where the net revenue accumulated on a voyage amounts to more than USD1,400,000.00 EP-Team shall be due an amount of USD70,000.00 plus 6.5% of the difference between the net revenue and USD1,400,000.00.*

- *For the purposes of this agreement net revenue on a voyage is read as gross revenue for that voyage less:-*

    o   *Agency commissions incurred by EP-Team in securing cargos for that voyage*
    o   *Stevedoring costs incurred in operating cargos secured by EP-Team on that voyage in ports after the origin port and before the destination port.*

*The management fee shall be invoiced to SIL by EP-Team upon completion of all invoicing for each voyage and will become payable immediately.*

2.   **Off-hire of Vessels**

*All costs associated with the off-hiring of vessels will be borne by SIL. Where EP-Team is called upon to administer the off-hire of vessels in Houston and / or other ports a management fee of USD2,500.00 will be charged by EP-Team to SIL and invoiced by EP-Team to SIL along with any other costs directly incurred by EP-Team in administering this activity.*

3.   **Other Activities**

24

*SIL may from time to time request EP-Team to engage in other activities not listed here on its behalf in relation to the operation of the vessels. Where EP-Team is called upon to engage in such activities the parties shall agree separate terms.*

*The parties will use their best endeavours to ensure that these terms are agreed in advance of the activity commencing although it is recognized that this may not always be possible for safety, commercial or operational reasons.*

*Where EP-Team has engaged in such activities and it has not reached agreement on terms and conditions, EP-Team will be entitled to invoice its costs associated with this activity to SIL along with a management fee of 10% of such costs pending resolution of terms between the parties.*

This shall constitute Supplement No 2. to Sales and Logistics Services Agreement between Suzlon Infrastructure Ltd. and EP-Team, Inc., pursuant to Section 14 of said Agreement.

**For: SUZLON INFRASTRUCTURE LTD.**

Sanjeev Bangad

Dated _____ 10 – 11 – 2006

For: EP-Team, Inc.

**David R. Pulk**

Dated _____

HILL RIVKINS & HAYDEN LLP
*Attorneys for Plaintiff ProShipLine, Inc.*
45 Broadway, Suite 1500
New York, New York 10006
Tel: (212) 669-0600
Fax: (212) 669-0699 .

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| PROSHIPLINE, INC., | |
| Plaintiff, | Index No.: 07-CV-10969 (RWS) |
| vs. | **DECLARATION OF NEIL JOHNSON** |
| ASPEN INFRASTRUCTURES, LTD. f/k/a SUZLON INFRASTRUCTURE, LTD., | |
| Defendant. | |

NEIL JOHNSON, declares under penalty of perjury under the laws of the United

States pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a principal of ProShipLine, Inc. ("PSL" or "ProShipLine"), plaintiff

herein, and make this declaration based upon personal knowledge and upon information

provided to me.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a spreadsheet I

created which sets forth ProShipLine's calculations as to the principal amount of it claim

and damages.

3.      It is my understanding that as of July 31, 2007, Aspen Infrastructure Ltd.

("AIL" or "Aspen") had at least seven vessels on time charter with varying periods of

time remaining under the charter parties. The seven known vessels are set forth in the first row of the chart at Exhibit 1.

4.    In the second row of the chart at Exhibit 1 is the approximate date upon which each charter party commenced.

5.    Based upon my familiarity with Aspen's charter arrangements and knowledge of others at PSL, it is my understanding that the duration of each charter was for three years.

6.    Upon this basis, I calculated the number of months remaining on each charter from July 31, 2007 onward.

7.    In my experience vessels on charter to AJL would call at US ports an average of four times per year, and in connection with each US port call PSL earned an average revenue of $90,000.

8.    Upon this basis, in the seventh row of the chart I calculated the anticipated remaining number of US port calls for each vessel and in the ninth row calculated the anticipated lost profit which would have inured to PSL.

9.    As calculated, the total amount of anticipated lost profit and the principal amount of PSL's claim and damages is 5,889,930.00.

Dated: Singapore
        January 16, 2008

                                                        NEIL JOHNSON

2

| Vessel Name | Beluga Revelation | Margaretha Green | Beluga Inspiration | Beluga Fascination | Beluga Eternity | Beluga Emotion | Beluga Fusion | Total |
|---|---|---|---|---|---|---|---|---|
| Charter party commencement on arrival | 16-Apr-06 | 10-Mar-06 | 16-Abo-07 | 18-Mar-07 | 10-Mar-07 | 10-Mar-07 | 10-Mar-07 | |
| Duration in months | 30 | 36 | 36 | 36 | 36 | 36 | 36 | |
| Normal handover date | 10-Apr-09 | 19-Mar-09 | 10-Mar-09 | 18-Mar-09 | 10-Mar-09 | 10-Mar-09 | 10-Mar-09 | |
| Approximate number of rotations per season | 4 | 4 | 4 | 4 | 4 | 4 | 4 | |
| Months remaining at 31-July-2007 | 23.33 | 19.33 | 31.33 | 31.33 | 31.33 | 31.33 | 31.33 | |
| Approximate number of voyages remaining | 8.78 | 5.44 | 10.44 | 10.44 | 10.44 | 10.44 | 10.44 | |
| Nominal commission per rotation per sailing | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | |
| Lost Revenue | $ 59,590.00 | $ 579,990.00 | $ 939,990.00 | $ 939,990.00 | $ 939,990.00 | $ 939,990.00 | $ 939,990.00 | $ 5,889,930.05 |

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

AUG 0 6 2007

Michael N. Milby, Clerk of Court

| | |
|---|---|
| EP-TEAM, INC. and<br>PROSHIPLINE, INC.<br><br>Plaintiffs,<br><br>v.<br><br>ASPEN INFRASTRUCURE, LTD. f/k/a<br>SUZLON INFRASTRUCTURE, LTD,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. _____

**H-07 -2549**

## PLAINTIFFS' ORIGINAL COMPLAINT
## AND REQUEST FOR DECLARATORY RELIEF

Plaintiffs EP-Team, Inc. and ProShipLine, Inc. submit this request for declaratory relief

and show as follows:

### A. PARTIES

1.      Plaintiff EP-Team, Inc. ("EP-Team") is a corporation organized under the laws of

the State of Delaware, with its principal place of business in Houston, Texas. Plaintiff

ProShipLine, Inc. ("ProShipLine") is a corporation organized under the laws of the State of

Delaware, with its principal place of business in Houston, Texas. EP-Team and ProShipLine are

at times referred to collectively herein "Plaintiffs."

2.      Defendant Aspen Infrastructure, Ltd. f/k/a Suzlon Infrastructure, Ltd. ("Aspen" or

"Defendant"), is a corporation organized under the laws of India, with its principal place of

business in Pune, India. Defendant does not maintain a registered agent in the State of Texas.

Under the laws of the State of Texas, Defendant may be served by serving the Texas Secretary of

State.

## B. JURISDICTION

29

3.    The Court has diversity jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332(a)(2) because the suit is between citizens of Texas, and a citizen of India, and the amount in controversy exceeds $75,000, excluding interest and costs.

## C. VENUE

4.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a)(3) because defendant Aspen is subject to personal jurisdiction in this district and there is no other district where the action may be brought.

## D. FACTUAL BACKGROUND

5.    EP-Team is a United States company with its principal place of business in Houston, Texas. It is a logistics management organization that provides business development and management services to various companies.

6.    Aspen is an Indian corporation that is involved in the shipment of machinery to the United States on vessels which it has chartered. It is the successor corporation of Suzlon Infrastructure, Ltd., ("Suzlon") which was also an Indian corporation. Suzlon time chartered several ships in order to deliver freight from an affiliated company in India to the United States.

7.    On April 19, 2006, EP-Team and Suzlon entered into a Sales and Logistics Services Agreement, (the "Contract") whereby Suzlon appointed EP-Team as its exclusive United States sales agent to establish a sales and management operation to secure freight and associated revenue on the ships that Suzlon had chartered for the return voyages from the United States to India.

8.    Pursuant to the terms of the contract, EP-Team was the exclusive agent for the appropriate selection, assignment, and management of the terminal facilitation, stevedoring and

PLAINTIFFS' ORIGINAL COMPLAINT AND REQUEST FOR DECLARATORY RELIEF    PAGE 2

heavy lift operations related to the discharge and loading of Suzlon's vessels at U.S.A. ports and loading and discharge at intermediate or other destination ports.

9.    As part of its responsibilities under the Contract, EP-Team agreed to keep and maintain books and records reflecting revenues and calculations of gross revenue, vessel operating costs, net revenue and sales commission. EP-Team maintains a bank account into which it places funds received from the shipping customers and from which expenses, commissions and other expenses are paid ("the Account").

10.    The Contract specifically provides that the rights and duties of the parties are assignable, in whole or in part by either of the parties. Pursuant to this clause EP-Team, with the knowledge and agreement of Suzlon, assigned its rights and duties under the Contract to ProShipLine. As set forth above, Suzlon was reorganized as defendant Aspen.

11.    The Contract provides that it is to be construed and enforced in accordance with "English Law". The contract further provides for arbitration as follows:

"15.    ARBITRATION.

If any dispute arises between the parties out of or in connection with the Agreement, whether in the nature of interpretation or meaning of any term hereof, or as to any claim by one against the other or otherwise, the same shall be referred to arbitration of a common arbitrator if agreed upon, or to arbitrators, one to be appointed by each party to the dispute, and the arbitration shall be governed by the Arbitration Act for the time being enforced. Unless the parties to the dispute mutually agree to the location of the arbitration, the arbitration shall be held in Singapore."

12.    On November 10, 2006, the parties, through a written addendum, modified the contract termination provisions to read as follows:

"7.    Termination

A party shall have the right to terminate this arrangement by giving the other party 30 days notice of the same at any time during the currency of this agreement only in the following cases:

31

- Where a serious breach of contract by a party has been notified to the party by the other party and where within 30 days of such notification no action plan has been set forth by the party to the other party to mitigate the breach then the other party may choose to terminate the contract.

- Where a party has committed an act of willful negligence causing material loss to the other party in performing its obligations under this agreement and where within 30 days of such act no action plan has been set forth by the party to the other party to mitigate the loss then the other party may choose to terminate the contract.

- Where a notice of default has been served and the procedure dealing with such notice has been followed and no party in breach has failed to remedy the breach then the other party may terminate the contract.

On such termination both the parties shall continue to perform their duties for the shipments already underway and shall be bound by the terms of this agreement till such time the activity undertaken or initiated prior to termination is not completed in totality.

The parties on such termination shall continue to cooperate with each other to ensure proper closure of accounts and completing all activities for the termination of the arrangement.

Upon receipt of such notice, the party receiving such notice shall:

Stop work on the date and to the extent set forth in such notice; and

- Take such further action regarding termination of the services or the Agreement as the party seeking termination may reasonably direct."

13.    As of July 14, 2007, there were five vessels under charter contract for which ProShipLine was providing services to Aspen.

14.    From the beginning of the Contract until the present time, ProShipLine has complied in all respects with its contractual obligations to Aspen. ProShipLine has not committed a breach of the Contract nor has it committed any act of willful negligence.

15.    By virtue of a letter dated May 18, 2006, Aspen categorically reiterated that Pro Ship Line was the exclusive United States agent of Aspen to negotiate, accept freight or cargo onto its ships.

16.    On July 5, 2007, Aspen, by and through its General Manager for Logistics, Mr. Sanjeev Bangad, sent an e-mail to ProShipLine, which stated in part as follows:

"In continuation of the message below, please note that from 1st August '07, the owners [Aspen] will have alternate agreements in place and thus ProShipLine will cease to be our agents.

This serves as required notice."

17.    Aspen's purported termination of the Contract without cause on the part of either EP-Team or ProShipLine is a breach of the Contract. Furthermore, the unjustifiable breach by Aspen of the Contract and the ostensible revocation of ProShipLine's agency to complete its responsibilities for ships in transit pursuant to the terms of the Contract have created confusion and present the possibility of damages to be incurred by EP-Team and/or ProShipLine.

18.    A justiciable controversy has arisen between EP-Team/ProShipLine and Aspen pertaining to the terms and termination of the Contract. Contractual provisions pertaining to the application of English Law and the arbitration clause are ambiguous in that they are not specific in specifying what is defined by the term "English Law" nor what is meant by the term "Arbitration Act".

19.    As of August 6, 2007, one of the ships for which ProShipLine was providing services to Suzlon was scheduled to dock at the Port of Houston. Another of the ships is expected to dock in Houston within the week.

20.    As a result of the wrongful actions of Aspen, ProShipLine and EP-Team will suffer damages for which they are entitled to seek restitution.

21.    Upon information and belief, Aspen has no assets in the United States from which Plaintiffs would be able to seek the payment of a future judgment other than the Account which ProShipLine manages on behalf of Aspen.

33

## E. REQUEST FOR DECLARATORY RELIEF

22.    Pursuant to 28 U.S.C. §§ 2201 – 2202 and Fed. R. Civ. P. 57, EP-Team requests a declaration from the Court:

- Clarifying the law to be applied to the construction and enforcement of the rights of the Plaintiffs and Defendant pursuant to the Contract;

- Specifying the forum for the arbitration of the dispute between the Plaintiffs and Defendant;

- Ordering the payment of the funds in the Account to the registry of the Court pending the resolution of the dispute between the parties by arbitration or otherwise.

WHEREFORE, Plaintiffs EP-Team, Inc. and ProShipLine, Inc. respectfully request that Aspen Infrastructure, Ltd. be duly cited in terms of the law to appear and answer herein, and that upon final trial hereof, Plaintiffs have judgment against said Defendant as follows:

1.    A declaratory judgment of this Court as requested herein;

2.    On final trial, the Plaintiffs have and recover from Defendant Aspen the Plaintiffs' expenses incurred, including reasonable attorney's fees;

3.    All costs of court be taxed against the Defendant;

4.    The Plaintiffs have such other and further relief to which the Plaintiffs may be justly entitled.

Respectfully submitted,

Mark W. Romney
Attorney-in-Charge
Texas Bar No. 17225750

34

SD Texas Bar No. 208180
SHANNON GRACEY RATLIFF & MILLER, LLP
500 N. Akard Street, Suite 2500
Dallas TX 75201
Telephone: 214.245.3090
Facsimile: 214.245.3097
nromney@shannongracey.com

Andrew Schreck
Texas Bar No. 17813250
SD Texas Bar No. 12929
SHANNON GRACEY RATLIFF & MILLER, LLP
1301 McKinney St., Suite 2920
Houston, TX 77010
Telephone: 713.255.4700
Facsimile: 713.655.1597
aschreck@shannongracey.com

ATTORNEYS FOR PLAINTIFFS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EP-TEAM, INC. and<br>PROSHIPLINE, INC.<br><br>Plaintiff,<br><br>v.<br><br>ASPEN INFRASTRUCURE, LTD. f/k/a<br>SUZLON INFRASTRUCTURE, LTD,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. H-07-2549<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF JESUS R. BAIZA

I, Jesus R. Baiza, declare under penalty of perjury that the following is true and correct.

  1.    I am the General Manager of ProShipLine, Inc. ("ProShipLine") and am, and at all material times have been, a duly authorized agent for ProShipLine, which was assigned a contract by EP Team, Inc. ("EP Team"), in the above-entitled and numbered cause of action.

  2.    All of the bank accounts maintained for the performance of the "Sales and Logistics Service Agreement" (the "Contract") between Suzlon Infrastructure, Ltd. ("SIL") and EP Team were in the name of ProShipLine. With the exception of a loan from EP Team to SIL in order to allow the discharge of freight from the first vessel under the terms of the Contract, and at the specific request of SIL, EP Team did not send or receive any money pertaining to the performance of the Contract, a fact which was always known by SIL which later changed its name to Aspen Infrastructure, Ltd. ("AIL").

  3.    All of the invoices which were prepared for the agency fee (commission) under the Contract were issued in the name of ProShipLine and not in the name of EP Team. All of these invoices were sent to AIL for approval prior to being paid. Many of the invoices contained the statement that ProShipLine, Inc. as agents for Aspen Infrastructure Limited (Owners).

  4.    On July 5, 2007, ProShipLine was advised by Mr. Sanjiv Bangad of AIL, that from August 1, 2007, it would no longer be the agent for AIL. ProShipLine understood this action to be the unilateral breach of the Contract by AIL that indicated

-1-

EXHIBIT
B

AIL did not intend to perform any further obligations imposed by the Contract after August 1, 2007. ProShipLine accepted this breach by AIL and understood that ProShipLine was discharged from performing, after August 1, 2007, any obligations under the Contract. Prior to receiving the notice, AIL had never advised ProShipLine that AIL considered ProShipLine to be in breach of any of its obligations under the Contract.

5.    ProShipLine at all times fully accounted for ocean freights which were collected on behalf of AIL during the operation of the Contract.

6.    ProShipLine fulfilled all of its obligations to AIL under the Contract up to the time of termination of the Contract by AIL which was Midnight, July 31, 2007, USA Central Daylight Time.

7.    ProShipLine at all times negotiated in good faith and kept proper accounts of payments made on behalf of AIL to third-party service providers. Under the terms of the Contract, ProShipLine made payments to third-party service providers on behalf of AIL only upon the express authorization of AIL.

8.    ProShipLine made payments to third-party service providers upon the express instructions of AIL as received prior to the termination of the Contract by AIL on August 1, 2007.

9.    Any claims which AIL has from the performance of the Contract are against ProShipLine rather than EP Team.

10.    The ProShipLine impress account which has funds pertaining to the performance of the Contract has a balance of approximately $699,000.

11.    ProShipLine believes that AIL breached the Contract and that ProShipLine will be entitled to recover damages against AIL, either in a lawsuit or an arbitration, far in excess of that amount.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 15, 2007.

Jesus R. Baiza

-2-

THIS IS A BLANK PAGE

38

THIS IS A BLANK PAGE

law2

| | | 39 |
|---|---|---|
| Date: | Fri, 3 Aug 2007 11:01:39 +0530 | |
| To: | "'David Pulk (EP-Team)'" <david.pulk@ep-team.net>, roger.clark@proshipline.com, neil.johnson@ep-team.net, 'Jessie Baiza' <jessie.baiza@proshipline.com> | |
| Cc: | law@chauncy.co.uk, law@chauncy.demon.co.uk, gmurr@bmpllp.com, 's ram kumar' <sraam@suzlon.com> | |
| From: | Sanjivv G Bangad <sbangad@suzlon.com> | |
| Subject: | AIL Impress A/c Fund status & reports - To : PSL, Cc : L.L.P. & Chauncy&Co.,, Beirne, Maynard & Parsons | |

03/08/2007

To : 'David Pulk (EP-Team)'; roger.clark@proshipline.com; Jessie Baiza;
'accounting@proshipline.com'
Cc :: law@chauncy.demon.co.uk; law@chauncy.co.uk; gmurr@bmpllp.com
To : Mr. Jessie / Mr. Roger / Mr. David & Mr. Neil
Cc : Beirne, Maynard & Parsons, L.L.P. & Chauncy & Co.
Dear Sirs,
Its quite surprising that none of Mr. Raam Kumar's mails get any response
from your end.
Since many are, matter of Urgency, wherein timely response is required from
your end.
Neither has he received any reply by mail nor any of his phone calls are
being answered from your end.
This puts us in total darkness of the situation & action taken at your end
and afraid this will have its commercial effect.
Find attached the mails for which there is no action taken by PSL.
Also, we await the financial and accounts reports from your side for the
month ended July.
Accordingly arrange to the transfer the balance fund available as on 31 July
in AIL impress account to the below mentioned banking details, by tonight :
          2. Banking details : WACHOVIA BANK, New York  SWIFT:
PNBFUS3NNYC
               For the Credit of : Industrial Development Bank of India
Ltd. (Formerly IDBI Bank Ltd.)
                                              Branch : Kalyani Nagar  City :
Pune
                                    Account No. 2000193001493

SWIFT: IBKLINBB007
     For the ultimate credit of : M/s. Aspen Infrastructures Limited, Pune.
A/c. No. 03410200000 4312

Kindly clarify and do needful.


Regards,


Sanjivv G Bangad
General Manager-International Logistics
Suzlon Energy Ltd.
3rd Floor, Weikfield IT City Infopark
Survey No. 30/3, 31/1 & 2 A, Vadgaonsheri, Nagar Road | Pune - 411 014 |
India.
Email: sbangad@suzlon.com
Mob: +91 9881072835
Board: +91-20-401 21999, Direct: +91 20 40121105  Fax:+91-20-4012 1100 /

**Bank of America**

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

40

Page 1 of 3
Statement Period
12/01/07 through 12/31/07
ISO  F P A  0A 48         0257647
Enclosures 0
Account Number  4880 0043 9659

*Business Banking*

PROSHIPLINE, INC
SIL ACCOUNT
3340B GREENS RD STE 690
HOUSTON TX 77032-2331

'02099 001 SCX999 I    4 0

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

## Customer Service Information

www.bankofamerica.com

## Deposit Accounts

## Full Analysis Business Checking

PROSHIPLINE, INC  SIL ACCOUNT

### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | 4880 0043 9659 | Statement Beginning Balance | $684,328.07 |
| Statement Period | 12/01/07 through 12/31/07 | Amount of Deposits/Credits | $9,639.25 |
| Number of Deposits/Credits | 1 | Amount of Withdrawals/Debits | $17,640.56 |
| Number of Withdrawals/Debits | 2 | Statement Ending Balance | $676,326.76 |
| Number of Days in Cycle | 31 | Average Ledger Balance | $684,439.82 |
| | | Service Charge | $0.00 |

### Deposits and Credits

| Date Posted | Customer Reference | Amount ($) | Description | Bank Reference |
|---|---|---|---|---|
| 12/06 | | 9,639.25 | Counter Credit | 813106230891769 |

4$^{H}_{1}$

Page 2 of 3
Statement Period
12/01/07 through 12/31/07
E0  P  PA  0A 48
Enclosures 0
Account Number  4880 0043 9659

PROSHIPLINE, INC
SIL ACCOUNT

## Withdrawals and Debits

### Other Debits

| Date Customer<br>Posted Reference | Amount ($) Description | Bank<br>Reference |
|---|---|---|
| 12/13<br>12/24 | 9,639.25 Return Item Chargeback<br>8,001.31 Bank Adjustment<br>Cur Trsf To TX 0488005768228 | 941612130519649<br>906012242024088 |

### Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|
| 12/01<br>12/06 | 684,328.07<br>693,967.32 | 12/13<br>12/24 | 684,328.07<br>676,326.76 |

42

0257649

## How To Balance Your Bank of America Account

**FIRST, start with your Account Register/Checkbook:**

1. List your Account Register/Checkbook Balance here ................................................................ $ _____

2. Subtract any service charges or other deductions not previously recorded that are listed on this statement ................ $ _____

3. Add any credits not previously recorded that are listed on this statement (for example interest) ................ $ _____

4. This is your NEW ACCOUNT REGISTER BALANCE ................................................................ $ _____

**NOW, with your Account Statement:**

1. List your Statement Ending Balance here ................................................................ $ _____

2. Add any deposits not shown on this statement ................................................................ $ _____

SUBTOTAL ........................ $ _____

3. List and total all outstanding checks, ATM, Check Card and other electronic withdrawals

| Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | |
|---|---|---|---|---|---|
| Date/Check # | Amount | Date/Check # | Amount | Date/Check # | Amount |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

4. TOTAL OF OUTSTANDING CHECKS, ATM, Check Card and other electronic withdrawals ........................ $ _____

5. Subtract total outstanding checks, ATM, Check Card and other electronic withdrawals from Subtotal
   This Balance should match your new Account Register Balance ........................ $ _____

Upon receipt of your statement, differences, if any, should be reported to the bank promptly in writing and in accordance with provisions in your deposit agreement.

### IMPORTANT INFORMATION FOR BANK DEPOSIT ACCOUNTS

**Change of Address.** Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Deposit Agreement.** When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule, which contain the current version of the terms and conditions of your account relationship, may be obtained at our banking centers.

**Electronic Transfers: In case of errors or questions about your electronic transfers**
If you think your statement or receipt is wrong or if you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
* Tell us your name and account number.
* Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
* Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting Other Problems.** You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or unauthorized transactions within the time periods specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree not to make a claim against us for the problems or unauthorized transactions.

**Direct Deposits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.

Bank of America, N.A. Member FDIC and    Equal Housing Lender

43

### Yvonne Kwek

| | |
|---|---|
| From: | Carol Mulcahy [Carol.Mulcahy@blplaw.com] |
| Sent: | Thursday, January 31, 2008 1:32 AM |
| To: | Murali Pany |
| Cc: | Michael Polonsky; Yvonne Kwek; Nicole Mak; law@chauncy.co.uk |
| Subject: | RE: Request for Further and Better Particulars of the Points of Claim |
| Attachments: | eStmt_12_31_2007 (AIL 9659).pdf; eStmt_11_30_2007 (AIL 9659).pdf |

Dear Mr Pany,

I refer to your email to Mr Polonsky of 29 January.

The document to which we would like a response is that attached to Mr Polonsky's email of 29 January 2008. In English procedural law the expression "Request for Information" is synonymous with "Request for Further and Better Particulars". We would like your client to provide the particulars identified in the document and are not posing interrogatories. I comment below on the various other questions you raise.

**Estoppel**
I can confirm that Mr Polonsky indicated during the hearing on Monday that estoppel by convention was one of the legal concepts upon which our client will rely.

**Deed of Assignment**
As Mr Polonsky made clear during the hearing, our formal position is that The Deed of Assignment is not a disclosable document because it has no relevance to the claim advanced by your client against EP-Team. He did, however, agree to take instructions as to whether EP-Team would be prepared to provide you with copy of this document on an ex gratia basis. I will come back to you when we have those instructions.

**Bank Statements**
In accordance with the indication given by Mr Polonsky during the hearing on Monday, our client has approached PSL and has obtained from PSL a copy of the bank statements requested together with authority to provide these to you. The statements are attached.

**Request for Audit**
As you are aware, EP-Team's position is that it has no books or records relating to the business. The tribunal made clear that should your client wish to pursue this matter it should issue a formal application setting out the grounds on which the application is made.

**PSL's involvement**
We note your preference for parallel proceedings. We would nevertheless be grateful for confirmation as to the position adopted by your client in relation to the suggestion that PSL be added to the current proceedings. It was agreed during Monday's hearing that you would take instructions on this proposal. Your refer to the disadvantage of the current proceedings being "saddled with reservations" but, as indicated by the tribunal, joinder would be the neatest way forward and the reservations necessary to safeguard your client's position would in fact be relatively straightforward in form.

For the avoidance of doubt, it would assist us if you would confirm that your client would be prepared to agree that the tribunal should have jurisdiction to determine PSL's claims against your client and that such jurisdiction would extend to a determination on the question of whether PSL and not EP-Team is the counterparty to the agency arrangements terminated by your client in July 2007. We take the view that a short submission agreement would be the best way to address this issue. This

**44**

could, of course, also make clear that the fact of your client submitting such question to the jurisdiction of the tribunal is entirely without prejudice to its right to defend the claim on the basis that PSL is not a party to the contract and that it can therefore have no contractual claims against your client.

**Reply**
As already indicated to the tribunal, we have no objection to time for delivery of the Reply being extended to 5 February 2008.

Regards

**Carol Mulcahy**
**Berwin Leighton Paisner**

---

**From:** Murali Pany [mailto:murali@jtjb.com]
**Sent:** 29 January 2008 09:51
**To:** Michael Polonsky; 'Yvonne Kwek'
**Cc:** Carol Mulcahy; Nicole Mak; law@chauncy.co.uk
**Subject:** RE: Request for Further and Better Particulars of the Points of Claim

Dear Mr Polonsky,

I refer to your email below.

I note that your email, in the text and heading, refers to a 'Request for Further and Better Particulars of the Points of Claim' whereas the attached document and letter refers to a 'Request for Further Information of the Points of Claim'. It is thus unclear whether it is a request for particulars or interrogatories. Be that as it may, we will take our client's instructions. However, we have to reserve our client's rights as to the form of the document, your client's entitlement to the information sought and any further requests that may follow.

At the hearing yesterday, you referred to estoppel by convention in relation to paragraph 1 of the Statement of Defence. For the sake of clarity and good order, I ask that you confirm that this is the species of estoppel being relied on by your client.

I would also be grateful if you could let me know your client's response to AIL's requests for an audit and for documents, namely the Assignment of 13 December 2007 and the Impress Account statements for November and December 2007, as set out in our email dated 23 January 2008.

Finally, please let us know whether you have managed to obtain instructions on parallel arbitration proceedings by PSL. We feel such proceedings would be much neater, as opposed to PSL joining the current proceedings, because it would avoid the current proceedings being saddled with reservations AIL would necessarily have to make insofar as PSL's involvement is concerned.

On another note, our client's Reply is due on Wednesday 30 January 2008. However, we require more time to finalise the document and ask whether you would object to the Reply being served on Tuesday 5 February 2008 instead.

Regards,

K. Murali Pany

Partner

3/7/2008

M/s **JOSEPH TAN JUDE BENNY**
Advocates & Solicitors
5 Shenton Way
#35-01 UIC Building
Singapore 068808

Tel: 65-6220 9388
Fax: 65-6225 7827

**JTJB Global Network**
Singapore * Piraeus * Bangkok * Kuala Lumpur * Taipei  * Jakarta * Los Angeles

Visit our website at www.jtjb.com

Supporting www.singaporelaw.sg

Confidentiality Notice: This message is meant for the addressee only. It may contain material that attracts legal privilege. If you receive this message in error please delete the same immediately.

45

## Yvonne Kwek

| | |
|---|---|
| **From:** | Carol Mulcahy [Carol.Mulcahy@blplaw.com] |
| **Sent:** | Friday, February 08, 2008 2:26 AM |
| **To:** | Murali Pany |
| **Cc:** | Yvonne Kwek; law@chauncy.co.uk; Nicole Mak; Michael Polonsky |
| **Subject:** | RE: AIL v EPT: Books and Records |

Dear Mr Pany,

Thank you for your email..

You state that your client's position that PSL is not a party to the agreement is irrelevant in relation to its request to audit PSL's books. With respect, we fail to see how this can be the case when the basis of your entitlement to seek an audit of PSL's books is wholly based on the provisions of that agreement. We repeat our view that a joinder of PSL to the current proceedings offers the parties a way out of this conundrum.

As indicated in my email of 30 January 2008, EP-Team's position is that it has no books or records relating to the business.

Regards

**Carol Mulcahy**
**Dispute Resolution**
**Berwin Leighton Paisner LLP**
**Telephone (direct): 020 7427 1303**
**Telephone (switchboard): 020 7760 1000**
**Fax: 020 7760 1111**

**From:** Murali Pany [mailto:murali@jtjb.com]
**Sent:** 07 February 2008 12:19
**To:** Carol Mulcahy
**Cc:** 'Yvonne Kwek'; law@chauncy.co.uk; Nicole Mak; Michael Polonsky
**Subject:** RE: AIL v EPT: Books and Records

Dear Ms Mulcahy,

I am struggling to understand the position(s) taken by your respective clients. It currently seems to be this:

  a)  EP-Team claims that it is no longer a party to the Agreement and does not have any books or records relating thereto; and

  b)  PSL claims it is a party to the Agreement (whether by assignment or otherwise) and ostensibly has the books and records relating thereto, but refuses to allow the audit.

The notice (not request) for audit is not only made in the context of the arbitration but under the Agreement. Further, the audit must surely be directed at the party/parties who apparently has/have

47

the books and records, EP-Team and PSL must respond to the notice of audit.

Insofar as EP-Team is concerned, it has submitted to the arbitration proceedings in Singapore and our client is of the view that relevant books and records were and are in its possession or control.

Insofar as PSL asserts that it is a party to the Agreement and has books and records, then it must allow the audit. Our client's position that PSL is not a party to the Agreement is irrelevant in this regard.

PSL's refusal is noted. Please also confirm unequivocally the position of EP-Team.

Our client's rights to take such steps so as to compel the audit are reserved.


Regards,


K. Murali Pany


Partner
M/s JOSEPH TAN JUDE BENNY
Advocates & Solicitors
5 Shenton Way
#35-01 UIC Building
Singapore 068808

Tel: 65-6220 9388
Fax: 65-6225 7827

JTJB Global Network
Singapore * Piraeus * Bangkok * Kuala Lumpur * Taipei  * Jakarta * Los Angeles

Visit our website at www.jtjb.com

Supporting www.singaporelaw.sg


Confidentiality Notice: This message is meant for the addressee only. It may contain material that attracts legal privilege. If you receive this message in error please delete the same immediately.

---

**From:** Carol Mulcahy [mailto:Carol.Mulcahy@blplaw.com]
**Sent:** Wednesday, February 06, 2008 5:48 PM
**To:** Murali Pany
**Cc:** Yvonne Kwek; law@chauncy.co.uk; Nicole Mak; Michael Polonsky
**Subject:** FW: AIL v EPT: Books and Records


Dear Mr Pany,

PSL is not prepared to agree to agree to an audit inspection of its books. It finds your client's position of seeking to enforce provisions of the agency agreement against PSL while at the same time contending that PSL is not a party to that agreement to be wholly inconsistent. Although your client asserts that PSL is the agent or sub-contractor of EP-Team, until such time as the tribunal has determined whether this is the case such position can provide no basis for making the request. As indicated in my previous email, your client's request for an audit of the books and records of PSL

48

highlights the advantages of there being a submission agreement under which both parties positions are clearly set out but which nevertheless provides a framework within which requests such as that made by your client can be made and complied with.

Regards

Carol Mulcahy

---

**From:** Carol Mulcahy
**Sent:** 05 February 2008 11:04
**To:** Murali Pany
**Cc:** 'Yvonne Kwek'; law@chauncy.co.uk; Nicole Mak; Michael Polonsky
**Subject:** RE: AIL v EPT: Books and Records

Dear Mr Pany,

Thank you for email of 4 February upon which I am taking PSL's instructions.

Regards

---

**From:** Murali Pany [mailto:murali@jtjb.com]
**Sent:** 04 February 2008 14:13
**To:** Carol Mulcahy
**Cc:** 'Yvonne Kwek'; law@chauncy.co.uk; Nicole Mak; Michael Polonsky
**Subject:** RE: AIL v EPT

Dear Ms Mulcahy,

Thank you for your reply.

On AILs' request for audit, with respect, we disagree that it is necessary to defer this point until after the issue of the proposed joinder of PSL has been settled.

On the contrary, this point can be resolved now and doing so would only assist and expedite the proceedings.

We note EP-Team's position that it has no books or records relating to the business. Based on this, EP-Team must be saying that such books and records are in the hands of PSL. Indeed, Mr Polonsky stated that the telephone conference on 28 January 2008 that the books and records are the books and records of PSL.

AIL is of the view that PSL is entirely controlled by EP-Team. In any event, PSL has asserted that it is a party to the Agreement.

Therefore, on behalf of AIL, we hereby give notice that AIL wishes to exercise its absolute right under the Agreement to audit the books and records relating to the Agreement whether in the hands of EP-Team or PSL.

Please make the books and records available for audit by 15 February 2008.

This notice is given without prejudice to AIL's expressed position regarding PSL.

Regards,

3/5/2008

## K. Murali Pany                                            49

Partner
**M/s JOSEPH TAN JUDE BENNY**
Advocates & Solicitors
5 Shenton Way
#35-01 UIC Building
Singapore 068808

Tel: 65-6220 9388
Fax: 65-6225 7827

**JTJB Global Network**
Singapore * Piraeus * Bangkok * Kuala Lumpur * Taipei  * Jakarta * Los Angeles

Visit our website at www.jtjb.com

Supporting www.singaporelaw.sg

Confidentiality Notice: This message is meant for the addressee only. It may contain material that attracts legal privilege. If you receive this message in error please delete the same immediately.

---

**From:** Carol Mulcahy [mailto:Carol.Mulcahy@blplaw.com]
**Sent:** Monday, February 04, 2008 3:36 AM
**To:** Murali Pany
**Cc:** Yvonne Kwek; law@chauncy.co.uk; Nicole Mak; Michael Polonsky
**Subject:** AIL v EPT

Dear Mr Pany,

Thank you for your email of 1 February 2008 to which my response is as follows:
**Request for Further Information**
Whilst I must disagree with your analysis of our Request, I note that you are taking instructions. If you decline to provide any of the particulars we have requested, we invite you to set out in detail the reasons for so declining so that we can consider making an appropriate application to the tribunal.

**Estoppel**
On the basis of evidence currently available the reference to estoppel in paragraph 1 of the Statement of Defence will be argued in terms of estoppel by convention. However, we reserve the right to supplement our submissions in relation to the basis of any estoppel when discovery has taken place.

**Request for Audit**
I suggest that we defer seeking instructions on this until after the issue of the proposed joinder of PSL has been settled.

**PSL**
We have considered the points made in your email. PSL is not willing to engage in parallel proceedings. Our client takes the view that parallel proceedings offer no advantage and many disadvantages over joinder. We also believe that a short submission agreement is the most

50

satisfactory means of protecting both parties' positions on the issues raised in correspondence. As you will have seen, we have made our client's position known to the tribunal and have taken the liberty of preparing a draft agreement which we hope will assist in expediting resolution of this matter by making clear precisely what our client has in mind. We invite you to let us have your comments on the draft agreement as soon as possible.

Regards

**Carol Mulcahy**
**Dispute Resolution**
**Berwin Leighton Paisner LLP**
**Telephone (direct): 020 7427 1303**
**Telephone (switchboard): 020 7760 1000**
**Fax: 020 7760 1111**

----------------------------------------------------------------------------------

**Berwin Leighton Paisner LLP**

Adelaide House, London Bridge, London EC4R 9HA, UK
DX 92 London/Chancery Lane
t: +44 (0)20 7760 1000 f: +44 (0)20 7760 1111 w: http://www.blplaw.com

----------------------------------------------------------------------------------

Berwin Leighton Paisner LLP is a limited liability partnership registered in England and Wales (registered number OC315919) and is regulated by the Solicitors Regulation Authority. A list of members of Berwin Leighton Paisner LLP and of the non-members, who are designated as partners, is open to inspection at the above registered office. The term partner is used to refer to a member of Berwin Leighton Paisner LLP or an employee or consultant with equivalent standing and qualifications. The members are either solicitors or registered foreign lawyers. VAT registration number: GB 243 2449 76.

This email and the information it contains are confidential and may be privileged, if you have received this email in error please notify us immediately. You should not copy it for any purpose, or disclose its contents to any other person.
Internet communications are not secure and therefore Berwin Leighton Paisner LLP does not accept legal responsibility for the contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender.

This email has been checked for potential computer viruses using Messagelabs technology.

----------------------------------------------------------------------------------