07 Civ. 8813 (RWS)


DECLARATION OF
K. MURALITHERAPANY IN OPPOSITION TO DEFENDANT'S MOTION TO
VACATE
MARITIME ATTACHMENT


*Exhibit 9*



Claimant; Sanjeev Bangad : 2ⁿᵈ ; .03.2008

IN THE MATTER OF AN ARBITRATION

Between

## ASPEN INFRASTRUCTURES, LTD.
### (FORMERLY KNOWN AS SUZLON INFRASTRUCTURE, LTD.)

... Claimant

And



EP-TEAM, INC.

... Respondent

### **AFFIDAVIT**

I, Sanjeev Bangad, care of 5th Floor, Godrej Millennium, 9 Koregaon Park Road, Pune, 411-001, Maharashtra, India, do hereby swear/affirm and say as follows:-

1.    I am the General Manager of Suzlon Infrastructure, Limited. (hereinafter "the Claimant"). Suzlon Infrastructure, Ltd. changed its name to Aspen Infrastructures, Ltd. in March 2007, but changed its name back to Suzlon Infrastructure, Limited. on 19th September 2007. I am duly authorised to make this Affidavit on behalf of the Claimant.



2

2.    Insofar as the matters deposed to herein are within my personal knowledge, they are true. Insofar as the matters deposed to herein are not within my personal knowledge, they are based on the Claimant's file, records and papers available to me as the General Manager and are to the best of my knowledge and belief.

3.    I annex hereto collectively marked "SB-2" copies of documents referred to in this Affidavit. References to page numbers are references to the page numbers of "SB-2".

4.    By a written agreement dated 9 April 2006, the Claimant and the Respondent entered into a "Sales and Logistics Service Agreement" (hereinafter "the Agreement") wherein the Claimant appointed the Respondent as its general sales and port services agent in the USA. This is not in dispute and a copy of the Agreement is annexed at pages 12 to 19.

5.    The Respondent subsequently drew up an Addendum No. 1 dated 20 April 2006 wherein it was suggested that the effective date of the Agreement be taken as 19 April 2006. Further, certain clarifications and changes to the Agreement were proposed.

6.    Clause 17 of the Agreement provided that no modifications to the Agreement shall be valid unless made in writing and signed by the duly authorized



3

representatives of the parties. The said Addendum No. 1 was not signed or expressly agreed to in writing by the Claimant and/or its duly authorized representative.

7.  The Respondent subsequently drew up an Addendum No. 2 dated 10 November 2006. This Addendum No. 2 made changes to Clause 7 of the Agreement (relating to termination) and the "Compensation" provision in Attachment A to the Agreement. This Addendum No.2 was drafted by the Respondent and submitted to the Claimant. It was signed and dated by the Claimant and returned to the Respondent, but a copy signed by the Respondent was not received in return before 5 December 2006 when the Claimant sent notice to the Respondent that it considered the Addendum No. 2 "null and void". Copies of the said Addendums are annexed at pages 20 to 24.

8.  Disputes arose between the parties in relation to the Agreement and the Claimant commenced these arbitration proceedings. The Claimant has served its Points of Claim in these proceedings.

9.  In its Statement of Defence, the Respondent has asserted that ProShipLine, Inc. (hereinafter "PSL") and not the Respondent, is the proper party to the Agreement on the following grounds.



4

    a)     that the Agreement was equitably assigned by the Respondent to
            PSL; or

    b)     the Agreement was novated into an agreement between the Claimant
            and PSL; and/or

    c)     the Claimant is estopped from disputing that PSL was its agent under
            the Agreement until termination thereof.

### Assignment

10.     In proceedings commenced by the Respondent and PSL in Houston on 6
August 2007, they had stated that "Sometime between April 20, 2006 and
May 9, 2006, ProShipLine, Inc. was formed and EP Team assigned its rights
and duties under the Contract to it with complete notice to and the approval
of AIL." See, paragraph 2 of the Plaintiffs' Response to Defendant's Motion
to Stay Pending Arbitration filed on 15 November 2007 in Cause No. H:07-cv-
02549 in the United States District Court, Southern District of Texas, Houston
Division, a copy of which is annexed at pages 25 to 31.

11.     After the Houston proceedings were administratively closed by an Order of
Court, the Respondent and PSL applied to reinstate the matter and filed a
Motion for leave to file an amended complaint on 15 January 2008.



5

12.    In that Motion, and following that in the Amended Complaint, the Respondent and PSL stated the date of the alleged assignment as being on or about 25 April 2006 and sought declaratory relief that this assignment was "a valid assignment of the rights and obligations under the Contract that is binding upon Aspen". See; paragraph 1 of the Plaintiffs' Motion for Leave to File Amended Complaint Subject to Plaintiff's Motion to Reinstate, and paragraphs 11 and 36(a) of the Plaintiffs' First Amended Complaint, both filed in Cause No. H:07-cv-02549 in the United States District Court, Southern District of Texas, Houston Division. Copies of these documents are annexed at pages 32 to 46.

13.    Paragraph 11 of the Amended Complaint states:

"Paragraph 5 of the Contract specifically provides that the rights and duties of the parties are assignable, in whole or in part by either of the parties. Pursuant to this clause EP-Team Nevada, with the knowledge and agreement of Aspen, assigned its rights and duties under the Contract to ProShipLine on or about April 25, 2006. The formation of ProShipLine which at that time was a Nevada corporation (ProShipLine Nevada") and the assignment of the Contract was done, in part at the request of Aspen." (emphasis added)



6

14.  This is completely untrue.  At no time during the currency of the Agreement
     was the Claimant informed of an assignment of the Agreement by the
     Respondent to PSL.  At no time did the Claimant request an assignment.  At
     no time did the Claimant receive notice of any assignment.  To the contrary,
     as far as the Claimant was concerned there was never any question of an
     assignment of the Agreement by the Respondent.

15.  In the course of these proceedings, the Respondent through its lawyers,
     Berwin Leighton Paisner LLP (hereinafter "BLP") produced a letter dated 25
     April 2006 purportedly sent by EP-Team Inc to Suzlon Energy Ltd and Suzlon
     Infrastructure Ltd, and asserted that this letter is "either a valid legal
     assignment in accordance with the requirements of Section 136 of the Law of
     Property Act 1925, or it will operate as an equitable assignment (being
     evidence of a sufficient intention to assign)."  Copies of the said letter dated
     25 April 2006 received from BLP and a fax dated 30 November 2007 from
     BLP to the Tribunal, copied to M/s Joseph Tan Jude Benny, are annexed at
     pages 47 to 50.

16.  The Claimant has no record of ever having received the abovementioned
     letter dated 25 April 2006 and I personally cannot recall ever having seen it
     before.  Therefore, the authenticity of this letter is disputed.



7

17. Nonetheless, even assuming that the letter is genuine and was sent by EP-Team Inc to Suzlon Infrastructure Ltd, I am advised and verily believe that it cannot constitute a valid assignment of the Agreement.

18. Firstly, PSL only came into existence <u>after</u> this letter, to the Claimant's knowledge, on 3 May 2006. Indeed, the letter itself shows that PSL did not exist at that time. Secondly, the letter expressly states that the Respondent "will <u>then</u> hereby 'assign this Agreement' <u>for performance of service</u>". (emphasis added)



19. Therefore, at best and on the Respondent's own document, the said letter could only be evidence of a possible intention by the Respondent to assign in the future. Further, the said letter only shows an intention to assign the performance or provision of services under the Agreement to PSL, and not the Agreement itself or the Respondent's rights and duties thereunder.

20. The only notice the Claimant ever received of an assignment by the Respondent came much later by way of a notice from the Defendants' US solicitors, Shannon Gracey Ratliff & Miller, LLP, dated 14 December 2007.

21. The said Notice stated that "on 13 December 2007 EP-Team, Inc. ... assigned to ProShipLine, Inc. absolutely all rights that it had to sue for and recover damages from Aspen Infrastructures Ltd for breach of a Sales &



8

Logistics Agreement originally entered into on or about 19 April 2006, as subsequently amended, and/or for breach of any other obligations owed by Aspen Infrastructures Ltd to the Assignor." A copy of the said Notice is annexed at page 51.

22.    This notice clearly only assigns the Respondent's rights of suit. Further, the fact that the Respondent issued the said Notice dated 14 December 2007 is clear evidence that there was no prior assignment of the Agreement as alleged by the Respondent.

23.    As such, the Respondent has always been and continues to be the party liable to the Claimant under the Agreement.

**Novation**

24.    I am advised and verily believe that a novation of an agreement involves a third party replacing a party to an agreement and requires the clear consent of the original parties to the agreement.

25.    The Claimant had never consented to a novation of the Agreement or to any arrangement whereby PSI would replace the Respondent as the counterparty to the Agreement. The Respondent has yet to produce any evidence of such consent.



9

### Estoppel

26.   The Claimant's position regarding PSL is stated in the Claimant's Points of
      Claim and Reply to Statement of Defence namely:



  a)   It was understood by the Claimant that PSL was a 100% owned
       subsidiary of the Respondent and wholly within the control of the
       Respondent.

  b)   PSL was marketed to third parties as an agent of the Claimant.
       However, there was no contractual relationship between the Claimant
       and PSL and PSL was the agent or sub-contractor of the Respondent
       for the purposes of the Agreement.

  c)   Insofar as PSL did provide the services alleged by the Respondent in
       their Statement of Defence (which is not admitted), it did so as the
       agent or subcontractor of the Respondent under the Agreement. At
       all times, PSL was under the control of the Respondent. Further or in
       the alternative, the Claimant says that PSL would have been acting as
       a sub-agent



10

27    The Respondent always remained the counterparty to the Agreement and was never released or discharged from its liabilities and obligations to the Claimant under the Agreement.   The Claimant's conduct throughout in relation to the Agreement and the Respondent was on this basis.

28.    I am advised and verily believe that the issues set out in this application are suitable and appropriate to be determined as preliminary issues as it would be expedient to first determine the proper party to the Agreement, and make an award on the same at an early stage of the arbitration in order to save time and/or costs in the future conduct of this arbitration and/or assist parties in resolving the remaining matters in dispute.



Sworn/Affirmed by the abovenamed )

Sanjeev Bangad on this 13th day of )

March 2008 in                                )

                                        Before me

A NOTARY PUBLIC

11

THIS IS THE ANNEXURE

"SB-2"

REFERRED TO IN

THE AFFIDAVIT OF

**SANJEEV BANGAD**

# SALES AND LOGISTICS SERVICES AGREEMENT

12

THIS SALES AND LOGISTICS SERVICES AGREEMENT (THE "AGREEMENT") MADE as of this ____ TH day of April, 2006 by Suzlon Infrastructure Ltd., a company incorporated under the Companies Act 1956, India, having corporate offices at 9, Koregaon Park Road, Pune, 411 001, Maharashtra, India, (hereinafter referred to as "SIL", which expression shall unless it be repugnant to the context or meaning thereof be deemed to mean and include its successors and assigns), and EP-Team, Inc. a corporation formed under the laws of the State of Nevada, USA, having an office at 320 Lake Trail Court, Double Oak, Texas 75077-8491, USA (hereinafter referred to as "EP-Team"), which expressions shall unless it be repugnant to the context or meaning thereof be deemed to mean and include its successors and assigns),

WHEREAS, SIL is in the business of undertaking contracts for supply chain management and has chartered vessels which would be trading worldwide.

WHEREAS, EP-Team is a logistics management organization that, inter alia, provides business development and management services to various logistics organizations;

WHEREAS, SIL seeks to utilize the services of EP-Team in support of its efforts to book space on its vessels .

NOW THEREFORE, in consideration of the premises, the parties agree as follows:

## 1. PRELIMINARY STATEMENT

Time Chartering of Vessels

SIL presently has the following ocean-going vessels for a specific period of time:

* Beluga Spirit, chartered
* Beluga Margaretha Green,

SIL anticipates to have more vessels under its control and such vessels would be covered under the present agreement as and when they would be added to the present list. In the event such additional vessels are chartered, such additional vessels will be subject to this agreement and this agreement will be supplemented with a list of such vessels, according to the provisions set forth hereinafter regarding supplements or changes to this Agreement.

Planned Scope of Use of Charter Vessels

SIL anticipates loading these vessels at various ports in India and worldwide. SIL will control the load planning of all vessels loading cargoes for destination in United States. These voyages shall be considered "inbound voyages".

SIL also requires port terminal facilitation, stevedoring, storage and other logistics management services at Houston upon arrival and discharge of its cargo.

## 2. APPOINTMENT OF EP-TEAM AS GENERAL SALES AND PORT SERVICES AGENT IN USA

SIL is appointing EP-Team as its sales agent to establish a sales and management operation to secure freight and associated revenue.



13

The parties acknowledge that EP-Team additionally has the ability to bring to SIL opportunities to add cargo to specific outbound voyages from India as a revenue enhancement to SIL. SIL agrees that EP-Team will be the sales agent for appropriate co-ordination for additional freight and revenue for voyages from United States. However, SIL has full discretion to accept or reject any incremental cargo opportunities brought to it by EP-Team for outbound voyages.

The parties further acknowledge that EP-Team has the ability to manage on SIL's behalf all of the various port and terminal handling operations at Houston and other ports of arrival for the outbound voyages. Therefore SIL is appointing EP-Team to be its agent for the appropriate selection, assignment and management of the terminal facilitation, stevedoring, and heavy lift operations as related to the discharge and further loading of SIL's vessels at USA ports and loading/discharge at intermediate or other destination ports, as may be specified and per service requirements as agreed by the various parties necessary to the sale of cargo space and disposition of such cargo on those vessels.

### 3.  SERVICES

The EP-Team shall perform the work described or referred to in and required by the Statement of Work contained in Attachment A (the "Services/Fees") attached hereto and incorporated by reference as part of this Agreement.

### 4.  PERIOD OF PERFORMANCE

The term of this agreement is for a period coextensive with the time chartering of vessels by SIL, subject to earlier termination as provided in this Agreement. Any extension of the term will require execution of a written agreement signed by both parties.

### 5.  SUBCONTRACTS/ASSIGNMENTS

The EP-Team and SIL may assign this agreement, in whole or in part.

### 6.  NOTICE OF DEFAULT

In the event that either party commits a breach of this agreement or otherwise is in breach of any of the obligations of this Agreement, the other party may notify the breaching party that it is in default of its obligations and request the party to remedy such breach. Such notification shall be in writing and to the individual listed below as notify party for that party. The breaching party shall have 90 days from date of notice in which to remedy such breach. Failure of a party not to notify a party in breach shall not operate as a waiver or estoppel of such breach.

### 7.  TERMINATION

The parties shall have the right to terminate this arrangement by giving the other party 30 days notice of the same without stating any cause at any time during the currency of this agreement. On such termination both the parties shall continue to perform their duties for the shipment already underway and shall be bound by the terms of this agreement till such time the activity undertaken or initiated prior to termination is not competed in totality. The parties on such termination shall continue to co-operate with each other to ensure proper closure of accounts and completing all activities for the termination of the arrangement.

Upon completion of the procedure relating to Notice of Default, either party, may, for cause, terminate this Agreement and performance hereunder, in whole or, from time to time, in part by written notice of termination, which notice shall state the extent to which performance shall be terminated and the date upon which termination shall become effective.

2          _ .As agreed:  *David R. Pulk*

Dated: April 9, 2006



14

Upon receipt of such notice, the party receiving such notice shall:

- Stop work on the date and to the extent set forth in such notice, and
- Take such further action regarding termination of the Services or the Agreement as the party seeking termination may reasonably direct.

## 8.  PRICE AND PAYMENT

See Attachment A.

All taxes of every nature and kind, other than applicable sales taxes (if any) on EP-Team's services, that are applicable to amounts received by EP-Team from SIL, under the Agreement, shall be the responsibility of EP-Team and SIL shall have no obligation to EP-Team or to any taxing authority with respect to such taxes. EP-Team will indemnify and hold SIL harmless from any liability, costs, suits, attorney fees, or other costs of any kind resulting from claims by taxing authorities against SIL with respect to taxes which are the responsibility of EP-Team hereunder.

EP-Team agrees to keep and maintain books and records reflecting the revenues and calculations of gross revenue, vessel operating costs, net revenue and sales commissions, as further described in Attachment A, in accordance with sound accounting principles consistently applied. SIL shall have the right, upon at least ten (10) days advance written notice to EP-Team ("Audit Notice") and at SIL's sole expense, to audit EP-Team's books and records in order to verify such revenues, costs and calculations of fees. Any such audit shall be performed during EP-Team's normal business hours. EP-Team shall have the right to dispute the result of any such audit by SIL.  EP-Team shall maintain such books and records for a period of at least three years from the date of the relevant transaction.

## 9.  REPRESENTATIONS

The EP-Team represents, warrants and covenants to SIL that the EP-Team is not restricted in any way, by agreement or otherwise, from entering into this Agreement or performing the Services.

SIL represents, warrants and covenants to the EP-Team that SIL is not restricted in any way, by agreement or otherwise, from entering into this Agreement.

Notwithstanding the foregoing, the parties acknowledge that certain legal reviews are required to ensure legal and lawful operation of the intended service according to US Federal Maritime Commission regulations.

## 10.  CONFIDENTIALITY

SIL and the EP-Team agree that the terms and conditions of this Agreement are confidential and the parties hereto agree not to disclose the terms of this Agreement to any third party (other than to their respective attorneys, accountants, advisors and affiliates) except (i) as may be required by law or by the order of a court of competent jurisdiction, (ii) where such information is or becomes publicly available through lawful means without breach of this Agreement, or (iii) with the prior written consent of the other party. However, the parties agree that disclosures by either party to entities who propose to purchase from such party (or its affiliates) or enter into a financing transaction with such party (or its affiliates) concerning property of SIL (or its affiliates), or who propose to become investors in such party (or its affiliates) will not violate the terms of this confidentiality provision.

## 11.  COMPLIANCE WITH LAWS

Except as noted with respect to start-up costs relating to legal status of the vessel operations, the EP-

3

As agreed:    *David R. Pulk*

Dated: April 9, 2006



Team shall, at its own expense, comply with all laws, rules and regulations, and assume all liabilities or obligations imposed by such laws, rules and regulations, with respect to the EP-Team's performance hereunder.

SJL shall, at its own expense, comply with all laws, rules and regulations, and assume all liabilities or obligations imposed by such laws, rules and regulations, with respect to its status as charter party of the vessels and also as owner of the cargo on the outbound voyages.

### 12. INDEMNITY

Each party shall indemnify the other and its affiliates, partners, principals, representatives and employees from and against any and all liability, damages, losses, claims, demands, judgments, costs and expenses of every nature and kind, by reason of injury to or death of any person or damage to or destruction of property, to the extent arising out of the negligent acts or omissions or willful misconduct, of it and its employees, subcontractors or agents, if any, in performance under the Agreement. The provisions of this Section survive termination of the Agreement.

Neither party shall be responsible for any such losses, liabilities, claims, judgments, costs, demands, and expenses caused by the negligence and willful misconduct of the other party, its partners, principals, agents, representatives or employees. The provisions of this Section survive termination of the Agreement.

In the event litigation is filed against either party for which the other party may be responsible under this provision, notice shall be promptly given of such claim pursuant to the notice provisions of this Agreement.

### 13. APPLICABLE LAW

This agreement shall be construed and enforced in accordance with English Law.

### 14. ENTIRE AGREEMENT; SUPPLEMENTS AND MODIFICATIONS

This Agreement constitutes the entire understanding between the parties hereto with respect to the subject matter hereof and shall supersede all previous negotiations, commitments, understandings, and agreements. The parties may make changes or supplements to this agreement; such changes or supplements shall be reduced to writing, executed by authorized individuals of the parties and copies of such writings attached to this Agreement.

### 15. ARBITRATION

If any dispute arises between the parties out of or in connection with the agreement whether in the nature of interpretation or meaning of any term hereof or as to any claim by one against the other, or otherwise, the same shall be referred to arbitration of a common arbitrator if agreed upon or to arbitrators one to be appointed by each party to the dispute and the arbitration shall be governed by the Arbitration Act for the time being in force. Unless the parties to the dispute mutually agree to the location of the arbitration, the arbitration shall be held in Singapore.

### 16. ATTORNEYS' FEES

In the event of any litigation occurring out of this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees in connection with such litigation.

4

As agreed:     *David R. Pulk*
Dated: April 9, 2006

## 17. MODIFICATIONS

Except as expressly provided herein, no modifications to this Agreement shall be valid unless made in writing and signed by the duly authorized representative of SIL and the EP-Team, and neither the acquiescence in any performance at variance to the provision of this Agreement nor the failure to exercise any right or enforce any obligation hereunder shall be deemed a modification of this agreement.

## 18. NOTICES

All notices or requests to be given under this Agreement and all other communications related to the Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, sent by overnight courier or mailed, first class, by registered or certified mail return receipt requested, addressed as follows, and shall be effective when received:

For SIL:

Mr. Sanjeev Bangad
General Manager -- Logistic
5th Floor - Godrej Millenium
9, Koregaon Park Road
Pune, 411-001
Maharashtra
India

For EP-Team

Mr. David Pulk
President
320 Lake Trail Court
Double Oak, Texas 75077-8491
USA

Either party may change such address, designation, or title of the individuals by written notice issued and delivered as above.

SIGNED by the parties to be effective as of the date first written above.

SUZLON INFRASTRUCTURE LTD.

By: _____

Name: _____
Title: _____

EP-TEAM, INC.

By:  *David R. Pulk*

Name: David R. Pulk



greed:  *David R. Pulk*
Dated: April 9, 2006

16

ATTACHMENT A                                                                                  17

Legal Character of Service

It is the intent of the parties to represent in its sales that the actual services to be provided by the vessels is to be a non-liner service and further that there will be no specific tariff filings requisite to US Federal Maritime Commission requirements for vessel operating common carriers (VOCCs) or non-vessel operating common carriers (NVOCCs). The parties shall secure appropriate legal advice on how to structure its sales efforts and the charter operations to ensure such intended status.

Start-up Costs for the Vessels

Costs associated with such legal advice on the structure of the vessel service and other costs relating to the vessels legal and regulatory status (such as laws and regulations of other countries) shall be borne by EP-Team

Structure of Sales and Support Services

EP-Team will represent SIL in its efforts to develop freight for its voyages from United States.

The parties shall mutually develop standard operating and accounting procedures to manage the sales, operations and accounting processes prior to the sailing of the first voyage from United States. These shall include appropriate consideration for insurance coverage, requirements for bonds and certificates of financial responsibility.

EP-Team will provide dedicated sales and support staff in offices to be managed from a base of operations in Houston, Texas, based upon the capacity of the vessels and the anticipated trade lanes to be solicited for freight. Costs associated with this staff and any legal and regulatory obligations relating to such staff will be borne by EP-Team.

EP-Team anticipates additional support offices in Dallas, Texas (USA); Dubai, UAE; and Mumbai and Ahmedabad, India; as well as utilizing existing structures and sales organizational support in various global markets, (i.e., Seoul, Korea; Singapore; Paris, France; Hong Kong, S.A.R.; Amsterdam, Netherlands, etc.), and may open additional offices as required to maximize revenue to SIL for voyages from United States.

EP-Team shall target opportunities for the voyages from United States that will maintain SIL's 90 day round trip voyage sales order fulfillment planning schedule, unless otherwise waived by SIL due to significant revenue enhancement opportunities or otherwise.

EP-Team shall further coordinate with SIL on all opportunities for additional cargo for voyages from India.

EP-Team's focus for sales shall be in the following lanes:

Voyages from India:

* Space/cube as available on India-to-Houston trade lane

                                           7            As agreed:  *David R. Pulk*
                                                          Dated: April 9, 2006



- By inducement to/from those points wherein outbound voyages will be routed from India ports to other points, including, but not limited to, China, Republic of Korea, etc.

Voyages from United States

- Houston to all ports in India
- Inducement calls USA-ports Gulf/East Coast to ports of call within acceptable deviation (time and cost) from otherwise empty return voyage to Kandla/Mumbai
- Inducement calls to Ports in the Mediterranean Sea
- Inducement calls to Ports in the Red Sea, Arabian Sea and Arabian Gulf Via Suez Canal
- Provide for authorized P2-level B/L per U.S.A.-government "USA-flag vessel" using legal transit (not cabotage vessel - primarily lighter/barge to Kuwait, Oman, Qatar, and Iraq ports via Dubai, UAE)
- "Cargo of opportunity" to ASPAC-ports (China, Korea, etc.) Via Panama Canal based on inducement

## Accounting

Booking of Cargo for Voyages from India and United States

EP-Team shall be responsible for invoicing all amounts to companies which booked cargo on the vessels. EP-Team shall give credit and terms of credit to such companies per industry standards using industry accepted credit checking practices with prior written consent of SIL.

EP-Team shall account for all revenue billed and received on a per vessel voyage basis. EP-Team shall provide weekly reports to SIL of all accounts payable and receivable issues. Amounts due from customers but not yet received as of the time of vessel net revenue accounting and payment, shall be accounted for, commissions determined and net amounts paid to SIL on a monthly basis.

## Compensation

Various types of costs (fixed and variable) associated with the operation of the various vessels shall be established and agreed upon by the parties based upon the contract in effect between SIL and the vessel owner, or otherwise established at time of vessel voyage.

For actual costs assessed by third parties for such delay, diversion or otherwise due to the additional freight on the voyage, the parties shall agree upon who shall be responsible for payment of such costs. If SIL is the responsible party, it shall provide relevant cost information to EP-Team for further revenue accounting of the vessel voyage. This agreement shall be incorporated within the mutual standard procedures to be developed by the parties.

30 days after completion of each vessel voyage, EP-Team shall account for all revenue billed and received from customers (gross revenue) and compute net revenue based upon all costs associated with delay, diversion or carriage of non-SIL freight on the voyage. Net Vessel Voyage Revenue shall be Gross Revenue achieved per vessel less Vessel Operating Costs (those costs associated with inducement/delay, diversion and additional freight) including but not limited to, port fees, terminal/stevedoring, transit fees (Suez Canal), additional days of charter ("day rate" and bunker assessments). Details relating to these processes shall be incorporated in the standard procedures to be developed by the parties.

8

As agreed:    *David R. Pulk*

Dated: April 9, 2006



Net Vessel Voyage Revenue shall then be apportioned between SIL and EP-Team according to the following formula which shall be reviewed every six months and mutually agreed upon by the parties to be in line with the market trends. EP-Team shall remit the net revenue split due to SIL at that time.

EP-Team agrees that the cargoes that shall be booked by SIL for voyages from United States through their own contacts and in which EP-Team has no role to play, for such shipments the revenue will not be shared by SIL with EP-Team as would be agreed below, however they shall be paid 2% of net revenue earned as services charges for the services provided by EP-Team to SIL or its clients.

The details of the compensation, (commission on sales) schedule is listed below by example. The commissions are based on cumulative revenues attained, (i.e.; first dollar sales accrued from net revenue per vessel at the level noted).

| NET REVENUE per VESSEL (from and up to) | Incremental Commission to EP-TEAM for sales | | |
|---|---|---|---|
| $ 700,000 | 8.0% | | |
| $ 1,000,000 | 10.0% | | |
| $ 1,250,000 | 12.5% | | |
| $ 1,500,000 | 15.0% | | |
| $ 2,000,000 | 17.5% | | |
| $ 2,500,000 | 20.0% | | |

COMMISSIONS are based on NET REVENUE per VESSEL as defined in the AGREEMENT. Sales commissions are to be paid to EP-TEAM based on total cumulative revenues from US$1-base sales as calculated from NET REVENUE per VESSEL.

Port Handling and other Charges for Origin/Destination Services on Cargo Loaded on Vessels

EP-Team shall be responsible for securing all services required by SIL for efficient and effective offloading/loading of cargo as well as storage and beyond transportation. EP-Team shall further manage the pricing, invoicing, processing and payment for such services and in turn invoice SIL for such services.Prior to commencement of any such service, EP-Team shall provide to SIL all rate sheets, terms and conditions, tariffs and other relevant sources upon which its invoices are to be based and the same shall be approved by SIL before invoicing takes place. The intent of this process is to ensure that EP-Team is paid by SIL within the credit terms extended to EP-Team by the actual service providers.



9

As agreed: *David R. Pulk*
Dated: April 9, 2006

April 20, 2006

ADDENDUM No. 1 to Sales and Logistics Services Agreement

Attn: Mr. Sanjeev Bangad
Suzlon Energy Ltd.
On behalf
Suzlon Infrastructure Ltd.LTD

Thank you. We are in receipt of the copy of the contract executed by you on behalf of
SIL, and forwarded to us by S. Raam Kummar. We are in general agreement with you on
all points, with the following comments due to a need for clarification or correction.

Please refer with your agreement to the below points.

1.  The version that we received contains no page 6. It appears that the main body of the
    contract ends at page 5 and continues on page 7 with Attachment "A". This
    clarification is to note that there is no page 6 which forms a part of the Agreement.

2.  We need to put in a specific date at the beginning of the contract as the effective date
    of the Sales and Logistics Services Agreement - April 19, 2006 should be considered
    the effective date of the Agreement.

3.  Section 1 – Preliminary Statement, Planned Scope of Use of Charter Vessels. The
    first paragraph, third line mentions "inbound voyages". We believe that this was
    changed in error by Suzlon in a recent draft. It should be "outbound voyages". This
    will serve to be a modification to that phrase.

4.  Section 2, 2nd paragraph, second sentence. This sentence refers to "voyages from
    United States". Again, this section was changed in a recent draft by Suzlon and the
    original scope of the provision has been unintentionally altered. The paragraph is
    referring to voyages from India and the ability of EP-Team to supplement outbound
    voyages with additional non Suzlon cargo. This paragraph was not meant to apply to
    voyages from the United States. Therefore, this shall serve as a correction of the
    quoted phrase from "voyages from United States" to "voyages from India".

5.  Attachment "A" – Start Up Costs. As discussed and acknowledged by you today, we
    will revert to the original intent and language of this provision whereby EP-Team
    shall advance such costs, which shall be accounted for as a cost of operation against
    the first revenue generating charter vessel or vessels, in order to insure establishment
    of a lawful and legal vessel service for booking of non-Suzlon cargo on these vessels.

6.  Prior versions of the contract failed to account for the situation whereby the US
    regulatory authorities would object to our stated goal of operating a non-VOCC or

NVOCC service (or this objective otherwise fails to receive affirmative legal advice). In that event, we may need to establish a VOCC service. We anticipate that for that service the US regulatory authorities will at a minimum require for SIL to execute an assignment of your charter party to EP-Team for nominal consideration (eg. "One US Dollar per day") to legitimize the VOCC service by EP-Team.

This will simply acknowledge our understanding and agreement that a form of such assignment may be required. In that event, this will require immediate attention, cooperation, and execution of such assignment, taking such reasonable steps in order to insure compliance with relevant laws and uninterrupted vessel services.

7. The final issue is related to contractual port services upon arrival Houston for vessel no. 1 – "M/V Beluga Spirit", inclusive of terminal handling, stevedoring, and onward inland transportation wherein our Agreement indicates a potential overlapping of responsibilities with what we assume to be existing contracts for such services. In order to facilitate such services to SIL, please clarify this point, as we will work toward the optimization of SIL's interests.

This shall constitute Supplement No.1 to Sales and Logistics Services Agreement between Suzlon Infrastructure Ltd. and EP-Team, Inc., pursuant to Section 14 of said Agreement...

For: SUZLON INFRASTRUCTURE LTD.

Sanjeev Bangad

_____

Dated: _____

For: EP-TEAM, Inc.

David R. Pulk

_____

Dated: ___20 April 2006_____

November 10, 2006

**Attn: Mr Sanjivv Bangad**
**Suzlon Energy Ltd**
**On behalf of**
**Suzlon Infrastructure Ltd**

Dear Sanjivv,

<u>Re: Addendum No 2. to Sales and Logistics Services Agreement between EP-Team and Suzlon Infrastructure</u>

In accordance with our discussions over the past weeks we are presenting our suggested modifications to the wording of the Sales and Logistics Services Agreement executed between Suzlon Infrastructure Limited and EP-Team Inc on April 9, 2006 and as modified by Addendum No.1 dated and accepted April 20, 2006.

Please sign to confirm your agreement to the following points:

**A. <u>Replacement of Termination clause with the following wording:</u>**

**7.** *Termination*

*A party shall have the right to terminate this arrangement by giving the other party 30 days notice of the same at any time during the currency of this agreement only in the following cases:*

- *Where a serious breach of contract by a party has been notified to the party by the other party and where within 30 days of such notification no action plan has been set forth by the party to the other party to mitigate the breach then the other party may choose to terminate the contract.*

- *Where a party has committed an act of willful negligence causing material loss to the other party in performing its obligations under this agreement and where within 30 days of such act no action plan has been set forth by the party to the other party to mitigate the loss then the other party may choose to terminate the contract.*

- *Where a notice of default has been served and the procedure dealing with such notice has been followed and the party in breach has failed to remedy the breach then the other party may terminate the contract.*

*On such termination both the parties shall continue to perform their duties for the shipments already underway and shall be bound by the terms of this agreement till such time the activity undertaken or initiated prior to termination is not completed in totality.*

*The parties on such termination shall continue to cooperate with each other to ensure proper closure of accounts and completing all activities for the termination of the arrangement.*

*Upon receipt of such notice, the party receiving such notice shall:*

- *Stop work on the date and to the extent set forth in such notice, and*
- *Take such further action regarding termination of the services or the Agreement as the party seeking termination may reasonably direct.*

23

**B. Replacement of Compensation clause in ATTACHMENT A with the following wording:**

*Compensation*

*Except where otherwise agreed in advance in writing between the parties the costs of operation of the vessels shall be borne by SIL.*

*EP-Team shall be compensated in the following manner for its services:*

1.     *In relation to SIL vessels on voyages to India:*

*EP-Team will be remunerated by way of a composite fee to cover management of the following activities:*

- *Sales and marketing to customers of cargo space for voyages to India*
- *Invoicing and collection of payments from customer for cargo sold on SIL vessels by EP-Team*
- *Regular reporting of all activities related to SIL vessels for which EP-Team is responsible for including but not limited to regular outlook on cargo prospects, rates and market conditions, invoicing activity, port handling, and agency activity.*
- *Administration of payments of port and agent dues and charges related to return voyages to India*
- *Administration and oversight of port handling in Houston and other ports West of Suez for which PSL is responsible for sales and marketing return voyages to India*

*The management fee to be paid to EP-Team for this activity shall be as follows:*

- *Where the net revenue accumulated on a voyage is USD1,400,000.00 or below, EP-Team shall be due an amount of 5% of the net revenue.*

- *Where the net revenue accumulated on a voyage amounts to more than USD1,400,000.00 EP-Team shall be due an amount of USD70,000.00 plus 6.5% of the difference between the net revenue and USD1,400,000.00.*

- *For the purposes of this agreement net revenue on a voyage is read as gross revenue for that voyage less:-*

  o   *Agency commissions incurred by EP-Team in securing cargos for that voyage*
  o   *Stevedoring costs incurred in operating cargos secured by EP-Team on that voyage in ports after the origin port and before the destination port.*

*The management fee shall be invoiced to SIL by EP-Team upon completion of all invoicing for each voyage and will become payable immediately.*

2.     *Off-hire of Vessels*

*All costs associated with the off-hiring of vessels will be borne by SIL. Where EP-Team is called upon to administer the off-hire of vessels in Houston and / or other ports a management fee of USD2,500.00 will be charged by EP-Team to SIL and invoiced by EP-Team to SIL along with any other costs directly incurred by EP-Team in administering this activity.*

3.     *Other Activities*

24

*SIL may from time to time request EP-Team to engage in other activities not listed here on its behalf in relation to the operation of the vessels. Where EP-Team is called upon to engage in such activities the parties shall agree separate terms.*

*The parties will use their best endeavours to ensure that these terms are agreed in advance of the activity commencing although it is recognized that this may not always be possible for safety, commercial or operational reasons.*

*Where EP-Team has engaged in such activities and it has not reached agreement on terms and conditions, EP-Team will be entitled to invoice its costs associated with this activity to SIL along with a management fee of 10% of such costs pending resolution of terms between the parties.*

This shall constitute Supplement No 2. to Sales and Logistics Services Agreement between Suzlon Infrastructure Ltd. and EP-Team, Inc., pursuant to Section 14 of said Agreement.

For: SUZLON INFRASTRUCTURE LTD.

Sanjeev Bangad

Dated _____ 10 — 11 — 2006

For: EP-Team, Inc.

David R. Fulk

Dated _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EP-TEAM, INC. and<br>PROSHIPLINE, INC.<br><br>Plaintiffs,<br><br>v.<br><br>ASPEN INFRASTRUCTURE, LTD. f/k/a<br>SUZLON INFRASTRUCTURE, LTD.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. H-07-2549 |

## PLAINTIFFS' RESPONSE TO
## DEFENDANT'S MOTION TO STAY PENDING ARBITRATION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs file this response to Defendant's Motion to Stay Pending Arbitration and would respectfully show as follows:

### I.
### SUMMARY OF RESPONSE

The motion should be denied because the subject Arbitration Clause is not enforceable against EP Team. The Clause is not enforceable against EP Team because EP Team assigned the subject Contract to ProShipLine in April or May 2006, over a year prior to Movant's initial attempts to request arbitration in August 2007.

### II.
### FACTUAL BACKGROUND

Respondents submit the following pertinent facts in support of this Response:

- 1 -

1.      Contrary to the statement made by Mr. Sanjivv Bangad in his affidavit submitted in support of the Motion to Stay, the initial "Sales and Logistics Service Agreement" (the "Contract") between Suzlon Infrastructure, Ltd. ("SIL") and EP Team, Inc. was entered into on April 19, 2006.  Later, on April 20, 2006 an amendment to the Contract was agreed upon between the parties.  After that, on November 10, 2006 the parties agreed to a second amendment to the Contract which allowed either party to terminate the Contract, but only "for cause."  On April 11, 2007, SIL changed its name to AIL.  Thereafter ProShipLine dealt with AIL regarding performance within the scope of work under the Contract.  Paragraph 2, Affidavit of David R. Pulk, CEO and President of EP Team and a Director of ProShipLine, which is attached hereto as Exhibit A and by reference incorporated herein.

2.      At the time of the negotiation of the Contract it was requested by SIL that EP Team provide for exclusivity and dedicated services to SIL for performance under the Contract and for which EP Team agreed to establish a new company to which it would assign its performance under the Contract.  Sometime between April 20, 2006 and May 9, 2006, ProShipLine, Inc. was formed and EP Team assigned its rights and duties under the Contract to it with complete notice to and the approval of AIL.  Paragraph 3, Affidavit of David R. Pulk.

3.      All of the bank accounts maintained for the performance of the "Sales and Logistics Service Agreement" (the "Contract") between Suzlon Infrastructure, Ltd. ("SIL") and EP Team were in the name of ProShipLine.  With the exception of a loan from EP Team to SIL in order to allow the discharge of freight from the first vessel under the terms of the Contract, and at the specific request of SIL, EP Team did not send or receive any money pertaining to the performance of the Contract, a fact which was always known by SIL which later changed its

- 2 -

name to Aspen Infrastructure, Ltd. ("AIL"). Paragraph 2, Affidavit of Jesus R. Baiza, General Manager of ProShipLine.

    4.    All of the invoices which were prepared for the agency fee (commission) under the Contract were issued in the name of ProShipLine and not in the name of EP Team. All of these invoices were sent to AIL for approval prior to being paid. Many of the invoices contained the following statement: "ProShipLine, Inc. as agents for Aspen Infrastructure Limited (Owners)." Paragraph 3., Affidavit of Jesus R. Baiza.

    5.    On July 5, 2007, ProShipLine was advised by Mr. Bangad that from August 1, 2007, it would no longer be the agent for AIL. ProShipLine understood this action to be the unilateral breach of the Contract by AIL that indicated AIL did not intend to perform any further obligations imposed by the Contract after August 1, 2007. ProShipLine accepted this breach by AIL and understood that ProShipLine was discharged from performing after August 1, 2007 any obligations under the Contract. Prior to receiving the notice and contrary to the November 2006 amendment, AIL had never advised ProShipLine that AIL considered ProShipLine to be in breach of any of its obligations under the Contract. Paragraph 4, Affidavit of Jesus R. Baiza.

    6.    ProShipLine at all times fully accounted for ocean freights which were collected on behalf of AIL during the operation of the Contract. Paragraph 5, Affidavit of Jesus R. Baiza.

    7.    ProShipLine fulfilled all of its obligations to AIL under the Contract up to the time of termination of the Contract by AIL which was Midnight, August 1, 2007, USA Central Daylight Time. Paragraph 6, Affidavit of Jesus R. Baiza.

    8.    ProShipLine at all times negotiated in good faith and kept proper accounts of payments made on behalf of AIL to third-party service providers. Under the terms of the

Contract, ProShipLine made payments to third-party service providers on behalf of AIL only upon the express authorization of AIL. Paragraph 7, Affidavit of Jesus R. Baiza.

9.      ProShipLine made payments to third-party service providers upon the express instructions of AIL received prior to the termination of the Contract by AIL on August 1, 2007. Paragraph 8, Affidavit of Jesus R. Baiza.

10.     Any claims which AIL has from the performance of the Contract are against ProShipLine rather than EP Team. Paragraph 5, Affidavit of David R. Pulk.

11.     After AIL unilaterally terminated the Contract without cause on August 1, 2007, and without any agreement on the resolution of the differences between AIL and ProShipLine, EP Team and ProShipLine commenced this lawsuit in this Court to seek direction on the application of law to the dispute, the implementation of the arbitration provision in the Contract and the safeguarding of the funds remaining in the ProShipLine impress account. ProShipLine has requested that the Court order the payment of the remaining funds in the impress account into an escrow account which will then be used to pay any judgment which ProShipLine obtains from AIL. Paragraphs 6 and 8, Affidavit of David R. Pulk.

12.     The ProShipLine impress account which has funds pertaining to the performance of the Contract has a balance of approximately $699,000.00. Paragraph 10. Affidavit of Jesus R. Baiza.

13.     ProShipLine believes that AIL breached the Contract and that ProShipLine will be entitled to recover damages against AIL, either in a lawsuit or an arbitration, far in excess of that amount. Paragraph 11, Affidavit of Jesus R. Baiza.

14.     On October 12, 2007, without ProShipLine's knowledge, AIL filed for and obtained an order from the United States District Court for the Southern District of New York

- 4 -

against EP Team for an attachment under the Admiralty Supplemental Rule B of the Federal Rules of Civil Procedure. Paragraph 9, Affidavit of David R. Pulk.

15.    On November 12, 2007, ProShipLine and EP Team received a notice from the New York counsel for AIL that US$6,098.56 has been attached from an EP Team bank account at JP Morgan Chase Bank. . Paragraph 10, Affidavit of David R. Pulk.

### III.
### ARGUMENT: WHY THE MOTION SHOULD BE DENIED

A.    The Arbitration Clause Is Not Enforceable Against EP Team Because EP Team Assigned The Contract To ProShipLine.

The Movant has invoked arbitration against EP Team but has disregarded the fact that EP Team, with Movant's permission, assigned it rights and duties under the subject Contract to ProShipLine. Therefore, contrary to the statement in Defendant's motion at page 6 that the "Arbitration Clause between the parties is valid, irrevocable and enforceable against EP Team", EP Team is not a proper party and therefore the Clause is not enforceable against EP Team.

Respondents contend that arbitration should proceed, but only as between ProShipLine and Aspen, and not between EP Team and Aspen and request a declaration from the Court as to this assignment.

B.    If The Stay Is Granted, The Stay Should Be Conditioned Upon Deposit Of Disputed Funds In The Court's Registry.

Respondents concede that there is not a proper basis for interpleader in this matter but in the interests of justice, Respondents respectfully request the Court to direct Respondents to deposit funds it is currently retaining into the registry of the Court pending the outcome of arbitration between ProShipLine and Aspen.

## IV.
## CONCLUSION

Respondents respectfully request that the Court deny the motion until it has determined

the validity of the assignment between EP Team and ProShipLine.    In the alternative,

Respondents will agree to a stay if (1) Movants agree that ProShipLine and not EP Team is the

proper party to arbitration and (2) Movants agree to allow Respondents to deposit the disputed

funds into the registry of the Court.

Respectfully submitted,

SHANNON, GRACEY, RATLIFF & MILLER, L.L.P.

Mark Romney
State Bar No. 17225750
Southern District Bar No. 208180
500 North Akard Street, Suite 2500
Dallas, Texas 75201
(214) 245-3090 - Telephone
(214) 245-3097 - Facsimile

Andrew Z. Schreck
State Bar No. 17813250
Southern District Bar No. 12929
Shannon, Gracey, Ratliff & Miller, L.L.P.
1301 McKinney Street, Suite 2920
Houston, Texas 77010
(713) 255-4720 - Telephone
(713) 655-1597 - Facsimile

Attorney for Plaintiff EP-Team, Inc.

- 6 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to all counsel of record in accordance with the Federal Rules of Civil Procedure on this _15_ day of November, 2007.

Mr. Keith B. Letourneau
Bell, Ryniker & Letourneau
5847 San Felipe, Suite 4600
Houston, Texas 77057

Mark Romney

- 7 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EP-TEAM, INC. and )
PROSHIPLINE, INC. )
)
)
Plaintiff, )
)
v. )    Cause No. H:07-cv-02549
)
ASPEN INFRASTRUCURES, LTD. f/k/a )
SUZLON INFRASTRUCTURE, LTD, )
)
Defendant. )

## PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT SUBJECT TO PLAINTIFF'S MOTION TO REINSTATE

Plaintiffs, subject to Plaintiffs' Motion to Reinstate previously filed herein, respectfully move this Court for leave to file an Amended Complaint for the reasons set forth herein:

### RELIEF REQUESTED

1. On December 5, 2007, the Court granted Defendant Aspen Infrastructure's ("Aspen") Motion to Stay Pending Arbitration. Filed concurrently herewith and incorporated herein by reference, Plaintiffs have filed their Motion to Reinstate respectfully requesting that the Court reinstate the instant action to permit Plaintiffs to seek the Court's declaratory judgment that the assignment of the Contract from EP-Team to ProShipLine on or about April 25, 2006, was a valid assignment of the Contract that is binding upon Aspen and/or that Aspen is judicially estopped from disputing the arbitrability of ProShipLine's claims against Aspen in the arbitration proceeding underway between Aspen and EP-Team in Singapore.

2. Plaintiffs therefore move the Court to reinstate the case to the active calendar, to grant Plaintiff's Motion for Leave to File an Amended Complaint Subject to the Motion to

PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT SUBJECT TO PLAINTIFFS'
MOTION TO REINSTATE                                                    PAGE 1

Exhibit 4 - Sullivan

33

Reinstate, and permit Plaintiff leave to file its Amended Complaint, in the form that is attached

hereto as Exhibit A and incorporated herein by reference, against Defendant for its claims

thereunder to be determined by a jury before this Honorable Court.

WHEREFORE, Plaintiff ProShipLine respectfully requests that the Court grant its

Motion to Reinstate the case to the Court's active calendar and that it further grant Plaintiff's

Motion for Leave to File Amended Complaint thereby permitting Plaintiff to bring its claims for

damages against Defendant before a jury and this Court.

Respectfully submitted,

Mark W. Romney
Attorney-in-Charge
Texas Bar No. 17225750
SD Texas Bar No. 208180
SHANNON GRACEY RATLIFF & MILLER, LLP
500 N. Akard Street, Suite 2500
Dallas TX 75201
Telephone: 214.245.3090
Facsimile: 214.245.3097
mromney@shannongracey.com

Andrew Schreck
Texas Bar No. 17813250
SD Texas Bar No. 12929
SHANNON GRACEY RATLIFF & MILLER, LLP
1301 McKinney St., Suite 2920
Houston, TX 77010
Telephone: 713.255.4700
Facsimile: 713.655.1597
aschreck@shannongracey.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF CONFERENCE

This will certify that the undersigned personally conferred with Keith Letourneau, counsel for Defendant, on January 9, 2008, regarding the content of Plaintiff's Motion for Leave to File Amended Complaint Subject to Plaintiffs' Motion to Reinstate. The parties were not able to agree on the relief requested herein and it is therefore submitted to the Court for resolution.

Mark W. Romney

## CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the foregoing was served electronically and was sent via certified mail, return receipt requested, to Defendant's attorney of record, Keith B. Letourneau, Bell, Ryniker & Letourneau, 5847 San Felipe, Suite 4600, Houston, Texas 77057 on January 9, 2008.

Mark W. Romney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EP-TEAM, INC. and )
PROSHIPLINE, INC. )
                    )
           Plaintiffs, )
                    )
v. )         Cause No. 4:07-cv-02549
                    )         JURY TRIAL DEMANDED
ASPEN INFRASTRUCURES, LTD. f/k/a )
SUZLON INFRASTRUCTURE, LTD, )
                    )
           Defendant. )

### PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs EP-Team. Inc. and ProShipLine, Inc. submit this, their First Amended

Complaint, and show the Court as follows:

### A. PARTIES

1.     Plaintiff EP-Team, Inc. ("EP-Team") is a corporation organized under the laws of

the State of Delaware, with its principal place of business in Houston, Texas. Plaintiff

ProShipLine. Inc. ("ProShipLine") is a corporation organized under the laws of the State of

Delaware, with its principal place of business in Houston, Texas. EP-Team and ProShipLine are

at times referred to collectively herein as "Plaintiffs."

2.     Defendant Aspen Infrastructures, Ltd. f/k/a Suzlon Infrastructure, Ltd. ("Aspen"

or "Defendant"), is a corporation originally organized under the laws of India as Suzlon

Infrastructure Limited, registration no. 25-16516, with its principal place of business at 5th Floor,

Godrej Millennium, 9 Koregaon Park Road, Pune, Maharastra, India ("Suzlon"). On a date not

known to Plaintiffs, Suzlon changed its name to Aspen Infrastructures Limited. Aspen is the



PLAINTIFFS' FIRST AMENDED COMPLAINT                         PAGE 1

same corporation (registration no. 25-16516) as Suzlon.    Defendant does not maintain a registered agent in the State of Texas.    Defendant has already answered and appeared herein.

## B. JURISDICTION

3.    The Court has diversity jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332(a)(2) because the suit is between citizens of Texas, and a citizen of India, and the amount in controversy exceeds $75,000, excluding interest and costs.

## C. VENUE

4.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a)(3) because defendant Aspen is subject to personal jurisdiction in this district and there is no other district where the action may be brought.

## D. FACTUAL BACKGROUND

5.    EP-Team is a Delaware corporation with its principal place of business in Houston, Texas. It was originally organized as a Nevada corporation, ("EP-Team Nevada"). It is a logistics management organization that provides business development and management services to various companies.

6.    Suzlon, now known as Aspen, is an Indian corporation that is involved in the shipment of machinery to the United States on vessels which it has chartered.

7.    Aspen time chartered several ships in order to deliver freight from an affiliated company in India to the United States.

8.    On or about April 19, 2006, EP-Team Nevada and Aspen entered into a Sales and Logistics Services Agreement, whereby Aspen appointed EP-Team Nevada as its exclusive United States sales agent to establish a sales and management operation to secure freight and

37

associated revenue on the ships that Aspen had chartered for the return voyages from the United States to India.

9.      The Sales and Logistics Services Agreement was subsequently amended by Addendum No. 1 on or about April 20, 2006 and by Addendum No. 2 on or about November 10, 2006. The Sales and Logistics Services Agreement, Addendum No. 1 and Addendum No. 2 are hereafter referred to as the "the Contract".

10.      Pursuant to the terms of the Contract, EP-Team Nevada was the exclusive agent for the appropriate selection, assignment, and management of the terminal facilitation, stevedoring and heavy lift operations related to the discharge and loading of Aspen's vessels at U.S.A. ports and loading and discharge at intermediate or other destination ports.

11.      Paragraph 5 of the Contract specifically provides that the rights and duties of the parties are assignable, in whole or in part by either of the parties. Pursuant to this clause EP-Team Nevada, with the knowledge and agreement of Aspen, assigned its rights and duties under the Contract to ProShipLine on or about April 25, 2006. The formation of ProShipLine which at that time was a Nevada corporation ("ProShipLine Nevada") and the assignment of the Contract was done, in part, at the request of Aspen.

12.      EP-Team Nevada and ProShipLine Nevada both agreed and considered that the rights and obligations under the Contract had been assigned. Further, because of the request and conduct of Aspen, EP-Team Nevada and ProShipLine Nevada both considered that Aspen was aware of the assignment and so conducted itself as to be estopped from denying the effectiveness of the assignment.

13.      At all material times down to and including on or about May 15, 2007, ProShipLine Nevada performed in all respects all of the contractual obligations of the Contract.

PLAINTIFFS' FIRST AMENDED COMPLAINT                                    PAGE 3

14.    On or about May 15, 2007, EP-Team Nevada was reorganized as EP-Team, Inc. a

Delaware corporation ("EP-Team"). On or about May 15, 2007, ProShipLine Nevada was

reorganized as ProShipLine, Inc. a Delaware corporation ("ProShipLine").

15.    The Contract provides that it is to be construed and enforced in accordance with

"English Law". The Contract further provides for arbitration as follows:

> "15. ARBITRATION.
>
> If any dispute arises between the parties out of or in connection with the
> Agreement, whether in the nature of interpretation or meaning of any term hereof,
> or as to any claim by one against the other or otherwise, the same shall be
> referred to arbitration of a common arbitrator if agreed upon, or to arbitrators, one
> to be appointed by each party to the dispute, and the arbitration shall be governed
> by the Arbitration Act for the time being in force. Unless the parties to the
> dispute mutually agree to the location of the arbitration, the arbitration shall be
> held in Singapore."

16.    Addendum 2 to the Contract provides that Aspen could only terminate the

Contract for cause as follows:

> "7.    Termination
>
> A party shall have the right to terminate this arrangement by giving the other
> party 30 days notice of the same at any time during the currency of this agreement
> only in the following cases:
>
> • Where a serious breach of contract by a party has been notified to the
> party by the other party and where within 30 days of such notification no
> action plan has been set forth by the party to the other party to mitigate the
> breach then the other party may choose to terminate the contract.
>
> • Where a party has committed an act of willful negligence causing material
> loss to the other party in performing its obligations under this agreement
> and where within 30 days of such act no action plan has been set forth by
> the party to the other party to mitigate the loss then the other party may
> choose to terminate the contract.
>
> • Where a notice of default has been served and the procedure dealing with
> such notice has been followed and no party in breach has failed to remedy
> the breach then the other party may terminate the contract.

On such termination both the parties shall continue to perform their duties for the shipments already underway and shall be bound by the terms of this agreement till such time the activity undertaken or initiated prior to termination is not completed in totality.

The parties on such termination shall continue to cooperate with each other to ensure proper closure of accounts and completing all activities for the termination of the arrangement.

Upon receipt of such notice, the party receiving such notice shall:

Stop work on the date and to the extent set forth in such notice; and

• Take such further action regarding termination of the services or the Agreement as the party seeking termination may reasonably direct."

17.    As of July 5, 2007, there were five vessels under charter party for which ProShipLine was providing services to Aspen.

18.    From the beginning of the Contract until the present time, Plaintiff has complied in all respects with its contractual obligations to Aspen. Plaintiff has not committed a breach of the Contract nor has it committed any act of willful negligence.

19.    By virtue of letters dated April 19, 2006 and May 18, 2006, Aspen categorically stated that ProShipLine Nevada was Aspen's exclusive general sales and port services agent to secure freight for loading from ports in the United States on vessels being time chartered by Aspen and/or was the exclusive authorized sales and general agent of Aspen to offer, negotiate, accept freight or cargo onto its ships. By virtue of a letter dated August 8, 2006, Aspen categorically stated that ProShipLine Nevada was authorized by Aspen to collect freights for the account of Aspen re MV Margaretha Green v.002 Thorold/Ambarli.

20.    As part of its responsibilities under the Contract, ProShipLine agreed to keep and maintain books and records reflecting revenues and calculations of gross revenue, vessel operating costs, net revenue and sales commission. ProShipLine maintained a bank account into

which it places funds received from the shipping customers and from which expenses, commissions and other expenses are paid ("the ProShipLine, Inc. SIL Account").

21.    On July 5, 2007, Aspen, by and through its General Manager for Logistics, Mr. Sanjeev Bangad, sent an e-mail to ProShipLine, which stated in part as follows:

"In continuation of the message below, please note that from 1st August '07, the owners (SE Shipping lines PTE Ltd) will have alternate agreements in place and thus ProShipLine will cease to be our agents.

This serves as required notice."

22.    By terminating the Contract in this manner and without cause, Aspen committed a material breach of the Contract and evidenced its intention not to be bound by the Contract on and after August 1, 2007.

23.    ProShipLine accepted Aspen's repudiation and was thereby discharged from performing any duties arising under the Contract beginning August 1, 2007.

24.    Aspen's repudiation of the Contract without cause on the part of either EP-Team or ProShipLine is a breach of the Contract. Furthermore, the unjustifiable breach by Aspen of the Contract and the revocation of ProShipLine's agency to complete its responsibilities for ships pursuant to the terms of the Contract have caused damages to ProShipLine for which it is entitled to seek restitution.

25.    Because a justiciable controversy had arisen between EP-Team/ProShipLine and Aspen pertaining to the terms and termination of the Contract and the contractual provisions pertaining to the application of English Law and the arbitration clause were ambiguous in that they were not specific in specifying what was defined by the term "English Law" nor what was meant by the term "Arbitration Act", Plaintiff and EP-Team filed their Original Complaint with this Court on August 6, 2007.

26.    On August 30, 2007, Aspen advised EP-Team that it had appointed an arbitrator in Singapore and on October 9, 2007, Aspen requested the Singapore International Arbitration Centre ("SIAC") to constitute an arbitral tribunal. On October 15, 2007, EP-Team appointed an arbitrator.

27.    Defendant filed its Answer and Motion to Stay Pending Arbitration on October 26, 2007. As its first defense to the Complaint in its Answer, Aspen stated categorically that "a valid arbitration clause exists, the dispute falls within the scope of the arbitration clause, and no external legal constraints prohibit arbitration of Plaintiffs' claims." Defendant further denied the allegations of Plaintiffs' Original Complaint that there had been an assignment of the Contract from EP-Team to ProShipLine. In its Motion to Stay, Aspen asserted to the Court that "the FAA mandates that Plaintiffs' claims be arbitrated in Singapore and that this Court enter a stay of these proceedings."

28.    Thereafter, on November 16, 2007, the Initial Scheduling Conference was held before this Court, at which time the Court took Defendant's motion under advisement. On December 5, 2007, this Court entered an Order administratively closing the case and granting the parties leave to move to reinstate the case on the Court's active docket at the conclusion of the arbitration proceedings in Singapore.

29.    Only after Aspen's Texas counsel represented to the Court that all of the claims in this litigation were subject to arbitration and the Court had taken under advisement Defendant's Motion to Stay did Aspen reverse its position with regard to the arbitration of claims which ProShipLine has against Aspen for its breach of the Contract.

30.    In a letter dated December 4, 2007, to the arbitration panel constituted in Singapore to hear Aspen's claims against EP-Team counsel of the firm of Joseph Tan Jude

Benny on behalf of Aspen asserted to the panel that: "[Aspen] does not agree to the substitution of ProShipLine for EP-Team as the Respondent or to ProShipLine being joined as a second Respondent to these proceedings." They further went on to say "[Aspen] is not aware of and denies that there was any and/or any valid assignment of the [Contract] by EP-Team to ProShipLine." Finally, Aspen asserted to the panel, "[w]e do not agree that ProShipLine should be joined as a party to the existing arbitration and it is [Aspen's] position that ProShipLine does not and cannot have any claim against [Aspen]."

31.    In an e-mail dated December 7, 2007, to the arbitration panel constituted in Singapore to hear Aspen's claim against EP-Team counsel of the firm of Joseph Tan Jude Benny asserted to the panel that "[Aspen]'s position is, and always has been, that the [Contract] was not made with [ProShipLine] nor was it assigned to [ProShipLine] by EP-Team. Accordingly [Aspen] had no contract with [ProShipLine]."

32.    On December 13, 2007, EP-Team assigned to ProShipLine all rights to sue for, recover and retain on its own behalf, damages from Aspen as a result of Aspen's breach of the Contract or any other obligations owed by Aspen to EP-Team in connection with or arising out of the Contract.

33.    By the position it has taken in the arbitration proceedings, Aspen has expressly disclaimed the prior position it has stated to this Court that the claims of ProShipLine against Aspen are the subject of a binding arbitration agreement. ProShipLine is, therefore, entitled to seek relief from this Court for which it hereby sues.

34.    Upon information and belief, Aspen has no assets in the United States from which Plaintiffs would be able to seek the payment of a future judgment other than the Account which

PLAINTIFFS' FIRST AMENDED COMPLAINT                    PAGE 8

ProShipLine manages on behalf of Aspen and any funds that ProShipLine has been able to attach pursuant to Supplemental Rule B attachments.

## E. CAUSE OF ACTION

### REQUEST FOR DECLARATORY RELIEF

35.    Plaintiffs reassert the allegations of Paragraphs 1-34 as if fully set forth herein.

36.    Pursuant to 28 U.S.C. §§ 2201 – 2202 and Fed. R. Civ. P. 57, Plaintiffs request a declaratory judgment from the Court clarifying its previous order in the case to include the following:

a. that the assignment of the Contract from EP-Team to ProShipLine on or about April 25, 2006, was a valid assignment of the rights and obligations under the Contract that is binding upon Aspen or that Aspen is judicially estopped from disputing the arbitrability of ProShipLine's claims against Aspen in the arbitration proceeding underway between Aspen and EP-Team in Singapore; alternatively, that Aspen is estopped from denying that the rights and obligations under the Contract were transferred from EP-Team to ProShipLine;

b. that Aspen has waived its rights under the arbitration clause contained in the Contract by evincing a clear intention to dispute that it is bound thereby, and that ProShipLine be permitted to assert its claims under the Contract against Aspen before this Court; and,

c. ordering the payment of the funds in the ProShipLine SIL Account to the registry of the Court pending the resolution of the dispute between EP-Team/ProShipLine and Aspen in the Singapore arbitration.

37.    Plaintiff is entitled to recover its attorney's fees and costs against Aspen pursuant to the terms of the Contract for which it hereby sues.

PLAINTIFFS' FIRST AMENDED COMPLAINT                    PAGE 9

## COUNT TWO—BREACH OF CONTRACT

38.    ProShipLine reasserts the allegations of Paragraphs 1-37 as if fully set forth herein.

39.    There was a valid assignment of the Contract from EP-Team to ProShipLine which transferred the rights and the obligations under the Contract to ProShipLine and/or Aspen is estopped from denying that those rights and obligations were transferred from EP-Team to ProShipLine.

40.    Aspen has waived its rights under the arbitration clause contained in the Contract by unequivocally stating that it is not bound thereby.

41.    Aspen is in breach of the Contract by terminating the same without cause on either the part of ProShipLine or its assignor EP-Team.

42.    As a result of the wrongful actions of Aspen, Plaintiff has suffered and will suffer damages in the amount of at least $5,750,000, for which it is entitled to restitution.

43.    Plaintiff is entitled to recover its attorney's fees and costs against Aspen pursuant to the terms of the Contract for which it hereby sues.

### F. JURY DEMAND

44.    Plaintiff requests that this matter be tried by a jury.

WHEREFORE, Plaintiffs EP-Team, Inc. and ProShipLine, Inc. respectfully request that Aspen Infrastructures Limited be duly cited in terms of the law to appear and answer herein, and that upon final trial hereof, Plaintiff ProShipLine have judgment against said Defendant as follows:

1.    A declaratory judgment of this Court as requested herein;

2. Damages in an amount that will be shown at trial;

3. The Plaintiff have and recover from Defendant Aspen it's expenses incurred,

including reasonable attorney's fees;

4. All costs of court be taxed against the Defendant;

5. Such other and further relief to which the Plaintiff may be justly entitled.

Respectfully submitted,

Mark W. Romney
Attorney-in-Charge
Texas Bar No. 17225750
SD Texas Bar No. 208180
SHANNON GRACEY RATLIFF & MILLER, LLP
500 N. Akard Street, Suite 2500
Dallas TX 75201
Telephone: 214.245.3090
Facsimile: 214.245.3097
.......shgmlaw.com

Andrew Schreck
Texas Bar No. 17813250
SD Texas Bar No. 12929
SHANNON GRACEY RATLIFF & MILLER, LLP
1301 McKinney St., Suite 2920
Houston, TX 77010
Telephone: 713.255.4700
Facsimile: 713.655.1597
.......shannongracey.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the foregoing was served electronically and was sent via certified mail, return receipt requested, to Defendant's attorney of record, Keith B. Letourneau, Bell, Ryniker & Letourneau, 5847 San Felipe, Suite 4600, Houston, Texas 77057 on January _____, 2008.

_____

Mark W. Romney

47



**EP-Team**
Energy & Projects Team

320 Lake Trail Court
Double Oak, Texas 75077-8491 U.S.A.
Phone : +1 (817) 490-0805
Mobile : +1 (214) 912-3262
Email: david.pulk@ep-team.net
Alternate (internet) email: plblogisticspulk@aol.com
Web-site : www.ep-team.net

25th April 2006

Mr. Sanjeev Bangad
General Manager - Logistics
Suzlon Energy Ltd.
Suzlon Infrastructure Ltd.
5th Floor - Godrej Millennium
9, Koregaon Park Road
Pune – 411 001 – India

Re:    Sales and Logistics Services Agreement, executed 19th April 2006
       inclusive Addendum no. 1 to above dated and agreed 20th April 2006

Sanjeev:

As per our discussions and your advice, as SIL is interested in a "dedicated service partner", we are in agreement that to best serve the needs of SIL under the terms, conditions and scope of that Agreement, we will form a NEWCO that will be provide for those services.

We have selected the name ProShipLine (to be referred to as "PSL"), which upon checking the "names registration" appears to be available in the public domain, and would anticipate formal registration and incorporation, under the laws of the State of Nevada within the next 10-workdays. Should there be any change in name or time schedule, we will further advise, however in the interim, please notify all vendors as you may anticipate working within our sphere of influence. As you have so well noted, we agree, a "neutral (new) name" will likely present best to our target client market.

As per the terms of the Agreement, (reference point no. 5), we will then hereby "assign this Agreement" for performance of service once that company is active. The Houston office is in the process of final set-up, and in the interim, all resources of EP-TEAM will be placed at your disposition.

We look forward to a long and mutually rewarding business relationship.

Respectfully,

David R. Pulk
President / CEO
EP-Team, Inc.

Cc:    Mr. Joseph Roberts
       Mr. Neil Johnson

Adelaide House London Bridge London EC4R 9HA tel +44 (0)20 7760 1000 fax +44 (0)20 7760 1111 www.blplaw.com DX92 London

berwin leighton paisner

48

our ref        MSP/25880.1
your ref
ddl            020 7427 1287
e-mail         michael.polonsky@blplaw.com

Vinayak Pradhan Esq                                                      30 November 2007
Skrine & Co
Kuala Lumpur
Malaysia
By e-mail vp@skrine.com

and

Sundaresh Menon Esq
Rajah & Tann
4 Battery Road #26-01
Bank of China Building
Singapore 049908

By fax no: 00 65 6538 8598

and

Madan Assomull Esq
Assomull & Partners
111 North Bridge Road
#22-04/05/06 Peninsula Plaza
Singapore 179098

By fax no: 00 65 6538 8598

Dear Sirs

**SIAC ARBITRATION NO. 63 OF 2007**
**IN THE MATTER OF THE ARBITRATION UNDER THE INTERNATIONAL ARBITRATION**
**ACT BETWEEN ASPEN INFRASTRUCTURES LTD (FORMERLY KNOWN AS SUZLON**
**INFRASTRUCTURES LTD) AND EP-TEAM IC**

We write in response to Mr Menon's letter dated 29 November 2007.

**Preliminary conference**

So far as concerns the intended preliminary conference for directions, Mr Polonsky of our London
Office is not available at any time on 5 December because he will be abroad on that date. He is
available to participate in a telephone conference call on Monday 3 December from and after 12.30
p.m. London time, and all day on Tuesday 4 December.

**Preliminary issues**

The claims which the Applicant intends to make in these arbitration proceedings are not set out
with any particularity in either of the documents which the Applicant identified as the Notice of
Arbitration in response to the Arbitrators' request by letter dated 16 November 2007. However in a

Berwin Leighton Paisner LLP is a limited liability partnership registered in England and Wales (registered number OC315919) and is regulated by the Solicitors Regulation Authority. A list of members of Berwin Leighton Paisner LLP and of the non-members who are designated as partners is open to inspection at the above registered office. The term partner is used to refer to a member of Berwin Leighton Paisner LLP or an employee or consultant with equivalent standing and qualifications. The members are either solicitors or registered foreign lawyers.

berwin leighton paisner

to
date     30 November 2007
page     2

49

letter to us sent on 16 November 2007 Joseph Tan Jude Benny set out what they described as "the gist of [their] client's claims in the arbitration ... briefly summarised" as being, inter alia:-

"(a)    the payment of monies to our client of monies belonging to our client that are currently being wrongfully withheld by your client and/or their agent and/or subcontractor ProShipLine, Inc,

(b)     damages for and consequent upon such wrongful retention, including but not limited to loss of use of the monies and/or interest

(c)     damages for and consequent upon any wrongful and/or unauthorised and/or improper use, disbursement and/or application of the monies belonging to our client

(d)     damages for and consequent on your client's failure to properly administer the Agreement including its termination, including but not limited to their failure to make payments properly due to third parties for services supplied in respect of our client's vessels

(e)     damages for your client's various breaches of its duties and obligations under, and/or the express and/or implied terms of, the Agreement."

We are instructed by both EP-Team, Inc ("EP-Team") and ProShipLine, Inc, ("ProShipline"). EP-Team is Respondent to these arbitration proceedings. We consider that ProShipLine is the proper Respondent to the claims set out above. This results from the Sales & Logistics Services Agreement (as amended) ("the Agreement") having been assigned by EP-Team to ProShipLine.

The letter from EP-Team to Suzlon Infrastructure Ltd dated 25 April 2006 (a further copy of which is attached) is either a valid legal assignment in accordance with the requirements of Section 136 of the Law of Property Act 1925, or it will operate as an equitable assignment (being evidence of a sufficient intention to assign).

The benefits of the Agreement which were transferred by assignment from EP-Team to ProShipLine were "conditional benefits" as that expression was explained by Megarry V-C in *Tito v Waddell (No 2)* [1977] Ch 106, at page 290. The obligation under the Agreement to account to Aspen Infrastructures Ltd (as principal) for the net freight payments collected was inextricably linked *ab initio* to the entitlement of the agent to act as agent for Aspen Infrastructures Ltd under the Agreement. Assignment of conditional benefits carries with it assignment of the linked obligations. ProShipLine, as assignee, also acknowledges that the obligation to arbitrate disputes arising under the Agreement binds it.

For these reasons the claims which Joseph Tan Jude Benny formulated in their letter sent on 16 November 2007 are claims which should be brought against ProShipLine and not against EP-Team.

Furthermore, as a matter of English law, the obligation to account for monies only arises with respect to freight charges actually collected and/or received by the party sought to be held liable to account. EP-Team collected and received no freight monies, which were all collected and received by ProShipLine.

We invite the Applicant to consent to the Tribunal making a procedural order to substitute ProShipLine for EP-Team as Respondent in these arbitration proceedings.

to
date    30 November 2007
page    3

In the event that the Applicant does not consent to this course of action, we invite the Applicant to consent to the Tribunal making a procedural order joining ProShipLine as a second Respondent to the present proceedings. If the assignment operates only as an equitable assignment, it is necessary under English law to join both assignor and assignee to the proceedings. The validity and effect of the assignment can then be determined by the Tribunal during the course of these proceedings. EP-Team will join with ProShipLine to counterclaim for damages for breach of the Agreement.

In the event that the Applicant does not agree to this second course of action, EP-Team will dispute the jurisdiction of the Tribunal. Such challenge will necessarily involve immediate consideration by the tribunal of the issue of the validity and effect of the assignment of the Agreement. Should the issue of jurisdiction be decided against EP-Team, it will wish to have determined as a preliminary issue the question of whether, as a matter of law, it can be liable to the Applicant to account for monies for freight charges which it did not collect or receive. (If a hearing is arranged for a jurisdiction challenge, the further preliminary issue could be heard immediately following the jurisdiction decision, if appropriate.)

General directions

In the light of the matters set out above, we do not think it is appropriate to suggest any general directions that should be given at this stage.

However we invite the Tribunal (1) to make a procedural direction (notwithstanding that the present proceedings constitute an ad hoc arbitration) to apply the SIAC Rules as the applicable procedural framework (as we have previously suggested to the Applicant's lawyers) and (2) to direct that the Applicant should file and serve Claim Submissions within 21 days so that the Tribunal and our clients can know the claims it proposes to make.

We look forward to hearing from you with the appointed time for the preliminary conference for directions. We apologise that because of time differences between Malaysia/Singapore and the UK the times of our availability may be difficult to fit into your normal working days.

Yours faithfully

Berwin Leighton Paisner LLP

cc.  Joseph Tan Jude Benny, by fax 00 65 6225 7827

sead\5899746.2

Sent Event (Event Succeeded)                                                                    51

| Date: | 12/14/2007 | Time: | 5:45 PM |
|-------|------------|-------|---------|
| Pages: | 4 | Pages Sent: | 4 |
| Rei |  |  |  |
| Fax |  |  |  |

## NOTICE OF ASSIGNMENT

By this Notice we, Shannon Gracey Ratliff & Miller, LLP, as attorneys for ProShipLine, Inc.,
of 3340-B Greens Road, suite 690, Houston, Texas 77032, inform you that on 13 December
2007 EP-Team, Inc., of 3700 Forums Drive, Suite 201, Flower Mound, Texas 75028 ("the
Assignor") assigned to ProShipLine, Inc. absolutely all rights that it had to sue for and
recover damages from Aspen Infrastructures Ltd. (a company incorporated in India,
registration no. 25-16516, and having its office at 5th Floor, Godrej Millenium, 9 Koregaon
Park Road, Pune, Maharastra, India 411001) for breach of a Sales & Logistics Services
Agreement originally entered into on or about 19 April 2006, as subsequently amended,
and/or for breach of any other obligations owed by Aspen Infrastructures Ltd. to the
Assignor. The assignment takes effect from the date of this notice.

Please acknowledge receipt of this notice by signing the enclosed copy and returning it to us.

Yours truly,

Mark W Romney

Shannon Gracey Ratliff & Miller, LLP

Dated 14 December 2007

3