07 Civ. 8813 (RWS)


DECLARATION OF
K. MURALITHERAPANY IN OPPOSITION TO DEFENDANT'S MOTION TO
VACATE
MARITIME ATTACHMENT


*Exhibit 10*

IN THE MATTER OF AN ARBITRATION

Between:

        Aspen Infrastructures Ltd.                       **Claimant**

        and

        EP-Team, Inc                             **Respondent**

## FIRST AFFIDAVIT OF DAVID PULK

I, **DAVID RAYMOND PULK**, of 3700 Forums Drive, Suite # 201 Flower Mound, Texas 75028, United States of America, **MAKE OATH** and say as follows:

1.    I am President, Chief Executive Officer and a member of the Board of Directors of EP Team Inc. I am also a member of the Board of Directors of ProShipLine, Inc.

2.    I make this affidavit on behalf of the Respondent EP-Team, Inc (hereinafter "**EP-Team**" or "**the Respondent**") and in response to the First and Second Affidavits sworn/affirmed by Sanjivv Bangad (hereinafter "**Mr Bangad**") on 13 March 2008 in support of the Claimant's Applications for Partial or Interim Awards No. 1, No. 2 and No. 3, and in support of EP-Team's application for a final award that all of the claims for relief set out in the Claimant's Points of Claim be dismissed with costs.

3.    Insofar as the matters deposed to herein are within my personal knowledge, they are true. To the extent that matters deposed to herein are not within my personal knowledge they are based on (a) EP-Team's files, records and papers and (b) an examination of various documents made available to EP-Team by ProShipLine, Inc. (hereinafter "**PSL**").

4.    I shall refer in the course of this affidavit to various documents. A copy of each of these appears in one or other of the two exhibits to this affidavit ("**Exhibit 1**" and "**Exhibit 2**").

5.    I shall deal first with the facts upon which EP-Team relies in connection with the Applications of the Claimant Aspen Infrastructures Limited (hereinafter "**Aspen**" or "**the Claimant**"), and then go on to make some observations upon the evidence filed by Aspen. My understanding is that the Claimant was originally known as Suzlon Infrastructure Limited, then changed its name to Aspen, and towards the

1

end of 2007, changed its name back to Suzlon Infrastructure Limited. For reasons of convenience I refer in this Affidavit to "Aspen" irrespective of whether the Claimant was at the relevant time known as Suzlon Infrastructure Limited (or "SIL") or Aspen Infrastructures Limited. References in the contemporary documents to "SIL" should therefore be understood to be references to Aspen. To assist the Tribunal in understanding the facts underlying the issues that arise in all three of the Claimant's Applications, I shall deal first with Application No. 3.

**APPLICATION No. 3**

6    Aspen contends that EP-Team was the counterparty to the Sales and Logistics Services Agreement made between Aspen and EP-Team in April 2006 as thereafter amended (hereinafter "**the Agreement**") throughout its term, and that Aspen's conduct in relation to the Agreement and to EP-Team was at all times on this basis (paragraph 27 of Bangad Affidavit No. 2). I shall set out below the facts that demonstrate why this position is incorrect and which support EP-Team's position on the issues to be determined on Application No. 3, namely (a) whether the Agreement was assigned by EP-Team to PSL or (b) whether the Agreement was novated into an agreement between Aspen and PSL and/or (c) whether Aspen is estopped from disputing that PSL was its agent under the Agreement. In doing so I shall necessarily deal (by reference to the documentation provided by PSL) with the nature of the relationship between Aspen and PSL.

**Completion of the Sales and Logistics Services Agreement**

7    In late 2005, during the course of sales in the Indian market one of the Respondent's staff (Amnon Ehrlich) heard that Aspen was seeking options for air cargo charter flights from Europe to India. My understanding is that the Claimant's business is the distribution of alternative energy producing devices (in particular, wind turbines) sourced or produced and sold by its parent company, Suzlon Energy Limited ("Suzlon"). Suzlon places its wind farm equipment in the USA and elsewhere outside India for customers who seek alternative energy sources and/or need to obtain carbon credits. As I understand the position, Suzlon finds a client in need of its products, and then sells and delivers that wind energy equipment to the customer and electricity producers. I have been informed by representatives of Suzlon that Suzlon generally suffers a financial penalty if it fails to deliver equipment on time. EP-Team's manager in the Netherlands at that time, Peter Bouwhuis, made a visit to India with Amnon Ehrlich and met Mr Bangad (then employed by Suzlon as its General Manager (International Logistics) in addition to later being General Manager of Aspen) at Suzlon's then main operational offices at

2

5th Floor, Godrej Millennium 9, Koregaon Park Road, Pune-411 001, India, to discuss what were their needs and what EP-Team might do to assist. Although EP-Team did not obtain a contract for the next air shipments that Suzlon was to make, it subsequently moved a series of air charters for Suzlon.

8      In March 2006 Mr Bangad and Mr Rajagopalan Sridhar (Head of Supply Chain Management & International Operations at Suzlon) invited me to meet them in Germany on very short notice. I agreed to do so in the belief that I might be able to expand the business relationship between EP-Team and Suzlon. Mr Bangad had suggested to me that we would be discussing "other" business. I was not sure where this might lead, but understood that the discussions potentially concerned the movement of cargo via sea freight transport. At that time I was not aware that any company other than Suzlon was involved, and did not know of the existence of Aspen. Both Mr Bangad and Mr Sridhar (as well as others of their associates whom I met during the March meeting in Germany) gave me business cards which showed Suzlon's name alone.

9      Meetings took place in Nuremberg on 6 and 7 March 2006 and in Düsseldorf on 8 and 9 March 2006. In addition to Mr Bangad and Mr Sridhar, the meetings were attended (for Suzlon and/or Aspen) by Mr Rajeev Paisule (DGM of Imports at Suzlon), and Mr P C Mehta (Head of Purchasing and a Vice President of Suzlon). The meetings coincided with meetings that were taking place between Suzlon and/or Aspen and Jaap den Hartog of Beluga Chartering. Beluga were attending these meetings in order to attempt to finalise charter contract arrangements for the charter of Beluga vessels by Suzlon or Aspen. This was the first indication to us of the existence of Aspen. It became clear that Aspen was intending to charter a number of vessels in order to deliver Suzlon's product to the market place from production sites in India. During these discussions we assisted Aspen in formulating their requirements. The discussion then moved on to whether EP-Team would be prepared, on behalf of Aspen, (a) to manage the vessels when they arrived at ports in the United States and Canada, as well as in parts of South America (primarily Brazil, Mexico and the Caribbean) and Europe (primarily Mediterranean locations) west of the Suez Canal, and (b) to sell cargo space in them to third parties for their return voyage after delivery of Suzlon's wind turbines, towers and blades. I was interested in this proposal and we discussed a general framework of how the relationship might work. Further, on 6 March 2006, we met with the Senior Chartering Manager, Jens Melivang of BBC Chartering and Logistics, who was similarly seeking sea freight "part-charter" (time/volume) business from Suzlon. I read through the documents, was present and assisted

3

Suzion during the final negotiations. These led to the signing of the contracts for the vessels from Beluga and for additional space from BBC. It was conveyed to me by Mr Bangad and Mr Sridhar that the then projected charter vessels (3 to 4 vessels immediately from Beluga) would not be sufficient to accommodate the projected volumes of cargo necessary to ship for Suzion in the near-term, and hence space purchase on the BBC "open market vessels" would be necessary in the short-term. I was also told that longer-term the number of vessels under the direct control of Suzion and/or Aspen would of necessity increase in order to ensure delivery of goods to market. Initial projections advised to me were of between 6 to 8 vessels by mid-2007, and possibly more thereafter, and that consequently if we were to sign a contract, we would have to "gear up" to handle the necessary volume of vessel voyages and sale of "return loads" to offset the costs of operating the vessels.

10    Following these meetings in Germany, I discussed the Aspen proposal with colleagues at EP-Team. We made the decision to progress negotiations with Aspen and, following further discussions with Mr Bangad, I sent to him on 23 March 2006 an e-mail setting out proposed outline terms for a contract between Aspen and EP-Team. In early April 2006, together with Robert (Bob) Buhl (EP-Team's Vice President (Operations)) and Joseph (Joe) Roberts (EP-Team's in-house legal counsel), I flew to Pune, India, to continue negotiations with Mr Bangad. At this stage the structure of the business arrangement was put down on paper in a more formal way, and a first draft of an agreement between the parties was prepared. Bob Buhl and I had to leave to attend to other business before negotiations with Aspen were concluded, but Joe Roberts remained behind to continue discussions and to finalise what was to become the initial Agreement. He kept us informed of progress by e-mail. A further draft of the contract (the detail of which I believe to have been negotiated between Joe Roberts and Navita Menon, Suzlon's in-house lawyer), was circulated to us on 7 April 2006. Following telephone discussions with Mr Bangad, on 9 April 2006 I prepared a revised draft which I sent by e-mail to him on 10 April 2006. Following further telephone negotiations with Mr Bangad, I prepared another revised draft of the agreement which I sent to him by e-mail on 12 April 2006. Mr Bangad responded by sending me a copy of my draft of 9 April 2006, marked up with his suggested amendments. Subsequent e-mail and telephone negotiations over the period to 19 April 2006 resulted in a final form of agreement that was signed on behalf of Aspen and sent to me by Mr Bangad by e-mail late in the evening of 19 April 2006 (when because of time differences the date in India was already 20 April 2006). My colleagues and I reviewed the signed Agreement. We noticed a small number of drafting errors in the body of the

4

Agreement which we believed required correction and/or clarification. We dealt with these matters by way of a short Addendum to the Agreement (Addendum No. 1). I returned the Agreement (countersigned by me) together with the Addendum No. 1 (also signed by me) to Mr Bangad by e-mail early in the morning of 20 April 2006. Addendum No. 1 was acknowledged and (with the exception of one point that needed to be clarified with the Claimant's legal adviser) was agreed in writing on behalf of Aspen the same day. The outstanding point concerned our observation that the phrase "voyages from United States" in paragraph 2 of clause 2 of the Agreement should be replaced by the phrase "voyages from India" because this paragraph concerned the ability to supplement outbound voyages from India with non-Suzlon cargo. I do not believe that this outstanding point was ever either expressly agreed to or rejected, but in practice this was not an issue for the simple reason that we were aware of minimal available capacity on Suzlon's voyages from India and thus had no opportunity to sell the space because the vessels were virtually full coming out of India. (For the sake of completeness, I mention that one further revision to the Agreement was made in November 2006 by Addendum No. 2.)

**The Creation of ProShipLine, Inc.**

11      During the negotiations preceding signature of the Agreement my colleagues and I agreed with Mr Bangad and his colleagues that once the Agreement had been signed, EP-Team would arrange for the incorporation of a separate and distinct company (which in my discussions with Mr Bangad was initially referred to as the "Newco"), to which the role of Aspen's agent under the Agreement would be transferred in substitution for EP-Team. There were at least two reasons for this. First, Mr Bangad and (as I recall) Aspen's in-house lawyer Navita Menon both told us that Aspen wanted a company which was 100% dedicated to its requirements. This was more than a suggestion from them; it was made clear that this was a requirement. Mr Bangad told us that he felt that EP-Team could not be 100% dedicated to their requirements because it had other customers. He said that the commercial market had to understand that PSL would be "neutral" in performing functions relating to Aspen's business. Second, we felt that it might be damaging to EP-Team's core business of providing logistics services if EP-Team were also seen in the market place to be performing the role of a "tied agent" for Aspen. In any event it was felt that, from a sales and marketing perspective, it would be advantageous to have a "unique" name and company dedicated to handling the Suzlon/Aspen business. For obvious reasons, we wished to avoid incurring all of the costs associated with setting up a new company until an executed agreement was

in place. However, as the negotiations progressed, we took a number of steps with a view to having the new company operational upon signature of the Agreement. Such steps included discussion of possible corporate names (leading to our selection of "ProShipLine"), investigation of appropriate incorporation formalities (we decided that the place of incorporation would be the State of Nevada), the identification of possible office accommodation, the recruitment of staff, the consideration of requirements for registration of the company with the FMC (US Federal Maritime Commission) as a VOCC (Vessel Operating Common Carrier), creation of "ProShipLine" stationery, and the construction of a website. A sample of documentation evidencing these steps appears at pages 1 to 17 of Exhibit 1. As soon as the Agreement was signed (19/20 April 2006) we took all necessary steps to finalise these and other necessary arrangements. PSL was incorporated at 8:00:21am on 3 May 2006. A copy of the Corporate Charter and Articles of Incorporation of PSL, confirming that company's incorporation on 3 May 2006, appear at pages 18 to 19 of Exhibit 1.

12    There was never any issue between Aspen and EP-Team as to why or whether the contract should be transferred to the "Newco" (i.e. to PSL), because the only question was when, and how soon, the legal formalities would be completed.    It was for this reason that all of the various drafts of the Agreement prepared during negotiations contained an express provision permitting the assignment of the Agreement by the Respondent.

13    Following signature by both parties of the Agreement on 19/20 April 2006, on 25 April 2006 I wrote a letter to Mr Bangad in the following terms:

> Re Sales and Logistics Services Agreement executed 19th April 2006
> Inclusive Addendum No. 1 dated and agreed 20th April 2006
>
> "As per our discussions and your advice, as [Aspen] is interested in a "dedicated service partner", we are in agreement that to best serve the needs of [Aspen] under the terms, conditions, and scope of that Agreement we will form a NEWCO that will provide for those services.
>
> We have selected the name ProShipLine (to be referred to as "PSL") and would anticipate formal registration and incorporation, under the laws of the State of Nevada within the next 10-workdays....in the interim, please notify all vendors as you may anticipate working within our sphere of influence. As you have so well noted, we agree a "neutral (new) name" will likely present best to our target client market.
>
> As per the terms of the Agreement (reference point no. 5 [the provision for assignment]), we will then hereby "assign this Agreement" for performance of service once that company is active. The Houston office is in the process of final set-up, and in the interim all resources of EP-Team will be placed at your disposition....."

6

A copy of this letter appears at page 20 of Exhibit 1.

14    On the same day, I updated Mr Bangad by e-mail as to the current status of various matters connected with implementation of the Agreement. This e-mail also referred to registration of the name "ProShipLine". A copy of the e-mail appears at pages 21 to 23 of Exhibit 1. I am also aware that on or about 26 April 2006 Peter Bouwhuis of EP-Team spoke to Mr Bangad on a number of matters relating to the Agreement. One of these concerned the number of direct enquiries that Aspen was getting from freight forwarders to which I understand Peter Bouwhuis's response to have been that, once it was made public that it was PSL who would be "taking care" of Aspen's vessels, such enquiries should be directed to PSL. A copy of two e-mails from Peter Bouwhuis referring to this exchange with Mr Bangad appear at pages 24 to 27 of Exhibit 1. On 29 April 2006, Peter Bouwhuis sent to Mr Bangad a sample "ProShipLine" Bill of Lading which was to be used by PSL for bookings on Aspen's vessels and which he wished Aspen's legal department to evaluate. A copy of this e-mail and its attachment appears at pages 28 to 30 of Exhibit 1.

15    On 3 May 2006 at 8:00:21am Joe Roberts filed the necessary papers to incorporate PSL in the State of Nevada, and PSL came into existence thereupon. Thereafter, on the same day, Bob Buhl sent an e-mail to Mr Bangad (copied to me) in which he referred to a number of issues discussed with Mr Bangad during an earlier conference call we had had with him. This conversation had included a discussion as to the need to make clear to third parties the correct identity of the party who would be performing the role of agent for Aspen in accordance with the provisions of the Agreement. The e-mail sent by Mr Buhl to Mr Bangad included the following notification:

### COMMUNICATION WITH THE TRADE & POTENTIAL SHIPPERS

*It should be clear who will sell and co-ordinate the Export Cargo from the United States. To avoid the confusion which has arisen recently, will help make the vessel successful for Suzlon.*

**EP-Team has assigned our contract to ProShipLine**, *with offices in Houston, TX 77070 (see www.proshipline.com)* [emphasis added]

*The letter below, on Suzlon letterhead, stamped, will meet this requirement.*

### QUOTE:

*To whom it may concern:*

*This is to advise you that Suzlon Infrastructure Limited (SIL) has entered into a Sales and Logistics Services Agreement effective April 19, 2006, whereby ProShipLine, Inc., is to be SIL's general sales and port services agent responsible to secure freight for loading from ports in the United States on vessels being time chartered by SIL. In addition, ProShip Line, Inc. is SIL's agent for the appropriate*

> *selection, assignment and management of the terminal facilitation, stevedoring and heavy lift operations as related to the discharge and further loading of SIL's vessel at USA Ports and loading/discharge all intermediate or other destination ports.*
>
> **UNQUOTE.**

On 4 May 2006 under cover of an e-mail from Raam Kumar of Suzlon (with a copy to, amongst others, Mr Bangad, PSL and me) Mr Buhl was provided with a signed letter from Aspen addressed to third parties (potential vendors, clients, etc) in the precise terms requested of Mr Bangad in the e-mail of 3 May 2006 as set out above. Aspen backdated this letter to 19 April 2006 (the effective date of the Agreement), thereby acknowledging and confirming the substitution of PSL for EP-Team as the agent under the Agreement from the beginning of the effective commencement of the Agreement. A copy of Mr Buhl's e-mail of 3 May 2006 together with the e-mail from Mr Kumar of 4 May 2006 (with its attachment) appear at pages 31 to 36 of Exhibit 1. A copy of the letter was subsequently publicly displayed by PSL on its website without any objection from Aspen. A screen shot of the relevant page on PSL's website (with an enlarged copy of Aspen's letter) appear at pages 37 to 38 of Exhibit 1.

**My Continued Role in Communications with the Claimant**

16    At this point, and for the sake of completeness, I confirm that on or about 8 May 2007

16.1    "ProShipLine, Inc.", the company referred to above and incorporated in Nevada) was reorganised as "ProShipLine, Inc.", a corporation formed under the laws of the State of Delaware,

16.2    EP-Team's predecessor, "EP-Team, Inc." (a company incorporated in Nevada) was reorganised as "EP-Team, Inc.", a corporation also formed under the laws of the State of Delaware.

Pursuant to these corporate reorganisations "ProShipLine, Inc." (of Delaware) and EP-Team, Inc. (of Delaware) succeeded respectively to the rights and obligations of the Nevada companies of the same names. For the purposes of this Affidavit the references "PSL" and "EP-Team" (or "the Respondent") refer both to the original Nevada companies and to their successor companies incorporated in Delaware. The shares of both PSL and EP-Team are owned by a holding company, Herculea Group Inc. (also of Delaware). EP-Team owns no shares in PSL.

17    I should also explain that although, when PSL became operational, EP-Team
      dropped out of the picture in relation to the agency relationship with Aspen, I
      continued to remain in communication with Aspen and also with PSL's operational
      staff. This was because although the PSL team interacted well with Suzlon, with
      Aspen and with Capt Anil Gupta (to whom I refer in paragraph 21 below) on most
      issues, there were grave communications issues between Mr Bangad and Roger
      Clark, who acted as PSL's Chief Operating Officer, such that Mr Bangad used to
      vent his anger at me and at Neil Johnson. Roger Clark did not like being told how
      to manage the business by someone who was frequently ignorant of the facts on
      the ground in Houston. When he was requested to come to Houston to see things
      for himself, Mr Bangad delayed promised visits. Roger Clark did not have the time
      or the patience to deal with someone as emotional and volatile as Mr Bangad. I
      had to counsel Mr Bangad on numerous occasions that it would not be possible for
      PSL to achieve the goals set by Aspen if all aspects were micro-managed from
      India. At no point did I or Neil Johnson get involved in the day-to-day running of
      PSL's business as we would not have had the time or the day-to-day knowledge of
      what was to be done -- hence the line-up of expertise we had assembled.
      However, I was very mindful that the relationship with Mr Bangad was important,
      and one which I knew that PSL was keen to support given the nature of the
      requirements of the business.

18    It was for this reason that I undertook responsibility for negotiating various
      revisions to the Agreement with Aspen in November 2006 which are recorded in
      Addendum No. 2 to the Agreement. In this effort I was joined by Neil Johnson.
      Our strong preference would have been for Roger Clark and Jessie Baiza to have
      represented PSL in India for this negotiation, but around that time Roger Clark's
      daughter was involved in a very serious and near-fatal car accident and he was
      therefore unable or unwilling to travel, and Jessie Baiza was running what was by
      then a very busy office with a number of vessels in and out of Houston around that
      time, and as he handled virtually all of the administration and accounting functions
      (especially payments) for PSL, it was not possible for him to travel to India. The
      Tribunal will note that Addendum No. 2 was entered into in the name of EP-Team
      rather than PSL. I did not involve lawyers in the drafting and completion of
      Addendum No. 2, and mistakenly believed that the parties to the document
      recording the changes needed to be the same as those who had signed the original
      Agreement. I now understand that this is not correct and that, having successfully
      concluded negotiations with Aspen on PSL's behalf, I should have ensured that
      Addendum No 2, recording the agreed varied terms, was signed by PSL. I am in
      no doubt, however, that in the negotiations that Neil Johnson or I conducted with

Mr Bangad and Miss Menon, Mr Bangad accepted that I was acting on behalf of PSL (not EP-Team) and that the terms he agreed with me were intended to constitute an amendment to the terms of the agency agreement between Aspen and PSL. I have been advised by EP-Team's lawyers that Addendum No. 2 in any event constitutes evidence of the change in terms agreed between Aspen and PSL.

19    I also add that, in the course of its business, EP-Team from time to time placed freight with PSL on behalf of third parties for carriage on Aspen's vessels. However EP-Team was in no position to control or influence whose cargoes PSL contracted for Aspen's chartered vessels to carry. Indeed, there were a number of shipments for which EP-Team quoted, only to find that others had been quoted lower rates or had been given availability by PSL when none had been given to EP-Team. At all times PSL acted "neutrally" to the commercial market, and gave no favour to EP-Team in terms of treatment or cost of service.

**PSL as Agent for the Claimant**

20    PSL was created by the shareholders of EP-Team in accordance with Aspen's wishes, specifically for the purpose of exercising in place of EP-Team the various rights and fulfilling the various obligations created under the Agreement. PSL, not EP-Team, carried out the entire performance of rights and duties as Aspen's agent under the Agreement. As had been discussed and agreed with Mr Bangad prior to the signature of the Agreement, from the time of its incorporation PSL stepped into the shoes of EP-Team under the Agreement. As proposed by Aspen's in-house counsel Navita Menon, and as agreed by Joe Roberts, the draft of the Agreement specifically contained a right for either party to assign the Agreement. Paragraph 5 of the Agreement stated that "The EP-Team and SIL may assign this agreement, in whole or in part". I believed at the time that was sufficient to permit the anticipated replacement and substitution of the counter-party under the Agreement. I now understand that, as a matter of English law, a better characterisation of the agreed substitution of PSL for EP-Team may be by way of novation which resulted in the creation of a new agreement between different parties (Aspen and PSL) on the same terms as the old Agreement and the discharge of EP-Team from further obligation thereunder.

21    At all times after PSL's incorporation, each of PSL, Aspen and EP-Team conducted themselves on the basis that PSL was the Claimant's agent under the Agreement and that EP-Team no longer had any rights or duties thereunder. At Exhibit 2 is a sample of documents from PSL's files which has been made available to me for the purposes of this Affidavit. The documents in this Exhibit provide clear evidence that

the role of Aspen's agent and the various responsibilities under the Agreement that
this entailed were performed by PSL. Those services included responding to
communications directed to PSL by Aspen and their principals, as well as
their vendors and customers regarding the operations; management and
maintenance of specific identified vessels; advertising for and lining up cargoes for
the return voyages of the vessels (after the Aspen-arranged cargoes discharged);
arranging for and managing stevedoring operations for the loading and discharge
of cargo on individual vessels; lining up and managing heavy-lift operations for
specified vessels and their cargoes; planning and executing pre-arrival cargo-
discharge through meetings (attended by the stevedore, the ship's husbandry
agent, the import client, Aspen's broker, and others) and otherwise to expedite and
facilitate the cargo handling and vessel operations; sourcing and arranging for port
captains; planning, developing, managing and implementing issuance of mate's
receipts, bills of lading and booking notes; co-ordinating and managing berthing
procedures, including co-ordination of port and harbour pilots; arranging and co-
ordinating load-out terminals, reviewing and confirming materials receipts,
statements of facts and making corrections thereto; the purchasing of dunnage and
additional equipment required for individual vessels' operations, including welding
equipment, oxygen and acetylene gases, fire blankets, etc; the appointment of port
agents for vessel husbandry; the management, supervision and oversight of cargo
discharge and stowing, including from onboard the vessels; the management of
communications between the vessels and Aspen, and between the vessels and
local and foreign third parties, etc with regard to cargoes, sailings, routing, etc; the
management and supervision of dockage, line handling, sounding of tanks, tug
assistance, preparation of holds for cargoes, and otherwise directly providing
supplies and needs of the vessels; entering into contracts of freight (by the issue of
booking notes[1]) on behalf of Aspen; and liaising with the captains of Aspen-
chartered vessels. Also amongst PSL's responsibilities under the Agreement was
obtaining approvals from SIL/Aspen's nominated representative, Capt Anil Gupta of
Marcotrans Shipping Pvt Ltd, for the proposed terms of contracts with third parties.
I should add that PSL regarded Capt Gupta as Aspen's vessel manager and
operator. He was the associate of Mr Bangad who brokered the vessel charters
with Beluga, managed Suzlon's fuel account, and brokered port and terminal

[1] The procedure followed in relation to freight contracts is that the agent sells space on vessels and issues a "booking note" for these sales. The booking note constitutes a binding contract between the consignor of the cargo or its agent and the operator of the vessel. The booking note is subsequently replaced on delivery of the cargo to the vessel by a Bill of Lading, the document against which the goods are released on arrival of the shipment at the port of destination.

11

requirements in India. It was to him that Mr Bangad delegated the function of agreeing the rates and loadability for every single shipment. He also acted as a technical liaison back to the vessel owner where engineering works were required. I draw the Tribunal's attention, in particular, to the following items:

21.1    a letter from Roberts Consulting to Grove Jaskiewicz and Cobert dated 8 May 2006 seeking advice on behalf of PSL in relation to regulatory requirements in respect of PSL's conduct of Aspen's business together with Grove Jaskiewicz and Cobert's response dated 15 May 2006 (see pages 1 to 8 of Exhibit 2);

21.2    an e-mail from Roger Clark to Mr Bangad dated 17 May 2006 concerning the form of bills of lading and booking notes to be issued by PSL on behalf of Aspen (see page 9 of Exhibit 2);

21.3    a letter from Mr Bangad to Panalpina (a potential client and freight provider which was induced by Aspen to place cargoes on the voyages of the Aspen-chartered vessels) dated 18 May 2006 in which Mr Bangad confirmed that "*Proshipline is our authorised Sales and General agents in the USA. They have all the authority to offer, negotiate and accept freight/cargoes from USA to any part of the world on our ships.... We reiterate no one other than Proshipline else is authorized either to offer on ship or negotiate/accept freight/cargo on our ships.*" (see page 10 of Exhibit 2);

21.4    a PSL presentation document sent by me to Mr Bangad by e-mail on 2 June 2006 which contains details of the business of PSL, PSL's personnel, and PSL's relationship with the Suzlon organisation. This presentation states in terms (after an explanation of the various ship charters entered into by Suzlon Energy Ltd) that "*Suzlon entered into an Agreement with ProShipLine, Inc. to act as General Agents in the USA for sale and management of those vessels from USA (ports)".* It also includes a copy of the letter from Aspen to Panalpina dated 18 May 2006 referred to in paragraph 21.3 above (see pages 11 to 19 of Exhibit 2), but from which the name of Panalpina had been removed on grounds of commercial sensitivity;

21.5    a third party "hold harmless" agreement dated 28 June 2006 to which PSL was a party and which PSL signed "as agent for Suzlon Infrastructure Ltd"

and which Mr Bangad countersigned on behalf of Aspen (see page 20 of Exhibit 2);

21.6    an e-mail from Mr Bangad to the captain of the *MV Margaretha Green* dated 7 July 2006 (see page 21 of Exhibit 2) in the following terms:

> *Please issue authorizaton to our General Agent in US to sign and release the bills of lading for the cargo to be loaded from any ports in the USA. Their details are as under:*
>
> *The ProShipLine office contact information is.......*
>
> *USA agents for Suzlon Infrastructure Ltd (Owners);*

21.7    an exchange of emails between PSL and Aspen in June to August 2006 (see pages 22 to 27 of Exhibit 2) which record that Aspen requested PSL to hire a sales manager whose cost would be reimbursed by Aspen to PSL; Aspen wanted PSL to have a high-level sales person dedicated exclusively to their requirements; PSL interviewed a number of candidates (amongst them being Finn Rasmussen and Tyler Moore); Mr Bangad authorised PSL to hire Mr Rasmussen and approved the cost which was to be reimbursed by Aspen; Mr Bangad confirmed his agreement by e-mail; although Mr Rasmussen was an excellent candidate he accepted employment elsewhere, and PSL (with prior approval of Mr Bangad) engaged Mr Moore by contracting with his company; PSL invoiced to Aspen the cost of Mr Moore's services from mid-August through October 2006 and thereby obtained reimbursement;

21.8    a letter from Mr Bangad to Planet Shipping Inc dated 8 August 2006 (see page 28 of Exhibit 2) in which he states:

> *This is to advise you that; proShipLine, Inc. of Houston is authorized by Owners, Suzlon Infrastructure Ltd, to collect freight for SIL account re MV Margaretha Green v.002 Thorold/Ambarli;*

21.9    an e-mail from Raam Kumar of Suzlon to PSL dated 3 October 2006 (see pages 29 to 30) in which PSL is instructed that:

> *Since PSL is acting on behalf of SIL, in all Invoices it should be mentioned "On behalf of Suzlon Infrastructure Ltd"*

21.10   an e-mail from Mr Bangad to the captain of one of the Claimant's vessels dated 17 November 2006 (see page 31 of Exhibit 2) in which he states:

> *This has reference to our discussions regarding operation at Houston and other ports of loading in USA south America.......*

13

*As regards the operations and other deliverables expected of you the same are as under:*

*quick turnaround of the vessels*
*best possible stowage for maximum cargo intake keeping in mind fast discharge*
*best possible cost efficiency*

*and for delivering the above you will be required to liaise with following companies/persons:*

*proshipline (Our sales agents in USA);*

21.11    an e-mail from Mr Bangad to PSL dated 12 December 2006 (see page 32 of Exhibit 2) (responding to a request from PSL for approval for payment of an invoice) in which Mr Bangad states that:

> *Brokerage invoices may be settled immediately upon receipt of freight and as per the terms of the booking note. You don't need our approval for payment of brokerage as long as freight is fully collected and brokerage is being paid on collected freight.*

21.12    an exchange of e-mails between Mr Bangad and Roger Clark over the period 19 to 20 April 2007 concerning implementation of a code of conduct to promote a better business relationship between Aspen and PSL and which specified that *"all communication re SIL service will now include a Suzlon banner at the top and PSL will be listed as agent on behalf"* (see pages 33 to 34 of Exhibit 2);

21.13    an e-mail sent by Mr Bangad on 9 August 2007 (see pages 35 to 38 of Exhibit 2) (apparently to those who had booked cargoes through PSL on the *MV Margaretha Green*) stating that *"the Proshipline is no longer our agent in Houston, USA, with effect from 31st of August [sic] 07 and do not have authority anymore to either release/sign bills of lading or collect freight or perform any other function performed till now"*;

21.14    the bundle of PSL invoices in respect of agency fees (commission) payable in accordance with the terms of the Agreement delivered to Aspen over the period November 2006 to July 2007 (see pages 39 to 66 of Exhibit 2), some of which recite that PSL was the agent for Aspen;

21.15    a selection of PSL invoices (provided to Aspen as part of PSL's regular provision of information) in respect of third-party charges, and discharged by PSL at Aspen's request, which recite that PSL was the agent for Aspen (see pages 67 to 76 of Exhibit 2);

21.16   an exchange of e-mails between Raam Kumar and Jessie Baiza on 8 March 2007 (see page 77 of Exhibit 2) in which Mr Kumar wrote:

> *Dear Sirs,*
>
> *Kindly arrange to send scan copies of PSL Agency fees billed on SIL as on date & the basis and workings for the same*

22     With respect to the various services performed by PSL as agent for Aspen (as more particularly described in paragraph 21 above) I also draw the Tribunal's attention to the following documents included in Exhibit 2:

22.1   documents evidencing PSL's appointment of third party booking agents (Kilindini Shipping and International Maritime Services srl) for cargoes to be carried on Beluga vessels chartered by Aspen and PSL's appointment of third party agents for the handling of vessels or to act as port captain for the loading or discharge of cargoes (General Maritime Agency and Capt Fred Sheikh) (see pages 78 to 87 of Exhibit 2);

22.2   sample booking notes, bills of lading, and letters of authorisation from Ship Masters to PSL (see pages 88 to 127 of Exhibit 2);

22.3   e-mails evidencing the approval by Mr Bangad or Capt Gupta of contract terms which PSL had negotiated with third parties (see pages 128 to 150 of Exhibit 2);

22.4   documents evidencing enquiries made of PSL from freight forwarders and quotations for freight charges given by PSL (see pages 151 to 178);

22.5   documents concerning AMS filings for vessels chartered by Aspen (pages 179 to 182 of Exhibit 2);

22.6   documents evidencing communications with (or in respect of) captains of ships chartered by Aspen (see pages 183 to 193 of Exhibit 2);

22.7   communications between PSL and Aspen (Mr Bangad or Capt Gupta) with respect to vessel schedules (see pages 194 to 195 of Exhibit 2); and

22.8   communications between PSL and (amongst others) Aspen concerning terminal arrangements and stevedoring (see pages 196 to 208 of Exhibit 2).

15

23    From all of the above it can be seen that Aspen clearly regarded PSL (and not EP-Team) as its agent under the Agreement, and that it conducted itself toward PSL and third parties in a manner that is consistent only with there being an agency agreement between it and PSL. By way of one final illustration of the point made, I draw the Tribunal's attention to an e-mail exchange between Mr Bangad and PSL dated 10 August 2006 (see pages 209 to 210 of Exhibit 2) in which Mr Bangad complains that EP-Team has been named as the shipper in relation to some turbines booked on board one of the vessels chartered by Aspen. He goes on to say that "...*this will unnecessarily confuse the situation and create doubts in the minds of people. Why is it done in this way? Please henceforth have my explicit confirmation before booking any cargo in the name of associate or related companies because I want to sa[v]e potential trouble*". In fact, as can be seen from PSL's response, the explanation for this discrepancy was that EP-Team had booked freight through PSL as a customer, in the same way as any other third party might do.

### Observations upon the Evidence of Mr Bangad contained in his Second Affidavit of 13 March 2008.

24    At paragraph 14 of his affidavit, Mr Bangad states that "at no time" did the Claimant receive notice of any assignment. By way of response to this statement, I draw particular attention to EP-Team's letter to Mr Bangad of 25 April 2006, to EP-Team's e-mail to Mr Bangad of 3 May 2006, and to Mr Kumar's e-mail to Mr Buhl of 4 May 2006, all referred to at paragraphs 13 and 15 above. I note that Mr Bangad disputes having received the letter of 25 April 2006, as well as the authenticity of such letter (paragraph 16 of Mr Bangad's affidavit). Given this position, it may assist the Tribunal if I provide the Tribunal with further details of the surrounding circumstances at the time when the letter was prepared. In any event, if the Tribunal accepts Mr Bangad's evidence on this point, EP-Team will rely upon the e-mail to Mr Bangad of 3 May 2006 and Mr Kumar's reply.

25    Mr Bangad makes the point (paragraphs 18 and 19 of his affidavit) that the notice of assignment contained in EP-Team's letter of 25 April 2006 was sent at a time when PSL had not yet been incorporated. Mr Bangad was advised that PSL was in the process of formation and registration. There would have been no purpose in registering a company, whose only function was to serve as exclusive agent for Aspen, had the Agreement not been signed and had PSL not then been substituted for EP-Team as agent under the Agreement. I accept on behalf of EP-Team that as at 25 April 2006 PSL had not yet been incorporated, although the necessary papers

16

were in the process of being filed with the State of Nevada authorities. However Mr Bangad was well aware that PSL staff and systems were in place to commence performance under the Agreement as soon as the formalities connected to incorporation had been completed. Further and in any event, by the time of the e-mail to Mr Bangad at 9:53pm on 3 May 2006 and of Mr Kumar's reply of 4 May 2006, the incorporation of PSL had been completed (see the Corporate Charter and Articles of Incorporation of PSL referred to at paragraph 11 above).

26      At paragraph 25 of his affidavit, Mr Bangad contends that Aspen did not consent to a novation of the agreement or to any arrangement whereby PSL would replace EP-Team as counterparty to the Agreement. At paragraph 26 of his affidavit, Mr Bangad contends that in its dealings with Aspen, PSL was under the control of EP-Team and/or that PSL acted as EP-Team's agent or sub-contractor. I believe that the facts and documentation referred to above demonstrate that this was not the case and that, on the contrary, there was a direct contractual relationship between Aspen and PSL (and not between Aspen and EP-Team) as evidenced (inter alia) by the delivery to and payment of PSL invoices by Aspen, by the making of third party contracts by PSL expressly as agent on behalf of Aspen, and by Aspen holding out PSL as its agent to third parties on numerous occasions.

27      For the avoidance of doubt, I confirm that there was no agreement between EP-Team and PSL pursuant to which PSL was sub-contracted to EP-Team, or by which EP-Team appointed PSL to be its sub-agent, to perform the services as Aspen's agent under the Agreement. Further, EP-Team did not receive any benefit from the Agreement by receiving any of the freight charges payable by Aspen's consignors or any of the agency fees payable by Aspen, and it has no claim or entitlement to recover any part of those fees from PSL. EP-Team received none of the agency fees payable by Aspen to its agent under the Agreement, and never invoiced Aspen for any such fees.

**APPLICATIONS NO. 1 AND 2**

28      I am advised by EP-Team's lawyers that, by Application No. 1, Aspen asks the Tribunal to order EP-Team to provide Aspen with all the books and records relating to the Agreement, and that by Application No. 2 Aspen asks the Tribunal to order EP-Team to provide Aspen with all bank statements and/or a full accounting of all transactions relating to the bank account which Aspen acknowledges was "set up" by PSL with Bank of America bearing the account number 4880 0043 9656, and "all supporting documents". EP-Team's position is that, by reason of the events described above, it did not conduct business as the Claimant's agent. It therefore

17

has no books or records relating to such business. The documents contained at Exhibit 2 evidence the fact that it was PSL and not EP-Team that acted as Aspen's agent. In relation to Aspen's specific request concerning details of the bank account into which money was received and out of which disbursements were made in connection with the Claimant's business, it may assist the tribunal if I set out below details of PSL's banking arrangements as described to me by PSL's General Manager, Jessie Baiza.

**PSL's Impress Account**

29    Following its incorporation, PSL opened two bank accounts with Bank of America, an "own account" into which and from which its own money was paid, and an account referred to as "the Impress Account". The latter is an account into which were paid freight charges collected by PSL for services performed for third parties as agent for and on behalf of Aspen in respect of shipments of east-bound cargoes.

30    In accordance with instructions from Aspen, PSL sent to Capt Gupta details of each of the potential cargo shipments it had managed to negotiate for shipment from the United States, Canada and elsewhere on the vessels chartered by Aspen, and did not commit the Claimant to any particular contract of carriage without prior approval from Aspen or its designated "alter ego" Capt Gupta. Once a booking note had been issued by PSL, accepted by the booking party (a majority of the time it was the shipper or their agent/broker who booked the freight), and duly signed by both parties, the booking terms were that ocean-freight was due five days after departure of the vessel. All moneys had to be received prior to arrival of the vessel at the destination port, in order for the release of Bills of Lading. The consignee was required to produce evidence of payment to effect formal release by the vessel and receipt by the consignee of cargoes shipped. This practice was adhered to by PSL. Any deviation was authorised by Aspen (Mr Kumar or Mr Bangad) or by Capt Gupta (who was authorized by Mr Bangad for such matters). The freight charges, when received, were credited to and paid into the Impress Account. PSL paid from the Impress Account third party invoices which Aspen specifically requested it to pay, such as bunker fuel charges, terminal and stevedoring fees, port fees and tug fees incurred by the Claimant in connection with the voyages of the vessels it had chartered to the USA and other locations, as well as fees incurred at remote locations and ports for services such as port fees, stevedoring, heavy lift charges and dunnage). PSL imposed an "administration and transfer fee" of US$ 250 for implementing each such request, which Aspen always

18

deemed to be "urgent" (see by way of example a selection of these invoices sent regularly by email to Aspen at pages 211 to 214 of Exhibit 2).

31    All of the invoices which PSL issued to Aspen in respect of PSL's agency fees were generated from information contained in statements of account delivered monthly to Aspen for review and approval. Each statement of account was intended to show the profitability of a particular vessel voyage after taking into account all of the costs of that voyage. A calculation of the amount of the agency fee was provided with each invoice, and the agency fee amounts were debited to the Impress Account. PSL did not receive invoices of some costs associated with the discharge of the cargoes on arrival at the port on eastbound voyages, and estimated those costs based on what PSL knew to be the market cost. Although upon completion of the voyage of a particular vessel Aspen was free to review the statement of account and provide copies of all invoices not held by PSL in order to require the adjustment of any agency invoice to reflect an accurate and fair calculation, Aspen never questioned the amount of any invoice for agency fees. Once drawn up, PSL's agency fee invoices were either hand delivered (see emails and attached spreadsheets dated 31 October 2006 and 11 January 2007 at pages 215 to 224 of Exhibit 2 (and related invoices at pages 39, 41, 44 and 49 of Exhibit 2)) or were sent to Aspen first as scanned copies by email to Mr Kumar, copied to Mr Bangad, and then, later, as paper copies as part of PSL's routine provision of hard copies of documents relating to the services it performed under the Agreement. In a Declaration filed by him in proceedings in the United States District Court for the Southern District of New York (Case 07 Civ 10969 (RWS)) Mr Bangad has exhibited these invoices, which he described as "true and correct copies of invoices received from ProShipLine for agency fees attendant to each vessel voyage", and that "[t]he invoices were sent by ProShipLine" (paragraph 13 of that Declaration). The invoices he has exhibited and verified as true and correct copies of invoices Aspen received from PSL are the same as the invoices at pages 39 to 62 of Exhibit 2, although the 4 invoices dated either 27 July 2007 or 31 July 2007 (which appear at pages 63 to 66 of Exhibit 2) are not included in Mr Bangad's exhibit.

32    For the reasons already given, neither EP-Team nor any of its designated corporate officers is or at any time has been an account holder of, or has been authorised to give instructions on behalf of EP-Team relating to transactions affecting, any bank accounts into which monies relating to Aspen's business have been paid. Although Neil Johnson and I have been authorised signatories to that account, this was solely in our capacities as members of the Board of Directors of PSL (and not in our

19

capacities as directors of EP-Team). It is PSL and not EP-Team who acted as Aspen's agent and (as has been confirmed to me by Jessie Baiza), not surprisingly, it is PSL with whom Aspen dealt in relation to all financial matters relating to Aspen's business. This is, of course, a circumstance well known to Aspen and I refer by way of example to the following documents contained at Exhibit 2:

32.1    e-mail from Mr Bangad to Jessie Baiza of PSL dated 14 July 2006 (see page 225 of Exhibit 2):

> *"Dear Jessie, Please let us have the account statement first thing in the morning as we are in bad shape for cash"*

32.2    e-mail from Raam Kumar of Suzlon to PSL (and copied to Mr Bangad) dated 23 January 2007 (see pages 226 to 227 of Exhibit 2):

> *"With receipt of the SIL Impress Accounts Statement as on 26 Dec 06 in your New Accounting System. Seems to be much more informative & many thanks for the effort taken by your team...*
>
> *Since PSL is following an Impress Account of [the Claimant]'s funds, its imperative that [the Claimant] has to account for each & every transaction incurred by PSL.*

- *So every bill copy is needed at our end (Preferably Original)*
- *In case Original is needed at your end (Please confirm), then undertaking letter by PSL is required.*
- *Scan Copy of bills and Sales Invoice are sent to SIL every week.*
- *Date of payment & receipts is to be mentioned."*

32.3    e-mail from Raam Kumar of Suzlon to PSL (copied to Mr Bangad) dated 27 February 2007 (see page 228 of Exhibit 2):

> *"Further in line with various mails regarding the information's & documentations required with respect to the SIL Impress Accounting System maintained by PSL, the following records are needed on PRIORITY immediately.*
>
> *SIL needs to capture each & every transactions incurred by PSL...*
>
> *Please find below the requirements priority wise.*
>
> *1. List of all Party details (Creditors &Debtors) -- **Note: As per attached Format***
>
> *2. Impress bank account statements as on date.*
>
> *3. Statement of Accounts for the period ended 28 Feb 07.*
>
> *4. All Original Bill copies (Expenses & Sales invoices)"*

32.4    e-mail from Raam Kumar to Jessie Baiza dated 8 March 2007 (referred to in paragraph 21.16 above in which Mr Kumar wrote:

*Dear Sirs,*

*Kindly arrange to send scan copies of PSL Agency fees billed on SIL as on date & the basis and workings for the same*

33    I am also advised by EP-Team's lawyers that by Application No. 2 Aspen asks the Tribunal to order EP-Team forthwith to pay the balance of the monies currently standing in the Impress Account to Aspen. As I have already explained, EP-Team did not collect or receive any monies from third parties who consigned cargoes for shipment on vessels chartered by Aspen, and accordingly no such monies have at any time been within its control or power. As I have also already explained, EP-Team has no authority or power to give any instructions in relation to any transactions affecting the Impress Account, and in particular has no authority or power to instruct PSL's bankers, Bank of America, to make any payments from the Impress Account. Equally, because PSL (in fulfilling its role as agent of Aspen under the Agreement) was neither the agent nor the sub-contractor of EP-Team, EP-Team has no entitlement or power to instruct PSL to make any transfer out of the Impress Account.

**The Respondent's Relationship with PSL**

34    PSL is not a subsidiary of EP-Team, nor is it EP-Team's agent or sub-contractor. The shares of both PSL and EP-Team are owned by the same holding company but this is the only nexus between the two companies. In the event that the Tribunal were to order EP-Team to produce information or documents held by PSL it would not be within the power of EP-Team to comply with such order without the co-operation and agreement of PSL.

**Observations upon the Evidence of Mr Bangad contained in his First Affidavit of 13 March 2008**

35    I draw to the Tribunal's attention Mr Bangad's admission (paragraph 10 of his affidavit) that the Impress Account is "held by PSL". As already stated, EP-Team has no right of access to the funds in that account, nor any control over the account, and has no right of action or claim against PSL in respect of monies held in the account

**CONCLUSIONS**

21

36    In light of all of the above facts and circumstances, I believe it to be clear that although the Agreement was signed by EP-Team, very shortly afterwards and by agreement with Aspen, PSL was substituted for EP-Team as Aspen's agent and EP-Team was discharged from any contractual obligations. In its dealings with PSL and with third parties, from 3 or 4 May 2006 onwards Aspen conducted itself in a manner wholly consistent with this position, and wholly inconsistent with EP-Team continuing to be its agent or to have any responsibilities under the Agreement. With Aspen's full knowledge and consent the entire performance of duties and services under the Agreement (including the opening of and control of the Impress Account) was carried out by PSL as Aspen's agent. As a result, Aspen has no cause of action against EP-Team in respect of the claims advanced in these proceedings.

**Claimant's Application for Dismissal**

35.    On the basis of the facts set out above, I ask that the Tribunal make an award dismissing Aspen's claims. I am advised by EP-Team's lawyers that, in the event that EP-Team is successful in relation to any one of the three issues identified in Aspen's Application No. 3, the Tribunal is entitled to make such an award pursuant to Article 32(1) and/or Article 34(2) of the UNCITRAL Arbitration Rules and/or Secton 2 and/or Section 12(5) and/or Section 19A of the International Arbitration Act. I also ask that the Tribunal make an award of costs in EP-Team's favour.

SWORN by the above-named          )

**DAVID RAYMOND PULK** on this    )

18th day of April 2008 at    )

Texas, United States of America     )



TraceyLynn E McElhone
MY Commission Expires
11/12/2008

Before me

on 18 April 2008

A NOTARY PUBLIC at 3700 Forums Drive
Suite 201
Flower Mound, TX 75022
U.S.A.

22